(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL FEDERATION OF INDEPENDENT BUSINESS ET AL. *v.* SEBELIUS, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 11–393. Argued March 26, 27, 28, 2012—Decided June 28, 2012*

In 2010, Congress enacted the Patient Protection and Affordable Care Act in order to increase the number of Americans covered by health insurance and decrease the cost of health care. One key provision is the individual mandate, which requires most Americans to maintain "minimum essential" health insurance coverage. 26 U. S. C. §5000A. For individuals who are not exempt, and who do not receive health insurance through an employer or government program, the means of satisfying the requirement is to purchase insurance from a private company. Beginning in 2014, those who do not comply with the mandate must make a "[s]hared responsibility payment" to the Federal Government. §5000A(b)(1). The Act provides that this "penalty" will be paid to the Internal Revenue Service with an individual's taxes, and "shall be assessed and collected in the same manner" as tax penalties. §§5000A(c), (g)(1).

Another key provision of the Act is the Medicaid expansion. The current Medicaid program offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care. 42 U. S. C. §1396d(a). The Affordable Care Act expands the scope of the Medicaid program and increases the number of individuals the States must cover. For ex-

——————

*Together with No. 11–398, *Department of Health and Human Services et al.* v. *Florida et al.,* and No. 11–400, *Florida et al.* v. *Department of Health and Human Services et al.,* also on certiorari to the same court.

ample, the Act requires state programs to provide Medicaid coverage by 2014 to adults with incomes up to 133 percent of the federal poverty level, whereas many States now cover adults with children only if their income is considerably lower, and do not cover childless adults at all. §1396a(a)(10)(A)(i)(VIII). The Act increases federal funding to cover the States' costs in expanding Medicaid coverage. §1396d(y)(1). But if a State does not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds. §1396c.

Twenty-six States, several individuals, and the National Federation of Independent Business brought suit in Federal District Court, challenging the constitutionality of the individual mandate and the Medicaid expansion. The Court of Appeals for the Eleventh Circuit upheld the Medicaid expansion as a valid exercise of Congress's spending power, but concluded that Congress lacked authority to enact the individual mandate. Finding the mandate severable from the Act's other provisions, the Eleventh Circuit left the rest of the Act intact.

*Held:* The judgment is affirmed in part and reversed in part.

648 F. 3d 1235, affirmed in part and reversed in part.

1. CHIEF JUSTICE ROBERTS delivered the opinion of the Court with respect to Part II, concluding that the Anti-Injunction Act does not bar this suit.

The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person," 26 U. S. C. §7421(a), so that those subject to a tax must first pay it and then sue for a refund. The present challenge seeks to restrain the collection of the shared responsibility payment from those who do not comply with the individual mandate. But Congress did not intend the payment to be treated as a "tax" for purposes of the Anti-Injunction Act. The Affordable Care Act describes the payment as a "penalty," not a "tax." That label cannot control whether the payment is a tax for purposes of the Constitution, but it does determine the application of the Anti-Injunction Act. The Anti-Injunction Act therefore does not bar this suit. Pp. 11–15.

2. CHIEF JUSTICE ROBERTS concluded in Part III–A that the individual mandate is not a valid exercise of Congress's power under the Commerce Clause and the Necessary and Proper Clause. Pp. 16–30.

(a) The Constitution grants Congress the power to "*regulate* Commerce." Art. I, §8, cl. 3 (emphasis added). The power to *regulate* commerce presupposes the existence of commercial activity to be regulated. This Court's precedent reflects this understanding: As expansive as this Court's cases construing the scope of the commerce

power have been, they uniformly describe the power as reaching "activity." *E.g., United States* v. *Lopez*, 514 U. S. 549, 560. The individual mandate, however, does not regulate existing commercial activity. It instead compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce.

Construing the Commerce Clause to permit Congress to regulate individuals precisely *because* they are doing nothing would open a new and potentially vast domain to congressional authority. Congress already possesses expansive power to regulate what people do. Upholding the Affordable Care Act under the Commerce Clause would give Congress the same license to regulate what people do not do. The Framers knew the difference between doing something and doing nothing. They gave Congress the power to *regulate* commerce, not to *compel* it. Ignoring that distinction would undermine the principle that the Federal Government is a government of limited and enumerated powers. The individual mandate thus cannot be sustained under Congress's power to "regulate Commerce." Pp. 16–27.

(b) Nor can the individual mandate be sustained under the Necessary and Proper Clause as an integral part of the Affordable Care Act's other reforms. Each of this Court's prior cases upholding laws under that Clause involved exercises of authority derivative of, and in service to, a granted power. *E.g., United States* v. *Comstock*, 560 U. S. ___. The individual mandate, by contrast, vests Congress with the extraordinary ability to create the necessary predicate to the exercise of an enumerated power and draw within its regulatory scope those who would otherwise be outside of it. Even if the individual mandate is "necessary" to the Affordable Care Act's other reforms, such an expansion of federal power is not a "proper" means for making those reforms effective. Pp. 27–30.

3. CHIEF JUSTICE ROBERTS concluded in Part III–B that the individual mandate must be construed as imposing a tax on those who do not have health insurance, if such a construction is reasonable.

The most straightforward reading of the individual mandate is that it commands individuals to purchase insurance. But, for the reasons explained, the Commerce Clause does not give Congress that power. It is therefore necessary to turn to the Government's alternative argument: that the mandate may be upheld as within Congress's power to "lay and collect Taxes." Art. I, §8, cl. 1. In pressing its taxing power argument, the Government asks the Court to view the mandate as imposing a tax on those who do not buy that product. Because "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality," *Hooper* v. *California*, 155 U. S. 648, 657, the question is whether it is "fairly possible" to inter-

pret the mandate as imposing such a tax, *Crowell* v. *Benson*, 285
U. S. 22, 62.  Pp. 31–32.

    4. CHIEF JUSTICE ROBERTS delivered the opinion of the Court with
respect to Part III–C, concluding that the individual mandate may be
upheld as within Congress's power under the Taxing Clause.  Pp. 33–
44.

    (a) The Affordable Care Act describes the "[s]hared responsibility
payment" as a "penalty," not a "tax."  That label is fatal to the appli-
cation of the Anti-Injunction Act.  It does not, however, control
whether an exaction is within Congress's power to tax.  In answering
that constitutional question, this Court follows a functional approach,
"[d]isregarding the designation of the exaction, and viewing its sub-
stance and application."  *United States* v. *Constantine*, 296 U. S. 287,
294.  Pp. 33–35.

    (b) Such an analysis suggests that the shared responsibility
payment may for constitutional purposes be considered a tax.  The
payment is not so high that there is really no choice but to buy health
insurance; the payment is not limited to willful violations, as penal-
ties for unlawful acts often are; and the payment is collected solely by
the IRS through the normal means of taxation.  Cf. *Bailey* v. *Drexel
Furniture Co.*, 259 U. S. 20, 36–37.  None of this is to say that pay-
ment is not intended to induce the purchase of health insurance.  But
the mandate need not be read to declare that failing to do so is un-
lawful.  Neither the Affordable Care Act nor any other law attaches
negative legal consequences to not buying health insurance, beyond
requiring a payment to the IRS.  And Congress's choice of language—
stating that individuals "shall" obtain insurance or pay a "penalty"—
does not require reading §5000A as punishing unlawful conduct.  It
may also be read as imposing a tax on those who go without insur-
ance.  See *New York* v. *United States*, 505 U. S. 144, 169–174.
Pp. 35–40.

    (c) Even if the mandate may reasonably be characterized as a
tax, it must still comply with the Direct Tax Clause, which provides:
"No Capitation, or other direct, Tax shall be laid, unless in Proportion
to the Census or Enumeration herein before directed to be taken."
Art. I, §9, cl. 4.  A tax on going without health insurance is not like a
capitation or other direct tax under this Court's precedents.  It there-
fore need not be apportioned so that each State pays in proportion to
its population.  Pp. 40–41.

    5. CHIEF JUSTICE ROBERTS, joined by JUSTICE BREYER and JUSTICE
KAGAN, concluded in Part IV that the Medicaid expansion violates
the Constitution by threatening States with the loss of their existing
Medicaid funding if they decline to comply with the expansion.
Pp. 45–58.

(a) The Spending Clause grants Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." Art. I, §8, cl. 1. Congress may use this power to establish cooperative state-federal Spending Clause programs. The legitimacy of Spending Clause legislation, however, depends on whether a State voluntarily and knowingly accepts the terms of such programs. *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17. "[T]he Constitution simply does not give Congress the authority to require the States to regulate." *New York* v. *United States*, 505 U. S. 144, 178. When Congress threatens to terminate other grants as a means of pressuring the States to accept a Spending Clause program, the legislation runs counter to this Nation's system of federalism. Cf. *South Dakota* v. *Dole*, 483 U. S. 203, 211. Pp. 45–51.

(b) Section 1396c gives the Secretary of Health and Human Services the authority to penalize States that choose not to participate in the Medicaid expansion by taking away their existing Medicaid funding. 42 U. S. C. §1396c. The threatened loss of over 10 percent of a State's overall budget is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion. The Government claims that the expansion is properly viewed as only a modification of the existing program, and that this modification is permissible because Congress reserved the "right to alter, amend, or repeal any provision" of Medicaid. §1304. But the expansion accomplishes a shift in kind, not merely degree. The original program was designed to cover medical services for particular categories of vulnerable individuals. Under the Affordable Care Act, Medicaid is transformed into a program to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level. A State could hardly anticipate that Congress's reservation of the right to "alter" or "amend" the Medicaid program included the power to transform it so dramatically. The Medicaid expansion thus violates the Constitution by threatening States with the loss of their existing Medicaid funding if they decline to comply with the expansion. Pp. 51–55.

(c) The constitutional violation is fully remedied by precluding the Secretary from applying §1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion. See §1303. The other provisions of the Affordable Care Act are not affected. Congress would have wanted the rest of the Act to stand, had it known that States would have a genuine choice whether to participate in the Medicaid expansion. Pp. 55–58.

6. JUSTICE GINSBURG, joined by JUSTICE SOTOMAYOR, is of the view that the Spending Clause does not preclude the Secretary from withholding Medicaid funds based on a State's refusal to comply with the

expanded Medicaid program. But given the majority view, she agrees with THE CHIEF JUSTICE's conclusion in Part IV–B that the Medicaid Act's severability clause, 42 U. S. C. §1303, determines the appropriate remedy. Because THE CHIEF JUSTICE finds the withholding—not the granting—of federal funds incompatible with the Spending Clause, Congress' extension of Medicaid remains available to any State that affirms its willingness to participate. Even absent §1303's command, the Court would have no warrant to invalidate the funding offered by the Medicaid expansion, and surely no basis to tear down the ACA in its entirety. When a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislation. See, *e.g., Ayotte* v. *Planned Parenthood of Northern New Eng.,* 546 U. S. 320, 328–330. Pp. 60–61.

ROBERTS, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–C, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined; an opinion with respect to Part IV, in which BREYER and KAGAN, JJ., joined; and an opinion with respect to Parts III–A, III–B, and III–D. GINSBURG, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which SOTOMAYOR, J., joined, and in which BREYER and KAGAN, JJ., joined as to Parts I, II, III, and IV. SCALIA, KENNEDY, THOMAS, and ALITO, JJ., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 11–393, 11–398 and 11–400

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, ET AL., PETITIONERS
11–393                  *v.*
KATHLEEN SEBELIUS, SECRETARY OF HEALTH
AND HUMAN SERVICES, ET AL.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL., PETITIONERS
11–398                  *v.*
FLORIDA ET AL.

FLORIDA, ET AL., PETITIONERS
11–400                  *v.*
DEPARTMENT OF HEALTH AND
HUMAN SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 28, 2012]

CHIEF JUSTICE ROBERTS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–C, an opinion with respect to Part IV, in which JUSTICE BREYER and JUSTICE KAGAN join, and an opinion with respect to Parts III–A, III–B, and III–D.

Today we resolve constitutional challenges to two provisions of the Patient Protection and Affordable Care Act of

2010: the individual mandate, which requires individuals to purchase a health insurance policy providing a minimum level of coverage; and the Medicaid expansion, which gives funds to the States on the condition that they provide specified health care to all citizens whose income falls below a certain threshold. We do not consider whether the Act embodies sound policies. That judgment is entrusted to the Nation's elected leaders. We ask only whether Congress has the power under the Constitution to enact the challenged provisions.

In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "is perpetually arising, and will probably continue to arise, as long as our system shall exist." *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819). In this case we must again determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess. Resolving this controversy requires us to examine both the limits of the Government's power, and our own limited role in policing those boundaries.

The Federal Government "is acknowledged by all to be one of enumerated powers." *Ibid.* That is, rather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers. Congress may, for example, "coin Money," "establish Post Offices," and "raise and support Armies." Art. I, §8, cls. 5, 7, 12. The enumeration of powers is also a limitation of powers, because "[t]he enumeration presupposes something not enumerated." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195 (1824). The Constitution's express conferral of some powers makes clear that it does not grant others. And the Federal

Government "can exercise only the powers granted to it." *McCulloch*, *supra*, at 405.

Today, the restrictions on government power foremost in many Americans' minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.

Indeed, the Constitution did not initially include a Bill of Rights at least partly because the Framers felt the enumeration of powers sufficed to restrain the Government. As Alexander Hamilton put it, "the Constitution is itself, in every rational sense, and to every useful purpose, A BILL OF RIGHTS." The Federalist No. 84, p. 515 (C. Rossiter ed. 1961). And when the Bill of Rights was ratified, it made express what the enumeration of powers necessarily implied: "The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10. The Federal Government has expanded dramatically over the past two centuries, but it still must show that a constitutional grant of power authorizes each of its actions. See, *e.g., United States* v. *Comstock*, 560 U. S. \_\_\_ (2010).

The same does not apply to the States, because the Constitution is not the source of their power. The Constitution may restrict state governments—as it does, for example, by forbidding them to deny any person the equal protection of the laws. But where such prohibitions do not apply, state governments do not need constitutional authorization to act. The States thus can and do perform many of the vital functions of modern government— punishing street crime, running public schools, and zoning property for development, to name but a few—even though

the Constitution's text does not authorize any government
to do so. Our cases refer to this general power of govern-
ing, possessed by the States but not by the Federal Gov-
ernment, as the "police power." See, *e.g., United States* v.
*Morrison*, 529 U. S. 598, 618–619 (2000).

"State sovereignty is not just an end in itself: Rather,
federalism secures to citizens the liberties that derive from
the diffusion of sovereign power." *New York* v. *United
States*, 505 U. S. 144, 181 (1992) (internal quotation
marks omitted). Because the police power is controlled by
50 different States instead of one national sovereign, the
facets of governing that touch on citizens' daily lives are
normally administered by smaller governments closer to
the governed. The Framers thus ensured that powers
which "in the ordinary course of affairs, concern the lives,
liberties, and properties of the people" were held by gov-
ernments more local and more accountable than a dis-
tant federal bureaucracy. The Federalist No. 45, at 293
(J. Madison). The independent power of the States also
serves as a check on the power of the Federal Government:
"By denying any one government complete jurisdiction
over all the concerns of public life, federalism protects the
liberty of the individual from arbitrary power." *Bond* v.
*United States*, 564 U. S. ___, ___ (2011) (slip op., at 9–10).

This case concerns two powers that the Constitution
does grant the Federal Government, but which must be
read carefully to avoid creating a general federal authority
akin to the police power. The Constitution authorizes
Congress to "regulate Commerce with foreign Nations, and
among the several States, and with the Indian Tribes."
Art. I, §8, cl. 3. Our precedents read that to mean that
Congress may regulate "the channels of interstate com-
merce," "persons or things in interstate commerce," and
"those activities that substantially affect interstate com-
merce." *Morrison, supra*, at 609 (internal quotation marks
omitted). The power over activities that substantially

affect interstate commerce can be expansive.  That power has been held to authorize federal regulation of such seemingly local matters as a farmer's decision to grow wheat for himself and his livestock, and a loan shark's extortionate collections from a neighborhood butcher shop. See *Wickard* v. *Filburn*, 317 U. S. 111 (1942); *Perez* v. *United States*, 402 U. S. 146 (1971).

Congress may also "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U. S. Const., Art. I, §8, cl. 1.  Put simply, Congress may tax and spend.  This grant gives the Federal Government considerable influence even in areas where it cannot directly regulate.  The Federal Government may enact a tax on an activity that it cannot authorize, forbid, or otherwise control.  See, *e.g., License Tax Cases*, 5 Wall. 462, 471 (1867).  And in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions.  See, *e.g., College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 686 (1999).  These offers may well induce the States to adopt policies that the Federal Government itself could not impose.  See, *e.g., South Dakota* v. *Dole*, 483 U. S. 203, 205–206 (1987) (conditioning federal highway funds on States raising their drinking age to 21).

The reach of the Federal Government's enumerated powers is broader still because the Constitution authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Art. I, §8, cl. 18.  We have long read this provision to give Congress great latitude in exercising its powers: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are

constitutional." *McCulloch*, 4 Wheat., at 421.

Our permissive reading of these powers is explained in part by a general reticence to invalidate the acts of the Nation's elected leaders. "Proper respect for a co-ordinate branch of the government" requires that we strike down an Act of Congress only if "the lack of constitutional authority to pass [the] act in question is clearly demonstrated." *United States* v. *Harris*, 106 U. S. 629, 635 (1883). Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices.

Our deference in matters of policy cannot, however, become abdication in matters of law. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury* v. *Madison*, 1 Cranch 137, 176 (1803). Our respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed. "The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional." Chief Justice John Marshall, A Friend of the Constitution No. V, Alexandria Gazette, July 5, 1819, in John Marshall's Defense of *McCulloch* v. *Maryland* 190–191 (G. Gunther ed. 1969). And there can be no question that it is the responsibility of this Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits. *Marbury* v. *Madison*, *supra*, at 175–176.

The questions before us must be considered against the background of these basic principles.

I

In 2010, Congress enacted the Patient Protection and Affordable Care Act, 124 Stat. 119. The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care. The Act's 10 titles stretch over 900 pages and contain hundreds of provisions. This case concerns constitutional challenges to two key provisions, commonly referred to as the individual mandate and the Medicaid expansion.

The individual mandate requires most Americans to maintain "minimum essential" health insurance coverage. 26 U. S. C. §5000A. The mandate does not apply to some individuals, such as prisoners and undocumented aliens. §5000A(d). Many individuals will receive the required coverage through their employer, or from a government program such as Medicaid or Medicare. See §5000A(f). But for individuals who are not exempt and do not receive health insurance through a third party, the means of satisfying the requirement is to purchase insurance from a private company.

Beginning in 2014, those who do not comply with the mandate must make a "[s]hared responsibility payment" to the Federal Government. §5000A(b)(1). That payment, which the Act describes as a "penalty," is calculated as a percentage of household income, subject to a floor based on a specified dollar amount and a ceiling based on the average annual premium the individual would have to pay for qualifying private health insurance. §5000A(c). In 2016, for example, the penalty will be 2.5 percent of an individual's household income, but no less than $695 and no more than the average yearly premium for insurance that covers 60 percent of the cost of 10 specified services (*e.g.,* prescription drugs and hospitalization). *Ibid.*; 42 U. S. C. §18022. The Act provides that the penalty will be paid to the Internal Revenue Service with an individual's taxes, and "shall be assessed and collected in the same manner"

as tax penalties, such as the penalty for claiming too
large an income tax refund.  26 U. S. C. §5000A(g)(1).  The
Act, however, bars the IRS from using several of its nor-
mal enforcement tools, such as criminal prosecutions and
levies.  §5000A(g)(2).  And some individuals who are sub-
ject to the mandate are nonetheless exempt from the
penalty—for example, those with income below a certain
threshold and members of Indian tribes.  §5000A(e).

  On the day the President signed the Act into law, Flor-
ida and 12 other States filed a complaint in the Federal
District Court for the Northern District of Florida.  Those
plaintiffs—who are both respondents and petitioners here,
depending on the issue—were subsequently joined by 13
more States, several individuals, and the National Fed-
eration of Independent Business.  The plaintiffs alleged,
among other things, that the individual mandate provi-
sions of the Act exceeded Congress's powers under Article
I of the Constitution.  The District Court agreed, holding
that Congress lacked constitutional power to enact the
individual mandate.  780 F. Supp. 2d 1256 (ND Fla. 2011).
The District Court determined that the individual man-
date could not be severed from the remainder of the Act,
and therefore struck down the Act in its entirety.  *Id.*, at
1305–1306.

  The Court of Appeals for the Eleventh Circuit affirmed
in part and reversed in part.  The court affirmed the Dis-
trict Court's holding that the individual mandate exceeds
Congress's power.  648 F. 3d 1235 (2011).  The panel
unanimously agreed that the individual mandate did not
impose a tax, and thus could not be authorized by Con-
gress's power to "lay and collect Taxes."  U. S. Const.,
Art. I, §8, cl. 1.  A majority also held that the individual
mandate was not supported by Congress's power to "regu-
late Commerce . . . among the several States."  *Id.,* cl. 3.
According to the majority, the Commerce Clause does not
empower the Federal Government to order individuals to

engage in commerce, and the Government's efforts to cast the individual mandate in a different light were unpersuasive. Judge Marcus dissented, reasoning that the individual mandate regulates economic activity that has a clear effect on interstate commerce.

Having held the individual mandate to be unconstitutional, the majority examined whether that provision could be severed from the remainder of the Act. The majority determined that, contrary to the District Court's view, it could. The court thus struck down only the individual mandate, leaving the Act's other provisions intact. 648 F. 3d, at 1328.

Other Courts of Appeals have also heard challenges to the individual mandate. The Sixth Circuit and the D. C. Circuit upheld the mandate as a valid exercise of Congress's commerce power. See *Thomas More Law Center* v. *Obama*, 651 F. 3d 529 (CA6 2011); *Seven-Sky* v. *Holder*, 661 F. 3d 1 (CADC 2011). The Fourth Circuit determined that the Anti-Injunction Act prevents courts from considering the merits of that question. See *Liberty Univ., Inc.* v. *Geithner*, 671 F. 3d 391 (2011). That statute bars suits "for the purpose of restraining the assessment or collection of any tax." 26 U. S. C. §7421(a). A majority of the Fourth Circuit panel reasoned that the individual mandate's penalty is a tax within the meaning of the Anti-Injunction Act, because it is a financial assessment collected by the IRS through the normal means of taxation. The majority therefore determined that the plaintiffs could not challenge the individual mandate until after they paid the penalty.[1]

---

[1] The Eleventh Circuit did not consider whether the Anti-Injunction Act bars challenges to the individual mandate. The District Court had determined that it did not, and neither side challenged that holding on appeal. The same was true in the Fourth Circuit, but that court examined the question *sua sponte* because it viewed the Anti-Injunction Act as a limit on its subject matter jurisdiction. See *Liberty Univ.*, 671

The second provision of the Affordable Care Act directly challenged here is the Medicaid expansion. Enacted in 1965, Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care. See 42 U. S. C. §1396a(a)(10). In order to receive that funding, States must comply with federal criteria governing matters such as who receives care and what services are provided at what cost. By 1982 every State had chosen to participate in Medicaid. Federal funds received through the Medicaid program have become a substantial part of state budgets, now constituting over 10 percent of most States' total revenue.

The Affordable Care Act expands the scope of the Medicaid program and increases the number of individuals the States must cover. For example, the Act requires state programs to provide Medicaid coverage to adults with incomes up to 133 percent of the federal poverty level, whereas many States now cover adults with children only if their income is considerably lower, and do not cover childless adults at all. See §1396a(a)(10)(A)(i)(VIII). The Act increases federal funding to cover the States' costs in expanding Medicaid coverage, although States will bear a portion of the costs on their own. §1396d(y)(1). If a State does not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds. See §1396c.

Along with their challenge to the individual mandate, the state plaintiffs in the Eleventh Circuit argued that the Medicaid expansion exceeds Congress's constitutional

_____

F. 3d, at 400–401. The Sixth Circuit and the D. C. Circuit considered the question but determined that the Anti-Injunction Act did not apply. See *Thomas More*, 651 F. 3d, at 539–540 (CA6); *Seven-Sky*, 661 F. 3d, at 5–14 (CADC).

powers. The Court of Appeals unanimously held that the Medicaid expansion is a valid exercise of Congress's power under the Spending Clause. U. S. Const., Art. I, §8, cl. 1. And the court rejected the States' claim that the threatened loss of all federal Medicaid funding violates the Tenth Amendment by coercing them into complying with the Medicaid expansion. 648 F. 3d, at 1264, 1268.

We granted certiorari to review the judgment of the Court of Appeals for the Eleventh Circuit with respect to both the individual mandate and the Medicaid expansion. 565 U. S. \_\_\_ (2011). Because no party supports the Eleventh Circuit's holding that the individual mandate can be completely severed from the remainder of the Affordable Care Act, we appointed an *amicus curiae* to defend that aspect of the judgment below. And because there is a reasonable argument that the Anti-Injunction Act deprives us of jurisdiction to hear challenges to the individual mandate, but no party supports that proposition, we appointed an *amicus curiae* to advance it.[2]

## II

Before turning to the merits, we need to be sure we have the authority to do so. The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U. S. C. §7421(a). This statute protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes. Because of the Anti-Injunction Act, taxes can ordinarily be

---

[2] We appointed H. Bartow Farr III to brief and argue in support of the Eleventh Circuit's judgment with respect to severability, and Robert A. Long to brief and argue the proposition that the Anti-Injunction Act bars the current challenges to the individual mandate. 565 U. S. \_\_\_ (2011). Both *amici* have ably discharged their assigned responsibilities.

challenged only after they are paid, by suing for a refund.
See *Enochs* v. *Williams Packing & Nav. Co.*, 370 U. S. 1,
7–8 (1962).

The penalty for not complying with the Affordable Care
Act's individual mandate first becomes enforceable in
2014.  The present challenge to the mandate thus seeks to
restrain the penalty's future collection.  *Amicus* contends
that the Internal Revenue Code treats the penalty as a
tax, and that the Anti-Injunction Act therefore bars this
suit.

The text of the pertinent statutes suggests otherwise.
The Anti-Injunction Act applies to suits "for the purpose
of restraining the assessment or collection of any *tax*."
§7421(a) (emphasis added).  Congress, however, chose to
describe the "[s]hared responsibility payment" imposed on
those who forgo health insurance not as a "tax," but as a
"penalty."   §§5000A(b), (g)(2).   There is no immediate
reason to think that a statute applying to "any tax" would
apply to a "penalty."

Congress's decision to label this exaction a "penalty"
rather than a "tax" is significant because the Affordable
Care Act describes many other exactions it creates as
"taxes."   See *Thomas More*, 651 F. 3d, at 551.   Where
Congress uses certain language in one part of a statute
and different language in another, it is generally pre-
sumed that Congress acts intentionally.  See *Russello* v.
*United States*, 464 U. S. 16, 23 (1983).

*Amicus* argues that even though Congress did not label
the shared responsibility payment a tax, we should treat it
as such under the Anti-Injunction Act because it functions
like a tax.  It is true that Congress cannot change whether
an exaction is a tax or a penalty for *constitutional* pur-
poses simply by describing it as one or the other.  Congress
may not, for example, expand its power under the Taxing
Clause, or escape the Double Jeopardy Clause's constraint
on criminal sanctions, by labeling a severe financial pun-

ishment a "tax." See *Bailey* v. *Drexel Furniture Co.*, 259
U. S. 20, 36–37 (1922); *Department of Revenue of Mont.* v.
*Kurth Ranch,* 511 U. S. 767, 779 (1994).

The Anti-Injunction Act and the Affordable Care Act,
however, are creatures of Congress's own creation. How
they relate to each other is up to Congress, and the best
evidence of Congress's intent is the statutory text. We
have thus applied the Anti-Injunction Act to statutorily
described "taxes" even where that label was inaccurate.
See *Bailey* v. *George*, 259 U. S. 16 (1922) (Anti-Injunction
Act applies to "Child Labor Tax" struck down as exceeding
Congress's taxing power in *Drexel Furniture*).

Congress can, of course, describe something as a penalty
but direct that it nonetheless be treated as a tax for pur-
poses of the Anti-Injunction Act. For example, 26 U. S. C.
§6671(a) provides that "any reference in this title to 'tax'
imposed by this title shall be deemed also to refer to the
penalties and liabilities provided by" subchapter 68B of
the Internal Revenue Code. Penalties in subchapter 68B
are thus treated as taxes under Title 26, which includes
the Anti-Injunction Act. The individual mandate, how-
ever, is not in subchapter 68B of the Code. Nor does any
other provision state that references to taxes in Title 26
shall also be "deemed" to apply to the individual mandate.

*Amicus* attempts to show that Congress did render the
Anti-Injunction Act applicable to the individual mandate,
albeit by a more circuitous route. Section 5000A(g)(1) spec-
ifies that the penalty for not complying with the man-
date "shall be assessed and collected in the same manner
as an assessable penalty under subchapter B of chapter
68." Assessable penalties in subchapter 68B, in turn,
"shall be assessed and collected in the same manner as
taxes." §6671(a). According to *amicus*, by directing that
the penalty be "assessed and collected in the same man-
ner as taxes," §5000A(g)(1) made the Anti-Injunction Act
applicable to this penalty.

The Government disagrees. It argues that §5000A(g)(1)
does not direct courts to apply the Anti-Injunction Act,
because §5000A(g) is a directive only to the Secretary of
the Treasury to use the same "'methodology and proce-
dures'" to collect the penalty that he uses to collect taxes.
Brief for United States 32–33 (quoting *Seven-Sky*, 661
F. 3d, at 11).

We think the Government has the better reading. As
it observes, "Assessment" and "Collection" are chapters of
the Internal Revenue Code providing the Secretary author-
ity to assess and collect taxes, and generally specifying
the means by which he shall do so. See §6201 (assess-
ment authority); §6301 (collection authority). Section
5000A(g)(1)'s command that the penalty be "assessed and
collected in the same manner" as taxes is best read as
referring to those chapters and giving the Secretary the
same authority and guidance with respect to the penalty.
That interpretation is consistent with the remainder of
§5000A(g), which instructs the Secretary on the tools he
may use to collect the penalty. See §5000A(g)(2)(A) (bar-
ring criminal prosecutions); §5000A(g)(2)(B) (prohibiting
the Secretary from using notices of lien and levies). The
Anti-Injunction Act, by contrast, says nothing about the
procedures to be used in assessing and collecting taxes.

*Amicus* argues in the alternative that a different section
of the Internal Revenue Code requires courts to treat the
penalty as a tax under the Anti-Injunction Act. Section
6201(a) authorizes the Secretary to make "assessments of
all taxes (including interest, additional amounts, additions
to the tax, and *assessable penalties*)." (Emphasis added.)
*Amicus* contends that the penalty must be a tax, because
it is an assessable penalty and §6201(a) says that taxes
include assessable penalties.

That argument has force only if §6201(a) is read in
isolation. The Code contains many provisions treating
taxes and assessable penalties as distinct terms. See, *e.g.,*

§§860(h)(1), 6324A(a), 6601(e)(1)–(2), 6602, 7122(b). There would, for example, be no need for §6671(a) to deem "tax" to refer to certain assessable penalties if the Code already included all such penalties in the term "tax." Indeed, *amicus*'s earlier observation that the Code requires assessable penalties to be assessed and collected "in the same manner as taxes" makes little sense if assessable penalties are themselves taxes. In light of the Code's consistent distinction between the terms "tax" and "assessable penalty," we must accept the Government's interpretation: §6201(a) instructs the Secretary that his authority to assess taxes includes the authority to assess penalties, but it does not equate assessable penalties to taxes for other purposes.

The Affordable Care Act does not require that the penalty for failing to comply with the individual mandate be treated as a tax for purposes of the Anti-Injunction Act. The Anti-Injunction Act therefore does not apply to this suit, and we may proceed to the merits.

## III

The Government advances two theories for the proposition that Congress had constitutional authority to enact the individual mandate. First, the Government argues that Congress had the power to enact the mandate under the Commerce Clause. Under that theory, Congress may order individuals to buy health insurance because the failure to do so affects interstate commerce, and could undercut the Affordable Care Act's other reforms. Second, the Government argues that if the commerce power does not support the mandate, we should nonetheless uphold it as an exercise of Congress's power to tax. According to the Government, even if Congress lacks the power to direct individuals to buy insurance, the only effect of the individual mandate is to raise taxes on those who do not do so, and thus the law may be upheld as a tax.

A

The Government's first argument is that the individual mandate is a valid exercise of Congress's power under the Commerce Clause and the Necessary and Proper Clause. According to the Government, the health care market is characterized by a significant cost-shifting problem. Everyone will eventually need health care at a time and to an extent they cannot predict, but if they do not have insurance, they often will not be able to pay for it. Because state and federal laws nonetheless require hospitals to provide a certain degree of care to individuals without regard to their ability to pay, see, *e.g.,* 42 U. S. C. §1395dd; Fla. Stat. Ann. §395.1041, hospitals end up receiving compensation for only a portion of the services they provide. To recoup the losses, hospitals pass on the cost to insurers through higher rates, and insurers, in turn, pass on the cost to policy holders in the form of higher premiums. Congress estimated that the cost of uncompensated care raises family health insurance premiums, on average, by over $1,000 per year. 42 U. S. C. §18091(2)(F).

In the Affordable Care Act, Congress addressed the problem of those who cannot obtain insurance coverage because of preexisting conditions or other health issues. It did so through the Act's "guaranteed-issue" and "community-rating" provisions. These provisions together prohibit insurance companies from denying coverage to those with such conditions or charging unhealthy individuals higher premiums than healthy individuals. See §§300gg, 300gg–1, 300gg–3, 300gg–4.

The guaranteed-issue and community-rating reforms do not, however, address the issue of healthy individuals who choose not to purchase insurance to cover potential health care needs. In fact, the reforms sharply exacerbate that problem, by providing an incentive for individuals to delay purchasing health insurance until they become sick, relying on the promise of guaranteed and affordable coverage.

The reforms also threaten to impose massive new costs on insurers, who are required to accept unhealthy individuals but prohibited from charging them rates necessary to pay for their coverage. This will lead insurers to significantly increase premiums on everyone. See Brief for America's Health Insurance Plans et al. as *Amici Curiae* in No. 11–393 etc. 8–9.

The individual mandate was Congress's solution to these problems. By requiring that individuals purchase health insurance, the mandate prevents cost-shifting by those who would otherwise go without it. In addition, the mandate forces into the insurance risk pool more healthy individuals, whose premiums on average will be higher than their health care expenses. This allows insurers to subsidize the costs of covering the unhealthy individuals the reforms require them to accept. The Government claims that Congress has power under the Commerce and Necessary and Proper Clauses to enact this solution.

1

The Government contends that the individual mandate is within Congress's power because the failure to purchase insurance "has a substantial and deleterious effect on interstate commerce" by creating the cost-shifting problem. Brief for United States 34. The path of our Commerce Clause decisions has not always run smooth, see *United States* v. *Lopez*, 514 U. S. 549, 552–559 (1995), but it is now well established that Congress has broad authority under the Clause. We have recognized, for example, that "[t]he power of Congress over interstate commerce is not confined to the regulation of commerce among the states," but extends to activities that "have a substantial effect on interstate commerce." *United States* v. *Darby*, 312 U. S. 100, 118–119 (1941). Congress's power, moreover, is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends

to activities that do so only when aggregated with similar activities of others.  See *Wickard*, 317 U. S., at 127–128.

Given its expansive scope, it is no surprise that Congress has employed the commerce power in a wide variety of ways to address the pressing needs of the time.  But Congress has never attempted to rely on that power to compel individuals not engaged in commerce to purchase an unwanted product.[3]  Legislative novelty is not necessarily fatal; there is a first time for everything.  But sometimes "the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent" for Congress's action.  *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. ___, ___ (2010) (slip op., at 25) (internal quotation marks omitted).  At the very least, we should "pause to consider the implications of the Government's arguments" when confronted with such new conceptions of federal power.  *Lopez*, *supra*, at 564.

The Constitution grants Congress the power to "*regulate* Commerce."  Art. I, §8, cl. 3 (emphasis added).  The power to *regulate* commerce presupposes the existence of commercial activity to be regulated.  If the power to "regulate" something included the power to create it, many of the provisions in the Constitution would be superfluous.  For example, the Constitution gives Congress the power to "coin Money," in addition to the power to "regulate the Value thereof."  *Id.,* cl. 5.  And it gives Congress the power

––––––––––

[3] The examples of other congressional mandates cited by JUSTICE GINSBURG, *post*, at 35, n. 10 (opinion concurring in part, concurring in judgment in part, and dissenting in part), are not to the contrary.  Each of those mandates—to report for jury duty, to register for the draft, to purchase firearms in anticipation of militia service, to exchange gold currency for paper currency, and to file a tax return—are based on constitutional provisions other than the Commerce Clause.  See Art. I, §8, cl. 9 (to "constitute Tribunals inferior to the supreme Court"); *id.,* cl. 12 (to "raise and support Armies"); *id.,* cl. 16 (to "provide for organizing, arming, and disciplining, the Militia"); *id.,* cl. 5 (to "coin Money"); *id.,* cl. 1 (to "lay and collect Taxes").

to "raise and support Armies" and to "provide and maintain a Navy," in addition to the power to "make Rules for the Government and Regulation of the land and naval Forces." *Id.,* cls. 12–14. If the power to regulate the armed forces or the value of money included the power to bring the subject of the regulation into existence, the specific grant of such powers would have been unnecessary. The language of the Constitution reflects the natural understanding that the power to regulate assumes there is already something to be regulated. See *Gibbons*, 9 Wheat., at 188 ("[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said").[4]

Our precedent also reflects this understanding. As expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching "activity." It is nearly impossible to avoid the word when quoting them. See, *e.g., Lopez, supra,* at 560 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sus-

——————

[4] JUSTICE GINSBURG suggests that "at the time the Constitution was framed, to 'regulate' meant, among other things, to require action." *Post,* at 23 (citing *Seven-Sky* v. *Holder*, 661 F. 3d 1, 16 (CADC 2011); brackets and some internal quotation marks omitted). But to reach this conclusion, the case cited by JUSTICE GINSBURG relied on a dictionary in which "[t]o order; to command" was the fifth-alternative definition of "to direct," which was itself the second-alternative definition of "to regulate." See *Seven-Sky, supra,* at 16 (citing S. Johnson, Dictionary of the English Language (4th ed. 1773) (reprinted 1978)). It is unlikely that the Framers had such an obscure meaning in mind when they used the word "regulate." Far more commonly, "[t]o regulate" meant "[t]o adjust by rule or method," which presupposes something to adjust. 2 Johnson, *supra,* at 1619; see also *Gibbons*, 9 Wheat., at 196 (defining the commerce power as the power "to prescribe the rule by which commerce is to be governed").

tained"); *Perez*, 402 U. S., at 154 ("Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class" (emphasis in original; internal quotation marks omitted)); *Wickard*, *supra*, at 125 ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37 (1937) ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control"); see also *post*, at 15, 25–26, 28, 32 (GINSBURG, J., concurring in part, concurring in judgment in part, and dissenting in part).[5]

The individual mandate, however, does not regulate existing commercial activity. It instead compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce. Construing the Commerce Clause to permit Congress to regulate individuals precisely *because* they are doing nothing would open a new and potentially vast domain to congressional authority. Every day individuals do not do an infinite number of things. In some cases they

––––––––––

[5] JUSTICE GINSBURG cites two eminent domain cases from the 1890s to support the proposition that our case law does not "toe the activity versus inactivity line." *Post*, at 24–25 (citing *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 335–337 (1893), and *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 657–659 (1890)). The fact that the Fifth Amendment requires the payment of just compensation when the Government exercises its power of eminent domain does not turn the taking into a commercial transaction between the landowner and the Government, let alone a government-compelled transaction between the landowner and a third party.

decide not to do something; in others they simply fail to do it. Allowing Congress to justify federal regulation by pointing to the effect of inaction on commerce would bring countless decisions an individual could *potentially* make within the scope of federal regulation, and—under the Government's theory—empower Congress to make those decisions for him.

Applying the Government's logic to the familiar case of *Wickard* v. *Filburn* shows how far that logic would carry us from the notion of a government of limited powers. In *Wickard*, the Court famously upheld a federal penalty imposed on a farmer for growing wheat for consumption on his own farm. 317 U. S., at 114–115, 128–129. That amount of wheat caused the farmer to exceed his quota under a program designed to support the price of wheat by limiting supply. The Court rejected the farmer's argument that growing wheat for home consumption was beyond the reach of the commerce power. It did so on the ground that the farmer's decision to grow wheat for his own use allowed him to avoid purchasing wheat in the market. That decision, when considered in the aggregate along with similar decisions of others, would have had a substantial effect on the interstate market for wheat. *Id.,* at 127–129.

*Wickard* has long been regarded as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," *Lopez*, 514 U. S., at 560, but the Government's theory in this case would go much further. Under *Wickard* it is within Congress's power to regulate the market for wheat by supporting its price. But price can be supported by increasing demand as well as by decreasing supply. The aggregated decisions of some consumers not to purchase wheat have a substantial effect on the price of wheat, just as decisions not to purchase health insurance have on the price of insurance. Congress can therefore command that those not buying wheat do so, just as it argues here that it may command that those not

buying health insurance do so. The farmer in *Wickard* was at least actively engaged in the production of wheat, and the Government could regulate that activity because of its effect on commerce. The Government's theory here would effectively override that limitation, by establishing that individuals may be regulated under the Commerce Clause whenever enough of them are not doing something the Government would have them do.

Indeed, the Government's logic would justify a mandatory purchase to solve almost any problem. See *Seven-Sky*, 661 F. 3d, at 14–15 (noting the Government's inability to "identify any mandate to purchase a product or service in interstate commerce that would be unconstitutional" under its theory of the commerce power). To consider a different example in the health care market, many Americans do not eat a balanced diet. That group makes up a larger percentage of the total population than those without health insurance. See, *e.g.,* Dept. of Agriculture and Dept. of Health and Human Services, Dietary Guidelines for Americans 1 (2010). The failure of that group to have a healthy diet increases health care costs, to a greater extent than the failure of the uninsured to purchase insurance. See, *e.g.,* Finkelstein, Trogdon, Cohen, & Dietz, Annual Medical Spending Attributable to Obesity: Payer- and Service-Specific Estimates, 28 Health Affairs w822 (2009) (detailing the "undeniable link between rising rates of obesity and rising medical spending," and estimating that "the annual medical burden of obesity has risen to almost 10 percent of all medical spending and could amount to $147 billion per year in 2008"). Those increased costs are borne in part by other Americans who must pay more, just as the uninsured shift costs to the insured. See Center for Applied Ethics, Voluntary Health Risks: Who Should Pay?, 6 Issues in Ethics 6 (1993) (noting "overwhelming evidence that individuals with unhealthy habits pay only a fraction of the costs associated

with their behaviors; most of the expense is borne by the rest of society in the form of higher insurance premiums, government expenditures for health care, and disability benefits"). Congress addressed the insurance problem by ordering everyone to buy insurance. Under the Government's theory, Congress could address the diet problem by ordering everyone to buy vegetables. See Dietary Guidelines, *supra*, at 19 ("Improved nutrition, appropriate eating behaviors, and increased physical activity have tremendous potential to . . . reduce health care costs").

People, for reasons of their own, often fail to do things that would be good for them or good for society. Those failures—joined with the similar failures of others—can readily have a substantial effect on interstate commerce. Under the Government's logic, that authorizes Congress to use its commerce power to compel citizens to act as the Government would have them act.

That is not the country the Framers of our Constitution envisioned. James Madison explained that the Commerce Clause was "an addition which few oppose and from which no apprehensions are entertained." The Federalist No. 45, at 293. While Congress's authority under the Commerce Clause has of course expanded with the growth of the national economy, our cases have "always recognized that the power to regulate commerce, though broad indeed, has limits." *Maryland* v. *Wirtz*, 392 U. S. 183, 196 (1968). The Government's theory would erode those limits, permitting Congress to reach beyond the natural extent of its authority, "everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." The Federalist No. 48, at 309 (J. Madison). Congress already enjoys vast power to regulate much of what we do. Accepting the Government's theory would give Congress the same license to regulate what we do not do, fundamentally changing the relation between the citizen and the Federal

Government.[6]

To an economist, perhaps, there is no difference between activity and inactivity; both have measurable economic effects on commerce. But the distinction between doing something and doing nothing would not have been lost on the Framers, who were "practical statesmen," not metaphysical philosophers. *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 673 (1980) (Rehnquist, J., concurring in judgment). As we have explained, "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take." *South Carolina* v. *United States*, 199 U. S. 437, 449 (1905). The Framers gave Congress the power to *regulate* commerce, not to *compel* it, and for over 200 years both our decisions and Congress's actions have reflected this understanding. There is no reason to depart from that understanding now.

The Government sees things differently. It argues that because sickness and injury are unpredictable but unavoidable, "the uninsured as a class are active in the market for health care, which they regularly seek and obtain." Brief for United States 50. The individual mandate "merely regulates how individuals finance and pay for that

_____

[6] In an attempt to recast the individual mandate as a regulation of commercial activity, JUSTICE GINSBURG suggests that "[a]n individual who opts not to purchase insurance from a private insurer can be seen as actively selecting another form of insurance: self-insurance." *Post*, at 26. But "self-insurance" is, in this context, nothing more than a description of the failure to purchase insurance. Individuals are no more "activ[e] in the self-insurance market" when they fail to purchase insurance, *ibid.*, than they are active in the "rest" market when doing nothing.

active participation—requiring that they do so through insurance, rather than through attempted self-insurance with the back-stop of shifting costs to others." *Ibid.*

The Government repeats the phrase "active in the market for health care" throughout its brief, see *id.,* at 7, 18, 34, 50, but that concept has no constitutional significance. An individual who bought a car two years ago and may buy another in the future is not "active in the car market" in any pertinent sense. The phrase "active in the market" cannot obscure the fact that most of those regulated by the individual mandate are not currently engaged in any commercial activity involving health care, and that fact is fatal to the Government's effort to "regulate the uninsured as a class." *Id.,* at 42. Our precedents recognize Congress's power to regulate "class[es] of *activities,*" *Gonzales* v. *Raich,* 545 U. S. 1, 17 (2005) (emphasis added), not classes of *individuals,* apart from any activity in which they are engaged, see, *e.g., Perez,* 402 U. S., at 153 ("Petitioner is clearly a member of the class which engages in 'extortionate credit transactions' . . ." (emphasis deleted)).

The individual mandate's regulation of the uninsured as a class is, in fact, particularly divorced from any link to existing commercial activity. The mandate primarily affects healthy, often young adults who are less likely to need significant health care and have other priorities for spending their money. It is precisely because these individuals, as an actuarial class, incur relatively low health care costs that the mandate helps counter the effect of forcing insurance companies to cover others who impose greater costs than their premiums are allowed to reflect. See 42 U. S. C. §18091(2)(I) (recognizing that the mandate would "broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums"). If the individual mandate is targeted at a class, it is a class whose commercial inactivity rather than activity is its defining feature.

The Government, however, claims that this does not matter.  The Government regards it as sufficient to trigger Congress's authority that almost all those who are uninsured will, at some unknown point in the future, engage in a health care transaction.  Asserting that "[t]here is no temporal limitation in the Commerce Clause," the Government argues that because "[e]veryone subject to this regulation is in or will be in the health care market," they can be "regulated in advance."  Tr. of Oral Arg. 109 (Mar. 27, 2012).

The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no support in our precedent.  We have said that Congress can anticipate the *effects* on commerce of an economic activity.  See, *e.g., Consolidated Edison Co.* v. *NLRB*, 305 U. S. 197 (1938) (regulating the labor practices of utility companies); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964) (prohibiting discrimination by hotel operators); *Katzenbach* v. *McClung*, 379 U. S. 294 (1964) (prohibiting discrimination by restaurant owners). But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce.  Each one of our cases, including those cited by JUSTICE GINSBURG, *post*, at 20–21, involved preexisting economic activity.  See, *e.g., Wickard*, 317 U. S., at 127–129 (producing wheat); *Raich*, *supra*, at 25 (growing marijuana).

Everyone will likely participate in the markets for food, clothing, transportation, shelter, or energy; that does not authorize Congress to direct them to purchase particular products in those or other markets today.  The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.  Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States.

The Government argues that the individual mandate can be sustained as a sort of exception to this rule, because health insurance is a unique product. According to the Government, upholding the individual mandate would not justify mandatory purchases of items such as cars or broccoli because, as the Government puts it, "[h]ealth insurance is not purchased for its own sake like a car or broccoli; it is a means of financing health-care consumption and covering universal risks." Reply Brief for United States 19. But cars and broccoli are no more purchased for their "own sake" than health insurance. They are purchased to cover the need for transportation and food.

The Government says that health insurance and health care financing are "inherently integrated." Brief for United States 41. But that does not mean the compelled purchase of the first is properly regarded as a regulation of the second. No matter how "inherently integrated" health insurance and health care consumption may be, they are not the same thing: They involve different transactions, entered into at different times, with different providers. And for most of those targeted by the mandate, significant health care needs will be years, or even decades, away. The proximity and degree of connection between the mandate and the subsequent commercial activity is too lacking to justify an exception of the sort urged by the Government. The individual mandate forces individuals into commerce precisely because they elected to refrain from commercial activity. Such a law cannot be sustained under a clause authorizing Congress to "regulate Commerce."

2

The Government next contends that Congress has the power under the Necessary and Proper Clause to enact the individual mandate because the mandate is an "integral part of a comprehensive scheme of economic regulation"—

the guaranteed-issue and community-rating insurance reforms. Brief for United States 24. Under this argument, it is not necessary to consider the effect that an individual's inactivity may have on interstate commerce; it is enough that Congress regulate commercial activity in a way that requires regulation of inactivity to be effective.

The power to "make all Laws which shall be necessary and proper for carrying into Execution" the powers enumerated in the Constitution, Art. I, §8, cl. 18, vests Congress with authority to enact provisions "incidental to the [enumerated] power, and conducive to its beneficial exercise," *McCulloch*, 4 Wheat., at 418. Although the Clause gives Congress authority to "legislate on that vast mass of incidental powers which must be involved in the constitution," it does not license the exercise of any "great substantive and independent power[s]" beyond those specifically enumerated. *Id.*, at 411, 421. Instead, the Clause is "'merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in the grant.'" *Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234, 247 (1960) (quoting VI Writings of James Madison 383 (G. Hunt ed. 1906)).

As our jurisprudence under the Necessary and Proper Clause has developed, we have been very deferential to Congress's determination that a regulation is "necessary." We have thus upheld laws that are "'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Comstock*, 560 U. S., at ___ (slip op., at 5) (quoting *McCulloch*, *supra*, at 413, 418). But we have also carried out our responsibility to declare unconstitutional those laws that undermine the structure of government established by the Constitution. Such laws, which are not "consist[ent] with the letter and spirit of the constitution," *McCulloch*, *supra,* at 421, are not "*proper* [means] for carrying into Execution" Congress's enumerated powers. Rather, they are, "in

the words of The Federalist, 'merely acts of usurpation' which 'deserve to be treated as such.'" *Printz* v. *United States*, 521 U. S. 898, 924 (1997) (alterations omitted) (quoting The Federalist No. 33, at 204 (A. Hamilton)); see also *New York*, 505 U. S., at 177; *Comstock*, *supra*, at ___ (slip op., at 5) (KENNEDY, J., concurring in judgment) ("It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause . . .").

Applying these principles, the individual mandate cannot be sustained under the Necessary and Proper Clause as an essential component of the insurance reforms. Each of our prior cases upholding laws under that Clause involved exercises of authority derivative of, and in service to, a granted power. For example, we have upheld provisions permitting continued confinement of those *already in federal custody* when they could not be safely released, *Comstock*, *supra,* at ___ (slip op., at 1–2); criminalizing bribes involving organizations *receiving federal funds*, *Sabri* v. *United States*, 541 U. S. 600, 602, 605 (2004); and tolling state statutes of limitations while cases are *pending in federal court*, *Jinks* v. *Richland County*, 538 U. S. 456, 459, 462 (2003). The individual mandate, by contrast, vests Congress with the extraordinary ability to create the necessary predicate to the exercise of an enumerated power.

This is in no way an authority that is "narrow in scope," *Comstock*, *supra,* at ___ (slip op., at 20), or "incidental" to the exercise of the commerce power, *McCulloch*, *supra*, at 418. Rather, such a conception of the Necessary and Proper Clause would work a substantial expansion of federal authority. No longer would Congress be limited to regulating under the Commerce Clause those who by some preexisting activity bring themselves within the sphere of federal regulation. Instead, Congress could reach beyond

the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it. Even if the individual mandate is "necessary" to the Act's insurance reforms, such an expansion of federal power is not a "proper" means for making those reforms effective.

The Government relies primarily on our decision in *Gonzales* v. *Raich*. In *Raich*, we considered "comprehensive legislation to regulate the interstate market" in marijuana. 545 U. S., at 22. Certain individuals sought an exemption from that regulation on the ground that they engaged in only intrastate possession and consumption. We denied any exemption, on the ground that marijuana is a fungible commodity, so that any marijuana could be readily diverted into the interstate market. Congress's attempt to regulate the interstate market for marijuana would therefore have been substantially undercut if it could not also regulate intrastate possession and consumption. *Id.,* at 19. Accordingly, we recognized that "Congress was acting well within its authority" under the Necessary and Proper Clause even though its "regulation ensnare[d] some purely intrastate activity." *Id.,* at 22; see also *Perez*, 402 U. S., at 154. *Raich* thus did not involve the exercise of any "great substantive and independent power," *McCulloch*, *supra*, at 411, of the sort at issue here. Instead, it concerned only the constitutionality of "individual *applications* of a concededly valid statutory scheme." *Raich*, *supra*, at 23 (emphasis added).

Just as the individual mandate cannot be sustained as a law regulating the substantial effects of the failure to purchase health insurance, neither can it be upheld as a "necessary and proper" component of the insurance reforms. The commerce power thus does not authorize the mandate. Accord, *post,* at 4–16 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting).

## B

That is not the end of the matter. Because the Commerce Clause does not support the individual mandate, it is necessary to turn to the Government's second argument: that the mandate may be upheld as within Congress's enumerated power to "lay and collect Taxes." Art. I, §8, cl. 1.

The Government's tax power argument asks us to view the statute differently than we did in considering its commerce power theory. In making its Commerce Clause argument, the Government defended the mandate as a regulation requiring individuals to purchase health insurance. The Government does not claim that the taxing power allows Congress to issue such a command. Instead, the Government asks us to read the mandate not as ordering individuals to buy insurance, but rather as imposing a tax on those who do not buy that product.

The text of a statute can sometimes have more than one possible meaning. To take a familiar example, a law that reads "no vehicles in the park" might, or might not, ban bicycles in the park. And it is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so. Justice Story said that 180 years ago: "No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution." *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830). Justice Holmes made the same point a century later: "[T]he rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (concurring opinion).

The most straightforward reading of the mandate is that it commands individuals to purchase insurance.

After all, it states that individuals "shall" maintain health insurance. 26 U. S. C. §5000A(a). Congress thought it could enact such a command under the Commerce Clause, and the Government primarily defended the law on that basis. But, for the reasons explained above, the Commerce Clause does not give Congress that power. Under our precedent, it is therefore necessary to ask whether the Government's alternative reading of the statute—that it only imposes a tax on those without insurance—is a reasonable one.

Under the mandate, if an individual does not maintain health insurance, the only consequence is that he must make an additional payment to the IRS when he pays his taxes. See §5000A(b). That, according to the Government, means the mandate can be regarded as establishing a condition—not owning health insurance—that triggers a tax—the required payment to the IRS. Under that theory, the mandate is not a legal command to buy insurance. Rather, it makes going without insurance just another thing the Government taxes, like buying gasoline or earning income. And if the mandate is in effect just a tax hike on certain taxpayers who do not have health insurance, it may be within Congress's constitutional power to tax.

The question is not whether that is the most natural interpretation of the mandate, but only whether it is a "fairly possible" one. *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). As we have explained, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper* v. *California*, 155 U. S. 648, 657 (1895). The Government asks us to interpret the mandate as imposing a tax, if it would otherwise violate the Constitution. Granting the Act the full measure of deference owed to federal statutes, it can be so read, for the reasons set forth below.

C

The exaction the Affordable Care Act imposes on those without health insurance looks like a tax in many respects. The "[s]hared responsibility payment," as the statute entitles it, is paid into the Treasury by "taxpayer[s]" when they file their tax returns. 26 U. S. C. §5000A(b). It does not apply to individuals who do not pay federal income taxes because their household income is less than the filing threshold in the Internal Revenue Code. §5000A(e)(2). For taxpayers who do owe the payment, its amount is determined by such familiar factors as taxable income, number of dependents, and joint filing status. §§5000A(b)(3), (c)(2), (c)(4). The requirement to pay is found in the Internal Revenue Code and enforced by the IRS, which—as we previously explained—must assess and collect it "in the same manner as taxes." *Supra*, at 13–14. This process yields the essential feature of any tax: it produces at least some revenue for the Government. *United States* v. *Kahriger*, 345 U. S. 22, 28, n. 4 (1953). Indeed, the payment is expected to raise about $4 billion per year by 2017. Congressional Budget Office, Payments of Penalties for Being Uninsured Under the Patient Protection and Affordable Care Act (Apr. 30, 2010), in Selected CBO Publications Related to Health Care Legislation, 2009–2010, p. 71 (rev. 2010).

It is of course true that the Act describes the payment as a "penalty," not a "tax." But while that label is fatal to the application of the Anti-Injunction Act, *supra*, at 12–13, it does not determine whether the payment may be viewed as an exercise of Congress's taxing power. It is up to Congress whether to apply the Anti-Injunction Act to any particular statute, so it makes sense to be guided by Congress's choice of label on that question. That choice does not, however, control whether an exaction is within Congress's constitutional power to tax.

Our precedent reflects this: In 1922, we decided two

challenges to the "Child Labor Tax" on the same day.  In
the first, we held that a suit to enjoin collection of the so-
called tax was barred by the Anti-Injunction Act.  *George*,
259 U. S., at 20.  Congress knew that suits to obstruct
taxes had to await payment under the Anti-Injunction
Act; Congress called the child labor tax a tax; Congress
therefore intended the Anti-Injunction Act to apply.  In
the second case, however, we held that the same exaction,
although labeled a tax, was not in fact authorized by Con-
gress's taxing power.  *Drexel Furniture*, 259 U. S., at 38.
That constitutional question was not controlled by Con-
gress's choice of label.

We have similarly held that exactions not labeled taxes
nonetheless were authorized by Congress's power to tax.
In the *License Tax Cases*, for example, we held that federal
licenses to sell liquor and lottery tickets—for which the
licensee had to pay a fee—could be sustained as exercises
of the taxing power.  5 Wall., at 471.  And in *New York* v.
*United States* we upheld as a tax a "surcharge" on out-of-
state nuclear waste shipments, a portion of which was
paid to the Federal Treasury.  505 U. S., at 171.  We thus
ask whether the shared responsibility payment falls
within Congress's taxing power, "[d]isregarding the designa-
tion of the exaction, and viewing its substance and appli-
cation."  *United States* v. *Constantine*, 296 U. S. 287, 294
(1935); cf. *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 310
(1992) ("[M]agic words or labels" should not "disable an
otherwise constitutional levy" (internal quotation marks
omitted)); *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359,
363 (1941) ("In passing on the constitutionality of a tax
law, we are concerned only with its practical operation,
not its definition or the precise form of descriptive words
which may be applied to it" (internal quotation marks
omitted)); *United States* v. *Sotelo*, 436 U. S. 268, 275
(1978) ("That the funds due are referred to as a 'penalty'

. . . does not alter their essential character as taxes").[7]

Our cases confirm this functional approach. For example, in *Drexel Furniture*, we focused on three practical characteristics of the so-called tax on employing child laborers that convinced us the "tax" was actually a penalty. First, the tax imposed an exceedingly heavy burden—10 percent of a company's net income—on those who employed children, no matter how small their infraction. Second, it imposed that exaction only on those who knowingly employed underage laborers. Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law. Third, this "tax" was enforced in part by the Department of Labor, an agency responsible for punishing violations of labor laws, not collecting revenue. 259 U. S., at 36–37; see also, *e.g., Kurth Ranch*, 511 U. S., at 780–782 (considering, *inter alia*, the amount of the exaction, and the fact that it was imposed for violation of a separate criminal law); *Constantine*, *supra*, at 295 (same).

The same analysis here suggests that the shared responsibility payment may for constitutional purposes be considered a tax, not a penalty: First, for most Americans the amount due will be far less than the price of insurance, and, by statute, it can never be more.[8] It may often

_____

[7] *Sotelo,* in particular, would seem to refute the joint dissent's contention that we have "never" treated an exaction as a tax if it was denominated a penalty. *Post,* at 20. We are not persuaded by the dissent's attempt to distinguish *Sotelo* as a statutory construction case from the bankruptcy context. *Post,* at 17, n. 5. The dissent itself treats the question here as one of statutory interpretation, and indeed also relies on a statutory interpretation case from the bankruptcy context. *Post,* at 23 (citing *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U. S. 213, 224 (1996)).

[8] In 2016, for example, individuals making $35,000 a year are expected to owe the IRS about $60 for any month in which they do not have health insurance. Someone with an annual income of $100,000 a year would likely owe about $200. The price of a qualifying insurance

be a reasonable financial decision to make the payment
rather than purchase insurance, unlike the "prohibitory"
financial punishment in *Drexel Furniture*. 259 U. S., at
37. Second, the individual mandate contains no scienter
requirement. Third, the payment is collected solely by the
IRS through the normal means of taxation—except that
the Service is *not* allowed to use those means most sugges-
tive of a punitive sanction, such as criminal prosecution.
See §5000A(g)(2). The reasons the Court in *Drexel Furni-
ture* held that what was called a "tax" there was a penalty
support the conclusion that what is called a "penalty" here
may be viewed as a tax.[9]

None of this is to say that the payment is not intended
to affect individual conduct. Although the payment will
raise considerable revenue, it is plainly designed to ex-
pand health insurance coverage. But taxes that seek to
influence conduct are nothing new. Some of our earliest
federal taxes sought to deter the purchase of imported
manufactured goods in order to foster the growth of do-
mestic industry. See W. Brownlee, Federal Taxation in
America 22 (2d ed. 2004); cf. 2 J. Story, Commentaries on
the Constitution of the United States §962, p. 434 (1833)
("the taxing power is often, very often, applied for other
purposes, than revenue"). Today, federal and state taxes
can compose more than half the retail price of cigarettes,

---

policy is projected to be around $400 per month. See D. Newman, CRS
Report for Congress, Individual Mandate and Related Information Re-
quirements Under PPACA 7, and n. 25 (2011).

[9] We do not suggest that any exaction lacking a scienter requirement
and enforced by the IRS is within the taxing power. See *post,* at 23–24
(joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting).
Congress could not, for example, expand its authority to impose crimi-
nal fines by creating strict liability offenses enforced by the IRS rather
than the FBI. But the fact the exaction here is paid like a tax, to the
agency that collects taxes—rather than, for example, exacted by De-
partment of Labor inspectors after ferreting out willful malfeasance—
suggests that this exaction may be viewed as a tax.

not just to raise more money, but to encourage people to quit smoking. And we have upheld such obviously regulatory measures as taxes on selling marijuana and sawed-off shotguns. See *United States* v. *Sanchez*, 340 U. S. 42, 44–45 (1950); *Sonzinsky* v. *United States*, 300 U. S. 506, 513 (1937). Indeed, "[e]very tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed." *Sonzinsky*, *supra,* at 513. That §5000A seeks to shape decisions about whether to buy health insurance does not mean that it cannot be a valid exercise of the taxing power.

In distinguishing penalties from taxes, this Court has explained that "if the concept of penalty means anything, it means punishment for an unlawful act or omission." *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U. S. 213, 224 (1996); see also *United States* v. *La Franca*, 282 U. S. 568, 572 (1931) ("[A] penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act"). While the individual mandate clearly aims to induce the purchase of health insurance, it need not be read to declare that failing to do so is unlawful. Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS. The Government agrees with that reading, confirming that if someone chooses to pay rather than obtain health insurance, they have fully complied with the law. Brief for United States 60–61; Tr. of Oral Arg. 49–50 (Mar. 26, 2012).

Indeed, it is estimated that four million people each year will choose to pay the IRS rather than buy insurance. See Congressional Budget Office, *supra,* at 71. We would expect Congress to be troubled by that prospect if such conduct were unlawful. That Congress apparently regards such extensive failure to comply with the mandate as

tolerable suggests that Congress did not think it was
creating four million outlaws. It suggests instead that the
shared responsibility payment merely imposes a tax citi-
zens may lawfully choose to pay in lieu of buying health
insurance.

The plaintiffs contend that Congress's choice of lan-
guage—stating that individuals "shall" obtain insurance
or pay a "penalty"—requires reading §5000A as punishing
unlawful conduct, even if that interpretation would ren-
der the law unconstitutional. We have rejected a similar
argument before. In *New York* v. *United States* we exam-
ined a statute providing that "'[e]ach State shall be re-
sponsible for providing . . . for the disposal of . . . low-level
radioactive waste.'" 505 U. S., at 169 (quoting 42 U. S. C.
§2021c(a)(1)(A)). A State that shipped its waste to another
State was exposed to surcharges by the receiving State,
a portion of which would be paid over to the Federal
Government. And a State that did not adhere to the
statutory scheme faced "[p]enalties for failure to comply,"
including increases in the surcharge. §2021e(e)(2); *New
York*, 505 U. S., at 152–153. New York urged us to read
the statute as a federal command that the state legisla-
ture enact legislation to dispose of its waste, which would
have violated the Constitution. To avoid that outcome, we
interpreted the statute to impose only "a series of incen-
tives" for the State to take responsibility for its waste. We
then sustained the charge paid to the Federal Government
as an exercise of the taxing power. *Id.,* at 169–174. We
see no insurmountable obstacle to a similar approach
here.[10]

––––––––––

[10] The joint dissent attempts to distinguish *New York* v. *United States*
on the ground that the seemingly imperative language in that case was
in an "introductory provision" that had "no legal consequences." *Post,*
at 19. We did not rely on that reasoning in *New York*. See 505 U. S., at
169–170. Nor could we have. While the Court quoted only the broad
statement that "[e]ach State shall be responsible" for its waste, that

The joint dissenters argue that we cannot uphold §5000A as a tax because Congress did not "frame" it as such. *Post,* at 17. In effect, they contend that even if the Constitution permits Congress to do exactly what we interpret this statute to do, the law must be struck down because Congress used the wrong labels. An example may help illustrate why labels should not control here. Suppose Congress enacted a statute providing that every taxpayer who owns a house without energy efficient windows must pay $50 to the IRS. The amount due is adjusted based on factors such as taxable income and joint filing status, and is paid along with the taxpayer's income tax return. Those whose income is below the filing threshold need not pay. The required payment is not called a "tax," a "penalty," or anything else. No one would doubt that this law imposed a tax, and was within Congress's power to tax. That conclusion should not change simply because Congress used the word "penalty" to describe the payment. Interpreting such a law to be a tax would hardly "[i]mpos[e] a tax through judicial legislation." *Post,* at 25. Rather, it would give practical effect to the Legislature's enactment.

Our precedent demonstrates that Congress had the power to impose the exaction in §5000A under the taxing power, and that §5000A need not be read to do more than impose a tax. That is sufficient to sustain it. The "question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods* v. *Cloyd W. Miller Co.*, 333 U. S.

_____

language was implemented through operative provisions that also use the words on which the dissent relies. See 42 U. S. C. §2021e(e)(1) (entitled "Requirements for non-sited compact regions and non-member States" and directing that those entities "shall comply with the following requirements"); §2021e(e)(2) (describing "Penalties for failure to comply"). The Court upheld those provisions not as lawful commands, but as "incentives." See 505 U. S., at 152–153, 171–173.

138, 144 (1948).

Even if the taxing power enables Congress to impose a tax on not obtaining health insurance, any tax must still comply with other requirements in the Constitution. Plaintiffs argue that the shared responsibility payment does not do so, citing Article I, §9, clause 4. That clause provides: "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." This requirement means that any "direct Tax" must be apportioned so that each State pays in proportion to its population. According to the plaintiffs, if the individual mandate imposes a tax, it is a direct tax, and it is unconstitutional because Congress made no effort to apportion it among the States.

Even when the Direct Tax Clause was written it was unclear what else, other than a capitation (also known as a "head tax" or a "poll tax"), might be a direct tax. See *Springer* v. *United States*, 102 U. S. 586, 596–598 (1881). Soon after the framing, Congress passed a tax on ownership of carriages, over James Madison's objection that it was an unapportioned direct tax. *Id.,* at 597. This Court upheld the tax, in part reasoning that apportioning such a tax would make little sense, because it would have required taxing carriage owners at dramatically different rates depending on how many carriages were in their home State. See *Hylton* v. *United States*, 3 Dall. 171, 174 (1796) (opinion of Chase, J.). The Court was unanimous, and those Justices who wrote opinions either directly asserted or strongly suggested that only two forms of taxation were direct: capitations and land taxes. See *id.*, at 175; *id.*, at 177 (opinion of Paterson, J.); *id.*, at 183 (opinion of Iredell, J.).

That narrow view of what a direct tax might be persisted for a century. In 1880, for example, we explained that "*direct taxes*, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument,

and taxes on real estate." *Springer*, *supra*, at 602.   In 1895, we expanded our interpretation to include taxes on personal property and income from personal property, in the course of striking down aspects of the federal income tax.  *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, 618 (1895).  That result was overturned by the Sixteenth Amendment, although we continued to consider taxes on personal property to be direct taxes.  See *Eisner* v. *Macomber*, 252 U. S. 189, 218–219 (1920).

A tax on going without health insurance does not fall within any recognized category of direct tax.  It is not a capitation.  Capitations are taxes paid by every person, "without regard to property, profession, or *any other circumstance*."  *Hylton*, *supra*, at 175 (opinion of Chase, J.) (emphasis altered).  The whole point of the shared responsibility payment is that it is triggered by specific circumstances—earning a certain amount of income but not obtaining health insurance.  The payment is also plainly not a tax on the ownership of land or personal property. The shared responsibility payment is thus not a direct tax that must be apportioned among the several States.

There may, however, be a more fundamental objection to a tax on those who lack health insurance.  Even if only a tax, the payment under §5000A(b) remains a burden that the Federal Government imposes for an omission, not an act.  If it is troubling to interpret the Commerce Clause as authorizing Congress to regulate those who abstain from commerce, perhaps it should be similarly troubling to permit Congress to impose a tax for not doing something.

Three considerations allay this concern.  First, and most importantly, it is abundantly clear the Constitution does not guarantee that individuals may avoid taxation through inactivity.  A capitation, after all, is a tax that everyone must pay simply for existing, and capitations are expressly contemplated by the Constitution.  The Court today holds that our Constitution protects us from federal

regulation under the Commerce Clause so long as we ab-
stain from the regulated activity.  But from its creation,
the Constitution has made no such promise with respect to
taxes.  See Letter from Benjamin Franklin to M. Le Roy
(Nov. 13, 1789) ("Our new Constitution is now established
. . . but in this world nothing can be said to be certain,
except death and taxes").

Whether the mandate can be upheld under the Com-
merce Clause is a question about the scope of federal
authority.  Its answer depends on whether Congress can
exercise what all acknowledge to be the novel course of
directing individuals to purchase insurance.  Congress's
use of the Taxing Clause to encourage buying something
is, by contrast, not new.  Tax incentives already promote,
for example, purchasing homes and professional educa-
tions.  See 26 U. S. C. §§163(h), 25A.  Sustaining the
mandate as a tax depends only on whether Congress *has*
properly exercised its taxing power to encourage purchas-
ing health insurance, not whether it *can.*  Upholding the
individual mandate under the Taxing Clause thus does
not recognize any new federal power.  It determines that
Congress has used an existing one.

Second, Congress's ability to use its taxing power to
influence conduct is not without limits.  A few of our cases
policed these limits aggressively, invalidating punitive
exactions obviously designed to regulate behavior other-
wise regarded at the time as beyond federal authority.
See, *e.g.*, *United States* v. *Butler*, 297 U. S. 1 (1936); *Drexel
Furniture*, 259 U. S. 20.  More often and more recently
we have declined to closely examine the regulatory motive
or effect of revenue-raising measures.  See *Kahriger*, 345
U. S., at 27–31 (collecting cases).  We have nonetheless
maintained that "'there comes a time in the extension of
the penalizing features of the so-called tax when it loses
its character as such and becomes a mere penalty with the
characteristics of regulation and punishment.'"  *Kurth*

*Ranch*, 511 U. S., at 779 (quoting *Drexel Furniture*, *supra*, at 38).

We have already explained that the shared responsibility payment's practical characteristics pass muster as a tax under our narrowest interpretations of the taxing power. *Supra,* at 35–36. Because the tax at hand is within even those strict limits, we need not here decide the precise point at which an exaction becomes so punitive that the taxing power does not authorize it. It remains true, however, that the "'power to tax is not the power to destroy while this Court sits.'" *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U. S. 342, 364 (1949) (quoting *Panhandle Oil Co.* v. *Mississippi ex rel. Knox*, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting)).

Third, although the breadth of Congress's power to tax is greater than its power to regulate commerce, the taxing power does not give Congress the same degree of control over individual behavior. Once we recognize that Congress may regulate a particular decision under the Commerce Clause, the Federal Government can bring its full weight to bear. Congress may simply command individuals to do as it directs. An individual who disobeys may be subjected to criminal sanctions. Those sanctions can include not only fines and imprisonment, but all the attendant consequences of being branded a criminal: deprivation of otherwise protected civil rights, such as the right to bear arms or vote in elections; loss of employment opportunities; social stigma; and severe disabilities in other controversies, such as custody or immigration disputes.

By contrast, Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more. If a tax is properly paid, the Government has no power to compel or punish individuals subject to it. We do not make light of the severe burden that taxation—especially taxation motivated by a regulatory purpose—can impose. But imposition

of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice.[11]

The Affordable Care Act's requirement that certain individuals pay a financial penalty for not obtaining health insurance may reasonably be characterized as a tax. Because the Constitution permits such a tax, it is not our role to forbid it, or to pass upon its wisdom or fairness.

## D

JUSTICE GINSBURG questions the necessity of rejecting the Government's commerce power argument, given that §5000A can be upheld under the taxing power. *Post,* at 37. But the statute reads more naturally as a command to buy insurance than as a tax, and I would uphold it as a command if the Constitution allowed it. It is only because the Commerce Clause does not authorize such a command that it is necessary to reach the taxing power question. And it is only because we have a duty to construe a statute to save it, if fairly possible, that §5000A can be interpreted as a tax. Without deciding the Commerce Clause question, I would find no basis to adopt such a saving construction.

The Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command. The Federal Government does have the power to impose a tax on those without health insurance. Section 5000A is

---

[11] Of course, individuals do not have a lawful choice not to pay a tax due, and may sometimes face prosecution for failing to do so (although not for declining to make the shared responsibility payment, see 26 U. S. C. §5000A(g)(2)). But that does not show that the tax restricts the lawful choice whether to undertake or forgo the activity on which the tax is predicated. Those subject to the individual mandate may lawfully forgo health insurance and pay higher taxes, or buy health insurance and pay lower taxes. The only thing they may not lawfully do is not buy health insurance and not pay the resulting tax.

therefore constitutional, because it can reasonably be read as a tax.

## IV

## A

The States also contend that the Medicaid expansion exceeds Congress's authority under the Spending Clause. They claim that Congress is coercing the States to adopt the changes it wants by threatening to withhold all of a State's Medicaid grants, unless the State accepts the new expanded funding and complies with the conditions that come with it. This, they argue, violates the basic principle that the "Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U. S., at 188.

There is no doubt that the Act dramatically increases state obligations under Medicaid. The current Medicaid program requires States to cover only certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled. 42 U. S. C. §1396a(a)(10). There is no mandatory coverage for most childless adults, and the States typically do not offer any such coverage. The States also enjoy considerable flexibility with respect to the coverage levels for parents of needy families. §1396a(a)(10)(A)(ii). On average States cover only those unemployed parents who make less than 37 percent of the federal poverty level, and only those employed parents who make less than 63 percent of the poverty line. Kaiser Comm'n on Medicaid and the Uninsured, Performing Under Pressure 11, and fig. 11 (2012).

The Medicaid provisions of the Affordable Care Act, in contrast, require States to expand their Medicaid programs by 2014 to cover *all* individuals under the age of 65 with incomes below 133 percent of the federal poverty line. §1396a(a)(10)(A)(i)(VIII). The Act also establishes a new

"[e]ssential health benefits" package, which States must provide to all new Medicaid recipients—a level sufficient to satisfy a recipient's obligations under the individual mandate. §§1396a(k)(1), 1396u–7(b)(5), 18022(b). The Affordable Care Act provides that the Federal Government will pay 100 percent of the costs of covering these newly eligible individuals through 2016. §1396d(y)(1). In the following years, the federal payment level gradually decreases, to a minimum of 90 percent. *Ibid.* In light of the expansion in coverage mandated by the Act, the Federal Government estimates that its Medicaid spending will increase by approximately $100 billion per year, nearly 40 percent above current levels. Statement of Douglas W. Elmendorf, CBO's Analysis of the Major Health Care Legislation Enacted in March 2010, p. 14, Table 2 (Mar. 30, 2011).

The Spending Clause grants Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." U. S. Const., Art. I, §8, cl. 1. We have long recognized that Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States' "taking certain actions that Congress could not require them to take." *College Savings Bank*, 527 U. S., at 686. Such measures "encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices." *New York*, *supra*, at 166. The conditions imposed by Congress ensure that the funds are used by the States to "provide for the . . . general Welfare" in the manner Congress intended.

At the same time, our cases have recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives. "We have repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a *contract*.'" *Barnes* v. *Gorman*, 536 U. S. 181, 186 (2002) (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981)). The

legitimacy of Congress's exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst, supra*, at 17. Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system "rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond*, 564 U. S., at ___ (slip op., at 8) (quoting *Alden* v. *Maine*, 527 U. S. 706, 758 (1999)). For this reason, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, *supra*, at 162. Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer.

That insight has led this Court to strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes. See, *e.g., Printz*, 521 U. S., at 933 (striking down federal legislation compelling state law enforcement officers to perform federally mandated background checks on handgun purchasers); *New York*, *supra*, at 174–175 (invalidating provisions of an Act that would compel a State to either take title to nuclear waste or enact particular state waste regulations). It has also led us to scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a "power akin to undue influence." *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 590 (1937). Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when "pressure turns into compulsion," *ibid.*, the legislation runs contrary to our system of federalism. "[T]he Constitution simply does not give Congress the authority to require the States to regulate." *New York*,

505 U. S., at 178. That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own.

Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system. "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *Id.,* at 169. Spending Clause programs do not pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds. In such a situation, state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer. But when the State has no choice, the Federal Government can achieve its objectives without accountability, just as in *New York* and *Printz.* Indeed, this danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers.

We addressed such concerns in *Steward Machine.* That case involved a federal tax on employers that was abated if the businesses paid into a state unemployment plan that met certain federally specified conditions. An employer sued, alleging that the tax was impermissibly "driv[ing] the state legislatures under the whip of economic pressure into the enactment of unemployment compensation laws at the bidding of the central government." 301 U. S., at 587. We acknowledged the danger that the Federal Government might employ its taxing power to exert a "power akin to undue influence" upon the States. *Id.,* at 590. But we observed that Congress adopted the challenged tax and abatement program to channel money to the States that would otherwise have gone into the Federal Treasury for

use in providing national unemployment services. Congress was willing to direct businesses to instead pay the money into state programs only on the condition that the money be used for the same purposes. Predicating tax abatement on a State's adoption of a particular type of unemployment legislation was therefore a means to "safeguard [the Federal Government's] own treasury." *Id.,* at 591. We held that "[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power." *Ibid.*

In rejecting the argument that the federal law was a "weapon[] of coercion, destroying or impairing the autonomy of the states," the Court noted that there was no reason to suppose that the State in that case acted other than through "her unfettered will." *Id.,* at 586, 590. Indeed, the State itself did "not offer a suggestion that in passing the unemployment law she was affected by duress." *Id.,* at 589.

As our decision in *Steward Machine* confirms, Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds. In the typical case we look to the States to defend their prerogatives by adopting "the simple expedient of not yielding" to federal blandishments when they do not want to embrace the federal policies as their own. *Massachusetts* v. *Mellon*, 262 U. S. 447, 482 (1923). The States are separate and independent sovereigns. Sometimes they have to act like it.

The States, however, argue that the Medicaid expansion is far from the typical case. They object that Congress has "crossed the line distinguishing encouragement from coercion," *New York, supra,* at 175, in the way it has structured the funding: Instead of simply refusing to grant the new funds to States that will not accept the new conditions, Congress has also threatened to withhold those States' existing Medicaid funds. The States claim that

this threat serves no purpose other than to force unwilling
States to sign up for the dramatic expansion in health care
coverage effected by the Act.

Given the nature of the threat and the programs at
issue here, we must agree. We have upheld Congress's
authority to condition the receipt of funds on the States'
complying with restrictions on the use of those funds,
because that is the means by which Congress ensures that
the funds are spent according to its view of the "general
Welfare." Conditions that do not here govern the use
of the funds, however, cannot be justified on that ba-
sis. When, for example, such conditions take the form of
threats to terminate other significant independent grants,
the conditions are properly viewed as a means of pressur-
ing the States to accept policy changes.

In *South Dakota* v. *Dole*, we considered a challenge to a
federal law that threatened to withhold five percent of a
State's federal highway funds if the State did not raise its
drinking age to 21. The Court found that the condition
was "directly related to one of the main purposes for which
highway funds are expended—safe interstate travel." 483
U. S., at 208. At the same time, the condition was not a
restriction on how the highway funds—set aside for spec-
ific highway improvement and maintenance efforts—were
to be used.

We accordingly asked whether "the financial induce-
ment offered by Congress" was "so coercive as to pass the
point at which 'pressure turns into compulsion.'" *Id.,* at
211 (quoting *Steward Machine*, *supra,* at 590). By "finan-
cial inducement" the Court meant the threat of losing five
percent of highway funds; no new money was offered to
the States to raise their drinking ages. We found that the
inducement was not impermissibly coercive, because
Congress was offering only "relatively mild encouragement
to the States." *Dole*, 483 U. S., at 211. We observed that
"all South Dakota would lose if she adheres to her chosen

course as to a suitable minimum drinking age is 5%" of her highway funds. *Ibid.* In fact, the federal funds at stake constituted less than half of one percent of South Dakota's budget at the time. See Nat. Assn. of State Budget Officers, The State Expenditure Report 59 (1987); *South Dakota* v. *Dole*, 791 F. 2d 628, 630 (CA8 1986). In consequence, "we conclude[d] that [the] encouragement to state action [was] a valid use of the spending power." *Dole*, 483 U. S., at 212. Whether to accept the drinking age change "remain[ed] the prerogative of the States not merely in theory but in fact." *Id.,* at 211–212.

In this case, the financial "inducement" Congress has chosen is much more than "relatively mild encouragement"—it is a gun to the head. Section 1396c of the Medicaid Act provides that if a State's Medicaid plan does not comply with the Act's requirements, the Secretary of Health and Human Services may declare that "further payments will not be made to the State." 42 U. S. C. §1396c. A State that opts out of the Affordable Care Act's expansion in health care coverage thus stands to lose not merely "a relatively small percentage" of its existing Medicaid funding, but *all* of it. *Dole*, *supra,* at 211. Medicaid spending accounts for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs. See Nat. Assn. of State Budget Officers, Fiscal Year 2010 State Expenditure Report, p. 11, Table 5 (2011); 42 U. S. C. §1396d(b). The Federal Government estimates that it will pay out approximately $3.3 trillion between 2010 and 2019 in order to cover the costs of *pre*-expansion Medicaid. Brief for United States 10, n. 6. In addition, the States have developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid. It is easy to see how the *Dole* Court could conclude that the threatened loss of less than half of one percent of South Dakota's budget left that State with a

"prerogative" to reject Congress's desired policy, "not merely in theory but in fact." 483 U. S., at 211–212. The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.[12]

JUSTICE GINSBURG claims that *Dole* is distinguishable because here "Congress has not threatened to withhold funds earmarked for any other program." *Post,* at 47. But that begs the question: The States contend that the expansion is in reality a new program and that Congress is forcing them to accept it by threatening the funds for the existing Medicaid program. We cannot agree that existing Medicaid and the expansion dictated by the Affordable Care Act are all one program simply because "Congress styled" them as such. *Post,* at 49. If the expansion is not properly viewed as a modification of the existing Medicaid program, Congress's decision to so title it is irrelevant.[13]

————————

[12] JUSTICE GINSBURG observes that state Medicaid spending will increase by only 0.8 percent after the expansion. *Post,* at 43. That not only ignores increased state administrative expenses, but also assumes that the Federal Government will continue to fund the expansion at the current statutorily specified levels. It is not unheard of, however, for the Federal Government to increase requirements in such a manner as to impose unfunded mandates on the States. More importantly, the size of the new financial burden imposed on a State is irrelevant in analyzing whether the State has been coerced into accepting that burden. "Your money or your life" is a coercive proposition, whether you have a single dollar in your pocket or $500.

[13] Nor, of course, can the number of pages the amendment occupies, or the extent to which the change preserves and works within the existing program, be dispositive. Cf. *post,* at 49–50 (opinion of GINSBURG, J.). Take, for example, the following hypothetical amendment: "All of a State's citizens are now eligible for Medicaid." That change would take up a single line and would not alter any "operational aspect[ ] of the program" beyond the eligibility requirements. *Post,* at 49. Yet it could hardly be argued that such an amendment was a permissible modification of Medicaid, rather than an attempt to foist an entirely new health care system upon the States.

Here, the Government claims that the Medicaid expansion is properly viewed merely as a modification of the existing program because the States agreed that Congress could change the terms of Medicaid when they signed on in the first place. The Government observes that the Social Security Act, which includes the original Medicaid provisions, contains a clause expressly reserving "[t]he right to alter, amend, or repeal any provision" of that statute. 42 U. S. C. §1304. So it does. But "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U. S., at 17. A State confronted with statutory language reserving the right to "alter" or "amend" the pertinent provisions of the Social Security Act might reasonably assume that Congress was entitled to make adjustments to the Medicaid program as it developed. Congress has in fact done so, sometimes conditioning only the new funding, other times both old and new. See, *e.g.,* Social Security Amendments of 1972, 86 Stat. 1381–1382, 1465 (extending Medicaid eligibility, but partly conditioning only the new funding); Omnibus Budget Reconciliation Act of 1990, §4601, 104 Stat. 1388–166 (extending eligibility, and conditioning old and new funds).

The Medicaid expansion, however, accomplishes a shift in kind, not merely degree. The original program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children. See 42 U. S. C. §1396a(a)(10). Previous amendments to Medicaid eligibility merely altered and expanded the boundaries of these categories. Under the Affordable Care Act, Medicaid is transformed into a program to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level. It is no longer a program to care for the neediest among us, but rather an element of a comprehensive national plan to provide uni-

versal health insurance coverage.[14]

Indeed, the manner in which the expansion is structured indicates that while Congress may have styled the expansion a mere alteration of existing Medicaid, it recognized it was enlisting the States in a new health care program. Congress created a separate funding provision to cover the costs of providing services to any person made newly eligible by the expansion. While Congress pays 50 to 83 percent of the costs of covering individuals currently enrolled in Medicaid, §1396d(b), once the expansion is fully implemented Congress will pay 90 percent of the costs for newly eligible persons, §1396d(y)(1). The conditions on use of the different funds are also distinct. Congress mandated that newly eligible persons receive a level of coverage that is less comprehensive than the traditional Medicaid benefit package. §1396a(k)(1); see Brief for United States 9.

As we have explained, "[t]hough Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions." *Pennhurst*, *supra*, at 25. A State could hardly anticipate that Congress's reservation of the right to "alter" or "amend" the Medicaid program included the power to transform it so dramatically.

JUSTICE GINSBURG claims that in fact this expansion is

_____

[14] JUSTICE GINSBURG suggests that the States can have no objection to the Medicaid expansion, because "Congress could have repealed Medicaid [and,] [t]hereafter, . . . could have enacted Medicaid II, a new program combining the pre-2010 coverage with the expanded coverage required by the ACA." *Post*, at 51; see also *post,* at 38. But it would certainly not be that easy. Practical constraints would plainly inhibit, if not preclude, the Federal Government from repealing the existing program and putting every feature of Medicaid on the table for political reconsideration. Such a massive undertaking would hardly be "ritualistic." *Ibid.* The same is true of JUSTICE GINSBURG's suggestion that Congress could establish Medicaid as an exclusively federal program. *Post,* at 44.

no different from the previous changes to Medicaid, such that "a State would be hard put to complain that it lacked fair notice." *Post,* at 56. But the prior change she discusses—presumably the most dramatic alteration she could find—does not come close to working the transformation the expansion accomplishes. She highlights an amendment requiring States to cover pregnant women and increasing the number of eligible children. *Ibid.* But this modification can hardly be described as a major change in a program that—from its inception—provided health care for "families with dependent children." Previous Medicaid amendments simply do not fall into the same category as the one at stake here.

The Court in *Steward Machine* did not attempt to "fix the outermost line" where persuasion gives way to coercion. 301 U. S., at 591. The Court found it "[e]nough for present purposes that wherever the line may be, this statute is within it." *Ibid.* We have no need to fix a line either. It is enough for today that wherever that line may be, this statute is surely beyond it. Congress may not simply "conscript state [agencies] into the national bureaucratic army," *FERC* v. *Mississippi,* 456 U. S. 742, 775 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part), and that is what it is attempting to do with the Medicaid expansion.

B

Nothing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use. What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding. Section 1396c gives the Secretary of Health and Human Services the authority to

do just that.  It allows her to withhold *all* "further [Medicaid] payments . . . to the State" if she determines that the State is out of compliance with any Medicaid requirement, including those contained in the expansion.  42 U. S. C. §1396c.  In light of the Court's holding, the Secretary cannot apply §1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion.

That fully remedies the constitutional violation we have identified.  The chapter of the United States Code that contains §1396c includes a severability clause confirming that we need go no further.  That clause specifies that "[i]f any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby." §1303.  Today's holding does not affect the continued application of §1396c to the existing Medicaid program.  Nor does it affect the Secretary's ability to withdraw funds provided under the Affordable Care Act if a State that has chosen to participate in the expansion fails to comply with the requirements of that Act.

This is not to say, as the joint dissent suggests, that we are "rewriting the Medicaid Expansion."  *Post,* at 48.  Instead, we determine, first, that §1396c is unconstitutional when applied to withdraw existing Medicaid funds from States that decline to comply with the expansion.  We then follow Congress's explicit textual instruction to leave unaffected "the remainder of the chapter, and the application of [the challenged] provision to other persons or circumstances."  §1303.  When we invalidate an application of a statute because that application is unconstitutional, we are not "rewriting" the statute; we are merely enforcing the Constitution.

The question remains whether today's holding affects other provisions of the Affordable Care Act.  In considering

that question, "[w]e seek to determine what Congress would have intended in light of the Court's constitutional holding." *United States* v. *Booker*, 543 U. S. 220, 246 (2005) (internal quotation marks omitted). Our "touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 330 (2006) (internal quotation marks omitted). The question here is whether Congress would have wanted the rest of the Act to stand, had it known that States would have a genuine choice whether to participate in the new Medicaid expansion. Unless it is "evident" that the answer is no, we must leave the rest of the Act intact. *Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U. S. 210, 234 (1932).

We are confident that Congress would have wanted to preserve the rest of the Act. It is fair to say that Congress assumed that every State would participate in the Medicaid expansion, given that States had no real choice but to do so. The States contend that Congress enacted the rest of the Act with such full participation in mind; they point out that Congress made Medicaid a means for satisfying the mandate, 26 U. S. C. §5000A(f)(1)(A)(ii), and enacted no other plan for providing coverage to many low-income individuals. According to the States, this means that the entire Act must fall.

We disagree. The Court today limits the financial pressure the Secretary may apply to induce States to accept the terms of the Medicaid expansion. As a practical matter, that means States may now choose to reject the expansion; that is the whole point. But that does not mean all or even any will. Some States may indeed decline to participate, either because they are unsure they will be able to afford their share of the new funding obligations, or because they are unwilling to commit the administra-

tive resources necessary to support the expansion. Other States, however, may voluntarily sign up, finding the idea of expanding Medicaid coverage attractive, particularly given the level of federal funding the Act offers at the outset.

We have no way of knowing how many States will accept the terms of the expansion, but we do not believe Congress would have wanted the whole Act to fall, simply because some may choose not to participate. The other reforms Congress enacted, after all, will remain "fully operative as a law," *Champlin, supra,* at 234, and will still function in a way "consistent with Congress' basic objectives in enacting the statute," *Booker*, *supra*, at 259. Confident that Congress would not have intended anything different, we conclude that the rest of the Act need not fall in light of our constitutional holding.

\*      \*      \*

The Affordable Care Act is constitutional in part and unconstitutional in part. The individual mandate cannot be upheld as an exercise of Congress's power under the Commerce Clause. That Clause authorizes Congress to regulate interstate commerce, not to order individuals to engage in it. In this case, however, it is reasonable to construe what Congress has done as increasing taxes on those who have a certain amount of income, but choose to go without health insurance. Such legislation is within Congress's power to tax.

As for the Medicaid expansion, that portion of the Affordable Care Act violates the Constitution by threatening existing Medicaid funding. Congress has no authority to order the States to regulate according to its instructions. Congress may offer the States grants and require the States to comply with accompanying conditions, but the States must have a genuine choice whether to accept the offer. The States are given no such choice in this case:

They must either accept a basic change in the nature of Medicaid, or risk losing all Medicaid funding. The remedy for that constitutional violation is to preclude the Federal Government from imposing such a sanction. That remedy does not require striking down other portions of the Affordable Care Act.

The Framers created a Federal Government of limited powers, and assigned to this Court the duty of enforcing those limits. The Court does so today. But the Court does not express any opinion on the wisdom of the Affordable Care Act. Under the Constitution, that judgment is reserved to the people.

The judgment of the Court of Appeals for the Eleventh Circuit is affirmed in part and reversed in part.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

―――――――

Nos. 11–393, 11–398 and 11–400

―――――――

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, ET AL., PETITIONERS
11–393                    *v.*
KATHLEEN SEBELIUS, SECRETARY OF HEALTH
AND HUMAN SERVICES, ET AL.


DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL., PETITIONERS
11–398                    *v.*
FLORIDA ET AL.


FLORIDA, ET AL., PETITIONERS
11–400                    *v.*
DEPARTMENT OF HEALTH AND
HUMAN SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 28, 2012]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR joins, and with whom JUSTICE BREYER and JUSTICE KAGAN join as to Parts I, II, III, and IV, concurring in part, concurring in the judgment in part, and dissenting in part.

I agree with THE CHIEF JUSTICE that the Anti-Injunction Act does not bar the Court's consideration of this case, and that the minimum coverage provision is a proper exercise of Congress' taxing power. I therefore join Parts I, II, and III–C of THE CHIEF JUSTICE's opinion. Unlike THE CHIEF JUSTICE, however, I would hold, alterna-

tively, that the Commerce Clause authorizes Congress to enact the minimum coverage provision. I would also hold that the Spending Clause permits the Medicaid expansion exactly as Congress enacted it.

I

The provision of health care is today a concern of national dimension, just as the provision of old-age and survivors' benefits was in the 1930's. In the Social Security Act, Congress installed a federal system to provide monthly benefits to retired wage earners and, eventually, to their survivors. Beyond question, Congress could have adopted a similar scheme for health care. Congress chose, instead, to preserve a central role for private insurers and state governments. According to THE CHIEF JUSTICE, the Commerce Clause does not permit that preservation. This rigid reading of the Clause makes scant sense and is stunningly retrogressive.

Since 1937, our precedent has recognized Congress' large authority to set the Nation's course in the economic and social welfare realm. See *United States* v. *Darby*, 312 U. S. 100, 115 (1941) (overruling *Hammer* v. *Dagenhart*, 247 U. S. 251 (1918), and recognizing that "regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause"); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37 (1937) ("[The commerce] power is plenary and may be exerted to protect interstate commerce no matter what the source of the dangers which threaten it." (internal quotation marks omitted)). THE CHIEF JUSTICE's crabbed reading of the Commerce Clause harks back to the era in which the Court routinely thwarted Congress' efforts to regulate the national economy in the interest of those who labor to sustain it. See, *e.g.*, *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 362, 368 (1935) (invalidating compulsory retirement and

pension plan for employees of carriers subject to the Inter-state Commerce Act; Court found law related essentially "to the social welfare of the worker, and therefore remote from any regulation of commerce as such"). It is a reading that should not have staying power.

A

In enacting the Patient Protection and Affordable Care Act (ACA), Congress comprehensively reformed the national market for health-care products and services. By any measure, that market is immense. Collectively, Americans spent $2.5 trillion on health care in 2009, accounting for 17.6% of our Nation's economy. 42 U. S. C. §18091(2)(B) (2006 ed., Supp. IV). Within the next decade, it is anticipated, spending on health care will nearly double. *Ibid.*

The health-care market's size is not its only distinctive feature. Unlike the market for almost any other product or service, the market for medical care is one in which all individuals inevitably participate. Virtually every person residing in the United States, sooner or later, will visit a doctor or other health-care professional. See Dept. of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for U. S. Adults: National Health Interview Survey 2009, Ser. 10, No. 249, p. 124, Table 37 (Dec. 2010) (Over 99.5% of adults above 65 have visited a health-care professional.). Most people will do so repeatedly. See *id.,* at 115, Table 34 (In 2009 alone, 64% of adults made two or more visits to a doctor's office.).

When individuals make those visits, they face another reality of the current market for medical care: its high cost. In 2010, on average, an individual in the United States incurred over $7,000 in health-care expenses. Dept. of Health and Human Services, Centers for Medi-care and Medicaid Services, Historic National Health

Expenditure Data, National Health Expenditures: Se-
lected Calendar Years 1960–2010 (Table 1). Over a life-
time, costs mount to hundreds of thousands of dollars. See
Alemayahu & Warner, The Lifetime Distribution of
Health Care Costs, in 39 Health Service Research 627, 635
(June 2004). When a person requires nonroutine care, the
cost will generally exceed what he or she can afford to pay.
A single hospital stay, for instance, typically costs up-
wards of $10,000. See Dept. of Health and Human Ser-
vices, Office of Health Policy, ASPE Research Brief: The
Value of Health Insurance 5 (May 2011). Treatments for
many serious, though not uncommon, conditions similarly
cost a substantial sum. Brief for Economic Scholars as
*Amici Curiae* in No. 11–398, p. 10 (citing a study indicat-
ing that, in 1998, the cost of treating a heart attack for the
first 90 days exceeded $20,000, while the annual cost of
treating certain cancers was more than $50,000).

Although every U. S. domiciliary will incur significant
medical expenses during his or her lifetime, the time when
care will be needed is often unpredictable. An accident, a
heart attack, or a cancer diagnosis commonly occurs with-
out warning. Inescapably, we are all at peril of needing
medical care without a moment's notice. See, *e.g.,* Camp-
bell, Down the Insurance Rabbit Hole, N. Y. Times, Apr. 5,
2012, p. A23 (telling of an uninsured 32-year-old woman
who, healthy one day, became a quadriplegic the next due
to an auto accident).

To manage the risks associated with medical care—
its high cost, its unpredictability, and its inevitability—
most people in the United States obtain health insurance.
Many (approximately 170 million in 2009) are insured by
private insurance companies. Others, including those
over 65 and certain poor and disabled persons, rely on
government-funded insurance programs, notably Medicare
and Medicaid. Combined, private health insurers and
State and Federal Governments finance almost 85% of the

medical care administered to U. S. residents. See Congressional Budget Office, CBO's 2011 Long-Term Budget Outlook 37 (June 2011).

Not all U. S. residents, however, have health insurance. In 2009, approximately 50 million people were uninsured, either by choice or, more likely, because they could not afford private insurance and did not qualify for government aid. See Dept. of Commerce, Census Bureau, C. DeNavas-Walt, B. Proctor, & J. Smith, Income, Poverty, and Health Insurance Coverage in the United States: 2009, p. 23, Table 8 (Sept. 2010). As a group, uninsured individuals annually consume more than $100 billion in health-care services, nearly 5% of the Nation's total. Hidden Health Tax: Americans Pay a Premium 2 (2009), available at http://www.familiesusa.org (all Internet material as visited June 25, 2012, and included in Clerk of Court's case file). Over 60% of those without insurance visit a doctor's office or emergency room in a given year. See Dept. of Health and Human Services, National Center for Health Statistics, Health—United States—2010, p. 282, Table 79 (Feb. 2011).

B

The large number of individuals without health insurance, Congress found, heavily burdens the national health-care market. See 42 U. S. C. §18091(2). As just noted, the cost of emergency care or treatment for a serious illness generally exceeds what an individual can afford to pay on her own. Unlike markets for most products, however, the inability to pay for care does not mean that an uninsured individual will receive no care. Federal and state law, as well as professional obligations and embedded social norms, require hospitals and physicians to provide care when it is most needed, regardless of the patient's ability to pay. See, *e.g.,* 42 U. S. C. §1395dd; Fla. Stat. §395.1041(3)(f) (2010); Tex. Health & Safety Code

Ann. §§311.022(a) and (b) (West 2010); American Medical Association, Council on Ethical and Judicial Affairs, Code of Medical Ethics, Current Opinions: Opinion 8.11— Neglect of Patient, p. 70 (1998–1999 ed.).

As a consequence, medical-care providers deliver significant amounts of care to the uninsured for which the providers receive no payment. In 2008, for example, hospitals, physicians, and other health-care professionals received no compensation for $43 billion worth of the $116 billion in care they administered to those without insurance. 42 U. S. C. §18091(2)(F) (2006 ed., Supp. IV).

Health-care providers do not absorb these bad debts. Instead, they raise their prices, passing along the cost of uncompensated care to those who do pay reliably: the government and private insurance companies. In response, private insurers increase their premiums, shifting the cost of the elevated bills from providers onto those who carry insurance. The net result: Those with health insurance subsidize the medical care of those without it. As economists would describe what happens, the uninsured "free ride" on those who pay for health insurance.

The size of this subsidy is considerable. Congress found that the cost-shifting just described "increases family [insurance] premiums by on average over $1,000 a year." *Ibid.* Higher premiums, in turn, render health insurance less affordable, forcing more people to go without insurance and leading to further cost-shifting.

And it is hardly just the currently sick or injured among the uninsured who prompt elevation of the price of health care and health insurance. Insurance companies and health-care providers know that some percentage of healthy, uninsured people will suffer sickness or injury each year and will receive medical care despite their inability to pay. In anticipation of this uncompensated care, health-care companies raise their prices, and insurers their premiums. In other words, because any uninsured

person may need medical care at any moment and because health-care companies must account for that risk, every uninsured person impacts the market price of medical care and medical insurance.

The failure of individuals to acquire insurance has other deleterious effects on the health-care market. Because those without insurance generally lack access to preventative care, they do not receive treatment for conditions—like hypertension and diabetes—that can be successfully and affordably treated if diagnosed early on. See Institute of Medicine, National Academies, Insuring America's Health: Principles and Recommendations 43 (2004). When sickness finally drives the uninsured to seek care, once treatable conditions have escalated into grave health problems, requiring more costly and extensive intervention. *Id.,* at 43–44. The extra time and resources providers spend serving the uninsured lessens the providers' ability to care for those who do have insurance. See Kliff, High Uninsured Rates Can Kill You—Even if You Have Coverage, Washington Post (May 7, 2012) (describing a study of California's health-care market which found that, when hospitals divert time and resources to provide uncompensated care, the quality of care the hospitals deliver to those with insurance drops significantly), available at http://www.washingtonpost.com/blogs/ezra-klein/post/ high-uninsured-rates-can-kill-you-even-if-you-have-coverage/2012/ 05/07/gIQALNHN8T_print.html.

## C

States cannot resolve the problem of the uninsured on their own. Like Social Security benefits, a universal health-care system, if adopted by an individual State, would be "bait to the needy and dependent elsewhere, encouraging them to migrate and seek a haven of repose." *Helvering* v. *Davis*, 301 U. S. 619, 644 (1937). See also Brief for Commonwealth of Massachusetts as *Amicus*

*Curiae* in No. 11–398, p. 15 (noting that, in 2009, Massachusetts' emergency rooms served thousands of uninsured, out-of-state residents). An influx of unhealthy individuals into a State with universal health care would result in increased spending on medical services. To cover the increased costs, a State would have to raise taxes, and private health-insurance companies would have to increase premiums. Higher taxes and increased insurance costs would, in turn, encourage businesses and healthy individuals to leave the State.

States that undertake health-care reforms on their own thus risk "placing themselves in a position of economic disadvantage as compared with neighbors or competitors." *Davis*, 301 U. S., at 644. See also Brief for Health Care for All, Inc., et al. as *Amici Curiae* in No. 11–398, p. 4 ("[O]ut-of-state residents continue to seek and receive millions of dollars in uncompensated care in Massachusetts hospitals, limiting the State's efforts to improve its health care system through the elimination of uncompensated care."). Facing that risk, individual States are unlikely to take the initiative in addressing the problem of the uninsured, even though solving that problem is in all States' best interests. Congress' intervention was needed to overcome this collective-action impasse.

D

Aware that a national solution was required, Congress could have taken over the health-insurance market by establishing a tax-and-spend federal program like Social Security. Such a program, commonly referred to as a single-payer system (where the sole payer is the Federal Government), would have left little, if any, room for private enterprise or the States. Instead of going this route, Congress enacted the ACA, a solution that retains a robust role for private insurers and state governments. To make its chosen approach work, however, Congress had to

use some new tools, including a requirement that most individuals obtain private health insurance coverage. See 26 U. S. C. §5000A (2006 ed., Supp. IV) (the minimum coverage provision). As explained below, by employing these tools, Congress was able to achieve a practical, altogether reasonable, solution.

A central aim of the ACA is to reduce the number of uninsured U. S. residents. See 42 U. S. C. §18091(2)(C) and (I) (2006 ed., Supp. IV). The minimum coverage provision advances this objective by giving potential recipients of health care a financial incentive to acquire insurance. Per the minimum coverage provision, an individual must either obtain insurance or pay a toll constructed as a tax penalty. See 26 U. S. C. §5000A.

The minimum coverage provision serves a further purpose vital to Congress' plan to reduce the number of uninsured. Congress knew that encouraging individuals to purchase insurance would not suffice to solve the problem, because most of the uninsured are not uninsured by choice.[1] Of particular concern to Congress were people who, though desperately in need of insurance, often cannot acquire it: persons who suffer from preexisting medical conditions.

Before the ACA's enactment, private insurance companies took an applicant's medical history into account when setting insurance rates or deciding whether to insure an individual. Because individuals with preexisting med-

_____

[1] According to one study conducted by the National Center for Health Statistics, the high cost of insurance is the most common reason why individuals lack coverage, followed by loss of one's job, an employer's unwillingness to offer insurance or an insurers' unwillingness to cover those with preexisting medical conditions, and loss of Medicaid coverage. See Dept. of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for the U. S. Population: National Health Interview Survey—2009, Ser. 10, No. 248, p. 71, Table 25 (Dec. 2010). "[D]id not want or need coverage" received too few responses to warrant its own category. See *ibid.,* n. 2.

ical conditions cost insurance companies significantly more than those without such conditions, insurers routinely refused to insure these individuals, charged them substantially higher premiums, or offered only limited coverage that did not include the preexisting illness. See Dept. of Health and Human Services, Coverage Denied: How the Current Health Insurance System Leaves Millions Behind 1 (2009) (Over the past three years, 12.6 million nonelderly adults were denied insurance coverage or charged higher premiums due to a preexisting condition.).

To ensure that individuals with medical histories have access to affordable insurance, Congress devised a three-part solution. First, Congress imposed a "guaranteed issue" requirement, which bars insurers from denying coverage to any person on account of that person's medical condition or history. See 42 U. S. C. §§300gg–1, 300gg–3, 300gg–4(a) (2006 ed., Supp. IV). Second, Congress required insurers to use "community rating" to price their insurance policies. See §300gg. Community rating, in effect, bars insurance companies from charging higher premiums to those with preexisting conditions.

But these two provisions, Congress comprehended, could not work effectively unless individuals were given a powerful incentive to obtain insurance. See Hearings before the House Ways and Means Committee, 111th Cong., 1st Sess., 10, 13 (2009) (statement of Uwe Reinhardt) ("[I]mposition of *community-rated premiums* and *guaranteed* issue on a market of competing private health insurers will inexorably drive that market into extinction, unless these two features are coupled with . . . *a mandate on individual[s] to be insured.*" (emphasis in original)).

In the 1990's, several States—including New York, New Jersey, Washington, Kentucky, Maine, New Hampshire, and Vermont—enacted guaranteed-issue and community-rating laws without requiring universal acquisition of insurance coverage. The results were disastrous. "All

seven states suffered from skyrocketing insurance pre-
mium costs, reductions in individuals with coverage, and
reductions in insurance products and providers." Brief for
American Association of People with Disabilities et al. as
*Amici Curiae* in No. 11–398, p. 9 (hereinafter AAPD Brief).
See also Brief for Governor of Washington Christine
Gregoire as *Amicus Curiae* in No. 11–398, pp. 11–14 (de-
scribing the "death spiral" in the insurance market Wash-
ington experienced when the State passed a law requiring
coverage for preexisting conditions).

Congress comprehended that guaranteed-issue and
community-rating laws alone will not work. When insur-
ance companies are required to insure the sick at afforda-
ble prices, individuals can wait until they become ill to buy
insurance. Pretty soon, those in need of immediate medi-
cal care—*i.e.,* those who cost insurers the most—become
the insurance companies' main customers. This "adverse
selection" problem leaves insurers with two choices: They
can either raise premiums dramatically to cover their
ever-increasing costs or they can exit the market. In the
seven States that tried guaranteed-issue and community-
rating requirements without a minimum coverage provi-
sion, that is precisely what insurance companies did. See,
*e.g.,* AAPD Brief 10 ("[In Maine,] [m]any insurance provid-
ers doubled their premiums in just three years or less.");
*id.,* at 12 ("Like New York, Vermont saw substantial
increases in premiums after its . . . insurance reform
measures took effect in 1993."); Hall, An Evaluation of
New York's Reform Law, 25 J. Health Pol. Pol'y & L. 71,
91–92 (2000) (Guaranteed-issue and community-rating
laws resulted in a "dramatic exodus of indemnity insurers
from New York's individual [insurance] market."); Brief
for Barry Friedman et al. as *Amici Curiae* in No. 11–398,
p. 17 ("In Kentucky, all but two insurers (one State-run)
abandoned the State.").

Massachusetts, Congress was told, cracked the adverse

selection problem. By requiring most residents to obtain insurance, see Mass. Gen. Laws, ch. 111M, §2 (West 2011), the Commonwealth ensured that insurers would not be left with only the sick as customers. As a result, federal lawmakers observed, Massachusetts succeeded where other States had failed. See Brief for Commonwealth of Massachusetts as *Amicus Curiae* in No. 11–398, p. 3 (noting that the Commonwealth's reforms reduced the number of uninsured residents to less than 2%, the lowest rate in the Nation, and cut the amount of uncompensated care by a third); 42 U. S. C. §18091(2)(D) (2006 ed., Supp. IV) (noting the success of Massachusetts' reforms).[2] In coupling the minimum coverage provision with guaranteed-issue and community-rating prescriptions, Congress followed Massachusetts' lead.

\* \* \*

In sum, Congress passed the minimum coverage provision as a key component of the ACA to address an economic and social problem that has plagued the Nation for decades: the large number of U. S. residents who are unable or unwilling to obtain health insurance. Whatever one thinks of the policy decision Congress made, it was Congress' prerogative to make it. Reviewed with appropriate deference, the minimum coverage provision, allied to the guaranteed-issue and community-rating prescriptions, should survive measurement under the Commerce and Necessary and Proper Clauses.

II

A

The Commerce Clause, it is widely acknowledged, "was the Framers' response to the central problem that gave

—————

[2] Despite its success, Massachusetts' medical-care providers still administer substantial amounts of uncompensated care, much of that to uninsured patients from out-of-state. See *supra,* at 7–8.

rise to the Constitution itself." *EEOC* v. *Wyoming*, 460 U. S. 226, 244, 245, n. 1 (1983) (Stevens, J., concurring) (citing sources). Under the Articles of Confederation, the Constitution's precursor, the regulation of commerce was left to the States. This scheme proved unworkable, because the individual States, understandably focused on their own economic interests, often failed to take actions critical to the success of the Nation as a whole. See Vices of the Political System of the United States, in James Madison: Writings 69, 71, ¶5 (J. Rakove ed. 1999) (As a result of the "want of concert in matters where common interest requires it," the "national dignity, interest, and revenue [have] suffered.").[3]

What was needed was a "national Government . . . armed with a positive & compleat authority in all cases where uniform measures are necessary." See Letter from James Madison to Edmund Randolph (Apr. 8, 1787), in 9 Papers of James Madison 368, 370 (R. Rutland ed. 1975). See also Letter from George Washington to James Madison (Nov. 30, 1785), in 8 *id.,* at 428, 429 ("We are either a United people, or we are not. If the former, let us, in all matters of general concern act as a nation, which ha[s] national objects to promote, and a national character to support."). The Framers' solution was the Commerce Clause, which, as they perceived it, granted Congress the authority to enact economic legislation "in all Cases for the general Interests of the Union, and also in those Cases to which the States are separately incompetent." 2 Records of the Federal Convention of 1787, pp. 131–132, ¶8

---

[3] Alexander Hamilton described the problem this way: "[Often] it would be beneficial to all the states to encourage, or suppress[,] a particular branch of trade, while it would be detrimental . . . to attempt it without the concurrence of the rest." The Continentalist No. V, in 3 Papers of Alexander Hamilton 75, 78 (H. Syrett ed. 1962). Because the concurrence of all States was exceedingly difficult to obtain, Hamilton observed, "the experiment would probably be left untried." *Ibid.*

(M. Farrand rev. 1966). See also *North American Co.* v. *SEC*, 327 U. S. 686, 705 (1946) ("[The commerce power] is an affirmative power commensurate with the national needs.").

The Framers understood that the "general Interests of the Union" would change over time, in ways they could not anticipate. Accordingly, they recognized that the Constitution was of necessity a "great outlin[e]," not a detailed blueprint, see *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819), and that its provisions included broad concepts, to be "explained by the context or by the facts of the case," Letter from James Madison to N. P. Trist (Dec. 1831), in 9 Writings of James Madison 471, 475 (G. Hunt ed. 1910). "Nothing . . . can be more fallacious," Alexander Hamilton emphasized, "than to infer the extent of any power, proper to be lodged in the national government, from . . . its immediate necessities. There ought to be a CAPACITY to provide for future contingencies[,] as they may happen; and as these are illimitable in their nature, it is impossible safely to limit that capacity." The Federalist No. 34, pp. 205, 206 (John Harvard Library ed. 2009). See also *McCulloch*, 4 Wheat., at 415 (The Necessary and Proper Clause is lodged "in a constitution[,] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs.").

## B

Consistent with the Framers' intent, we have repeatedly emphasized that Congress' authority under the Commerce Clause is dependent upon "practical" considerations, including "actual experience." *Jones & Laughlin Steel Corp.*, 301 U. S., at 41–42; see *Wickard* v. *Filburn*, 317 U. S. 111, 122 (1942); *United States* v. *Lopez*, 514 U. S. 549, 573 (1995) (KENNEDY, J., concurring) (emphasizing "the Court's definitive commitment to the practical conception of the commerce power"). See also *North American*

*Co.*, 327 U. S., at 705 ("Commerce itself is an intensely practical matter. To deal with it effectively, Congress must be able to act in terms of economic and financial realities." (citation omitted)). We afford Congress the leeway "to undertake to solve national problems directly and realistically." *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 103 (1946).

Until today, this Court's pragmatic approach to judging whether Congress validly exercised its commerce power was guided by two familiar principles. First, Congress has the power to regulate economic activities "that substantially affect interstate commerce." *Gonzales* v. *Raich*, 545 U. S. 1, 17 (2005). This capacious power extends even to local activities that, viewed in the aggregate, have a substantial impact on interstate commerce. See *ibid.* See also *Wickard*, 317 U. S., at 125 ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, *whatever its nature*, be reached by Congress if it exerts a substantial economic effect on interstate commerce." (emphasis added)); *Jones & Laughlin Steel Corp.*, 301 U. S., at 37.

Second, we owe a large measure of respect to Congress when it frames and enacts economic and social legislation. See *Raich*, 545 U. S., at 17. See also *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 729 (1984) ("[S]trong deference [is] accorded legislation in the field of national economic policy."); *Hodel* v. *Indiana*, 452 U. S. 314, 326 (1981) ("This [C]ourt will certainly not substitute its judgment for that of Congress unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent." (internal quotation marks omitted)). When appraising such legislation, we ask only (1) whether Congress had a "rational basis" for concluding that the regulated activity substantially affects interstate commerce, and (2) whether there is a "reasonable connection between the regulatory means selected and

the asserted ends." *Id.,* at 323–324. See also *Raich*, 545
U. S., at 22; *Lopez*, 514 U. S., at 557; *Hodel* v. *Virginia
Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264,
277 (1981); *Katzenbach* v. *McClung*, 379 U. S. 294, 303
(1964); *Heart of Atlanta Motel, Inc.* v. *United States*, 379
U. S. 241, 258 (1964); *United States* v. *Carolene Products
Co.*, 304 U. S. 144, 152–153 (1938). In answering these
questions, we presume the statute under review is consti-
tutional and may strike it down only on a "plain showing"
that Congress acted irrationally. *United States* v. *Morri-
son*, 529 U. S. 598, 607 (2000).

## C

Straightforward application of these principles would
require the Court to hold that the minimum coverage
provision is proper Commerce Clause legislation. Beyond
dispute, Congress had a rational basis for concluding that
the uninsured, as a class, substantially affect interstate
commerce. Those without insurance consume billions of
dollars of health-care products and services each year. See
*supra,* at 5. Those goods are produced, sold, and delivered
largely by national and regional companies who routinely
transact business across state lines. The uninsured also
cross state lines to receive care. Some have medical emer-
gencies while away from home. Others, when sick, go to a
neighboring State that provides better care for those who
have not prepaid for care. See *supra,* at 7–8.

Not only do those without insurance consume a large
amount of health care each year; critically, as earlier
explained, their inability to pay for a significant portion of
that consumption drives up market prices, foists costs on
other consumers, and reduces market efficiency and sta-
bility. See *supra,* at 5–7. Given these far-reaching effects
on interstate commerce, the decision to forgo insurance is
hardly inconsequential or equivalent to "doing nothing,"
*ante,* at 20; it is, instead, an economic decision Congress

has the authority to address under the Commerce Clause. See *supra,* at 14–16.  See also *Wickard,* 317 U. S., at 128 ("It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and *practices affecting such prices.*" (emphasis added)).

The minimum coverage provision, furthermore, bears a "reasonable connection" to Congress' goal of protecting the health-care market from the disruption caused by individuals who fail to obtain insurance.  By requiring those who do not carry insurance to pay a toll, the minimum coverage provision gives individuals a strong incentive to insure.  This incentive, Congress had good reason to believe, would reduce the number of uninsured and, correspondingly, mitigate the adverse impact the uninsured have on the national health-care market.

Congress also acted reasonably in requiring uninsured individuals, whether sick or healthy, either to obtain insurance or to pay the specified penalty.  As earlier observed, because every person is at risk of needing care at any moment, all those who lack insurance, regardless of their current health status, adversely affect the price of health care and health insurance.  See *supra,* at 6–7. Moreover, an insurance-purchase requirement limited to those in need of immediate care simply could not work. Insurance companies would either charge these individuals prohibitively expensive premiums, or, if community-rating regulations were in place, close up shop.  See *supra,* at 9–11.  See also Brief for State of Maryland and 10 Other States et al. as *Amici Curiae* in No. 11–398, p. 28 (hereinafter Maryland Brief) ("No insurance regime can survive if people can opt out when the risk insured against is only a risk, but opt in when the risk materializes.").

"[W]here we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to

the protection of commerce, our investigation is at an end."
*Katzenbach*, 379 U. S., at 303–304.  Congress' enactment
of the minimum coverage provision, which addresses a
specific interstate problem in a practical, experience-
informed manner, easily meets this criterion.

## D

Rather than evaluating the constitutionality of the
minimum coverage provision in the manner established by
our precedents, THE CHIEF JUSTICE relies on a newly
minted constitutional doctrine.  The commerce power does
not, THE CHIEF JUSTICE announces, permit Congress
to "compe[l] individuals to become active in commerce
by purchasing a product."  *Ante,* at 20 (emphasis deleted).

### 1
#### a

THE CHIEF JUSTICE's novel constraint on Congress'
commerce power gains no force from our precedent and for
that reason alone warrants disapprobation.  See *infra*, at
23–27.  But even assuming, for the moment, that Congress
lacks authority under the Commerce Clause to "compel
individuals not engaged in commerce to purchase an
unwanted product," *ante,* at 18, such a limitation would be
inapplicable here.  Everyone will, at some point, consume
health-care products and services.  See *supra,* at 3.  Thus,
if THE CHIEF JUSTICE is correct that an insurance-
purchase requirement can be applied only to those who
"actively" consume health care, the minimum coverage
provision fits the bill.

THE CHIEF JUSTICE does not dispute that all U. S. resi-
dents participate in the market for health services over
the course of their lives.  See *ante,* at 16 ("Everyone will
eventually need health care at a time and to an extent
they cannot predict.").  But, THE CHIEF JUSTICE insists,
the uninsured cannot be considered active in the market

for health care, because "[t]he proximity and degree of connection between the [uninsured today] and [their] subsequent commercial activity is too lacking." *Ante,* at 27.

This argument has multiple flaws. First, more than 60% of those without insurance visit a hospital or doctor's office each year. See *supra,* at 5. Nearly 90% will within five years.[4] An uninsured's consumption of health care is thus quite proximate: It is virtually certain to occur in the next five years and more likely than not to occur this year.

Equally evident, Congress has no way of separating those uninsured individuals who will need emergency medical care today (surely their consumption of medical care is sufficiently imminent) from those who will not need medical services for years to come. No one knows when an emergency will occur, yet emergencies involving the uninsured arise daily. To capture individuals who unexpectedly will obtain medical care in the very near future, then, Congress needed to include individuals who will not go to a doctor anytime soon. Congress, our decisions instruct, has authority to cast its net that wide. See *Perez* v. *United States*, 402 U. S. 146, 154 (1971) ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." (internal quotation marks omitted)).[5]

––––––––––

[4] See Dept. of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for U. S. Adults: National Health Interview Survey 2009, Ser. 10, No. 249, p. 124, Table 37 (Dec. 2010).

[5] Echoing THE CHIEF JUSTICE, the joint dissenters urge that the minimum coverage provision impermissibly regulates young people who "have no intention of purchasing [medical care]" and are too far "removed from the [health-care] market." See *post,* at 8, 11. This criticism ignores the reality that a healthy young person may be a day away from needing health care. See *supra,* at 4. A victim of an accident or unforeseen illness will consume extensive medical care immediately, though scarcely expecting to do so.

Second, it is Congress' role, not the Court's, to delineate the boundaries of the market the Legislature seeks to regulate. THE CHIEF JUSTICE defines the health-care market as including only those transactions that will occur either in the next instant or within some (unspecified) proximity to the next instant. But Congress could reasonably have viewed the market from a long-term perspective, encompassing all transactions virtually certain to occur over the next decade, see *supra,* at 19, not just those occurring here and now.

Third, contrary to THE CHIEF JUSTICE's contention, our precedent does indeed support "[t]he proposition that Congress may dictate the conduct of an individual today because of prophesied future activity." *Ante,* at 26. In *Wickard*, the Court upheld a penalty the Federal Government imposed on a farmer who grew more wheat than he was permitted to grow under the Agricultural Adjustment Act of 1938 (AAA). 317 U. S., at 114–115. He could not be penalized, the farmer argued, as he was growing the wheat for home consumption, not for sale on the open market. *Id.,* at 119. The Court rejected this argument. *Id.,* at 127–129. Wheat intended for home consumption, the Court noted, "overhangs the market, and if induced by rising prices, tends to flow into the market and check price increases [intended by the AAA]." *Id.,* at 128.

Similar reasoning supported the Court's judgment in *Raich*, which upheld Congress' authority to regulate marijuana grown for personal use. 545 U. S., at 19. Home-grown marijuana substantially affects the interstate market for marijuana, we observed, for "the high demand in the interstate market will [likely] draw such marijuana into that market." *Ibid.*

Our decisions thus acknowledge Congress' authority, under the Commerce Clause, to direct the conduct of an individual today (the farmer in *Wickard*, stopped from growing excess wheat; the plaintiff in *Raich*, ordered to

cease cultivating marijuana) because of a prophesied future transaction (the eventual sale of that wheat or marijuana in the interstate market). Congress' actions are even more rational in this case, where the future activity (the consumption of medical care) is certain to occur, the sole uncertainty being the time the activity will take place.

Maintaining that the uninsured are not active in the health-care market, THE CHIEF JUSTICE draws an analogy to the car market. An individual "is not 'active in the car market,'" THE CHIEF JUSTICE observes, simply because he or she may someday buy a car. *Ante,* at 25. The analogy is inapt. The inevitable yet unpredictable need for medical care and the guarantee that emergency care will be provided when required are conditions nonexistent in other markets. That is so of the market for cars, and of the market for broccoli as well. Although an individual *might* buy a car or a crown of broccoli one day, there is no certainty she will ever do so. And if she eventually wants a car or has a craving for broccoli, she will be obliged to pay at the counter before receiving the vehicle or nourishment. She will get no free ride or food, at the expense of another consumer forced to pay an inflated price. See *Thomas More Law Center* v. *Obama*, 651 F. 3d 529, 565 (CA6 2011) (Sutton, J., concurring in part) ("Regulating how citizens pay for what they already receive (health care), never quite know when they will need, and in the case of severe illnesses or emergencies generally will not be able to afford, has few (if any) parallels in modern life."). Upholding the minimum coverage provision on the ground that all are participants or will be participants in the health-care market would therefore carry no implication that Congress may justify under the Commerce Clause a mandate to buy other products and services.

Nor is it accurate to say that the minimum coverage provision "compel[s] individuals . . . to purchase an un-

wanted product," *ante,* at 18, or "suite of products," *post,* at
11, n. 2 (joint opinion of SCALIA, KENNEDY, THOMAS, and
ALITO, JJ.). If unwanted today, medical service secured by
insurance may be desperately needed tomorrow. Virtually
everyone, I reiterate, consumes health care at some point
in his or her life. See *supra,* at 3. Health insurance is a
means of paying for this care, nothing more. In requiring
individuals to obtain insurance, Congress is therefore not
mandating the purchase of a discrete, unwanted product.
Rather, Congress is merely defining the terms on which
individuals pay for an interstate good they consume:
Persons subject to the mandate must now pay for medical
care in advance (instead of at the point of service) and
through insurance (instead of out of pocket). Establishing
payment terms for goods in or affecting interstate com-
merce is quintessential economic regulation well within
Congress' domain. See, *e.g., United States* v. *Wrightwood
Dairy Co.*, 315 U. S. 110, 118 (1942). Cf. *post,* at 13 (joint
opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.)
(recognizing that "the Federal Government can prescribe
[a commodity's] quality . . . and even [its price]").

THE CHIEF JUSTICE also calls the minimum coverage
provision an illegitimate effort to make young, healthy
individuals subsidize insurance premiums paid by the less
hale and hardy. See *ante,* at 17, 25–26. This complaint,
too, is spurious. Under the current health-care system,
healthy persons who lack insurance receive a benefit for
which they do not pay: They are assured that, if they need
it, emergency medical care will be available, although they
cannot afford it. See *supra,* at 5–6. Those who have in-
surance bear the cost of this guarantee. See *ibid.* By
requiring the healthy uninsured to obtain insurance or
pay a penalty structured as a tax, the minimum coverage
provision ends the free ride these individuals currently
enjoy.

In the fullness of time, moreover, today's young and

healthy will become society's old and infirm.  Viewed over a lifespan, the costs and benefits even out: The young who pay more than their fair share currently will pay less than their fair share when they become senior citizens.  And even if, as undoubtedly will be the case, some individuals, over their lifespans, will pay more for health insurance than they receive in health services, they have little to complain about, for that is how insurance works.  Every insured person receives protection against a catastrophic loss, even though only a subset of the covered class will ultimately need that protection.

### b

In any event, THE CHIEF JUSTICE's limitation of the commerce power to the regulation of those actively engaged in commerce finds no home in the text of the Constitution or our decisions.  Article I, §8, of the Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States."  Nothing in this language implies that Congress' commerce power is limited to regulating those actively engaged in commercial transactions.  Indeed, as the D. C. Circuit observed, "[a]t the time the Constitution was [framed], to 'regulate' meant," among other things, "to require action."  See *Seven-Sky* v. *Holder*, 661 F. 3d 1, 16 (2011).

Arguing to the contrary, THE CHIEF JUSTICE notes that "the Constitution gives Congress the power to 'coin Money,' in addition to the power to 'regulate the Value thereof,'" and similarly "gives Congress the power to 'raise and support Armies' and to 'provide and maintain a Navy,' in addition to the power to 'make Rules for the Government and Regulation of the land and naval Forces.'"  *Ante,* at 18–19 (citing Art. I, §8, cls. 5, 12–14).  In separating the power to regulate from the power to bring the subject of the regulation into existence, THE CHIEF JUSTICE asserts, "[t]he language of the Constitution reflects the natural

understanding that the power to regulate assumes there is already something to be regulated." *Ante,* at 19.

This argument is difficult to fathom. Requiring individuals to obtain insurance unquestionably regulates the interstate health-insurance and health-care markets, both of them in existence well before the enactment of the ACA. See *Wickard*, 317 U. S., at 128 ("The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon."). Thus, the "something to be regulated" was surely there when Congress created the minimum coverage provision.[6]

Nor does our case law toe the activity versus inactivity line. In *Wickard*, for example, we upheld the penalty imposed on a farmer who grew too much wheat, even though the regulation had the effect of compelling farmers to purchase wheat in the open market. *Id.,* at 127–129. "[F]orcing some farmers into the market to buy what they could provide for themselves" was, the Court held, a valid means of regulating commerce. *Id.,* at 128–129. In another context, this Court similarly upheld Congress' authority under the commerce power to compel an "inactive" landholder to submit to an unwanted sale. See *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 335–337 (1893) ("[U]pon *the [great] power to regulate commerce*[,]" Congress has the authority to mandate the sale of real property to the Government, where the sale is essential to the improvement of a navigable waterway (emphasis added)); *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641,

––––––––––––

[6] THE CHIEF JUSTICE's reliance on the quoted passages of the Constitution, see *ante,* at 18–19, is also dubious on other grounds. The power to "regulate the Value" of the national currency presumably includes the power to increase the currency's worth—*i.e.,* to create value where none previously existed. And if the power to "[r]egulat[e] . . . the land and naval Forces" presupposes "there is already [in existence] something to be regulated," *i.e.,* an Army and a Navy, does Congress lack authority to create an Air Force?

657–659 (1890) (similar reliance on the commerce power regarding mandated sale of private property for railroad construction).

In concluding that the Commerce Clause does not permit Congress to regulate commercial "inactivity," and therefore does not allow Congress to adopt the practical solution it devised for the health-care problem, THE CHIEF JUSTICE views the Clause as a "technical legal conception," precisely what our case law tells us not to do. *Wickard*, 317 U. S., at 122 (internal quotation marks omitted). See also *supra,* at 14–16. This Court's former endeavors to impose categorical limits on the commerce power have not fared well. In several pre-New Deal cases, the Court attempted to cabin Congress' Commerce Clause authority by distinguishing "commerce" from activity once conceived to be noncommercial, notably, "production," "mining," and "manufacturing." See, *e.g., United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12 (1895) ("Commerce succeeds to manufacture, and is not a part of it."); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 304 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it."). The Court also sought to distinguish activities having a "direct" effect on interstate commerce, and for that reason, subject to federal regulation, from those having only an "indirect" effect, and therefore not amenable to federal control. See, *e.g., A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 548 (1935) ("[T]he distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one.").

These line-drawing exercises were untenable, and the Court long ago abandoned them. "[Q]uestions of the power of Congress [under the Commerce Clause]," we held in *Wickard*, "are not to be decided by reference to any formula which would give controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of

the actual effects of the activity in question upon inter-
state commerce." 317 U. S., at 120. See also *Morrison*,
529 U. S., at 641–644 (Souter, J., dissenting) (recounting
the Court's "nearly disastrous experiment" with formalis-
tic limits on Congress' commerce power). Failing to learn
from this history, THE CHIEF JUSTICE plows ahead with
his formalistic distinction between those who are "active
in commerce," *ante,* at 20, and those who are not.

It is not hard to show the difficulty courts (and Con-
gress) would encounter in distinguishing statutes that reg-
ulate "activity" from those that regulate "inactivity." As
Judge Easterbrook noted, "it is possible to restate most
actions as corresponding inactions with the same effect."
*Archie* v. *Racine*, 847 F. 2d 1211, 1213 (CA7 1988) (en
banc). Take this case as an example. An individual who
opts not to purchase insurance from a private insurer can
be seen as actively selecting another form of insurance:
self-insurance. See *Thomas More Law Center*, 651 F. 3d,
at 561 (Sutton, J., concurring in part) ("No one is in-
active when deciding how to pay for health care, as self-
insurance and private insurance are two forms of action
for addressing the same risk."). The minimum coverage
provision could therefore be described as regulating activ-
ists in the self-insurance market.[7] *Wickard* is another
example. Did the statute there at issue target activity
(the growing of too much wheat) or inactivity (the farmer's
failure to purchase wheat in the marketplace)? If any-
thing, the Court's analysis suggested the latter. See 317
U. S., at 127–129.

At bottom, THE CHIEF JUSTICE's and the joint dissent-

_____

[7] THE CHIEF JUSTICE's characterization of individuals who choose not
to purchase private insurance as "doing nothing," *ante,* at 20, is simi-
larly questionable. A person who self-insures opts against prepayment for
a product the person will in time consume. When aggregated, exercise
of that option has a substantial impact on the health-care market. See
*supra,* at 5–7, 16–17.

ers' "view that an individual cannot be subject to Commerce Clause regulation absent voluntary, affirmative acts that enter him or her into, or affect, the interstate market expresses a concern for individual liberty that [is] more redolent of Due Process Clause arguments." *Seven-Sky*, 661 F. 3d, at 19. See also *Troxel* v. *Granville*, 530 U. S. 57, 65 (2000) (plurality opinion) ("The [Due Process] Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." (internal quotation marks omitted)). Plaintiffs have abandoned any argument pinned to substantive due process, however, see 648 F. 3d 1235, 1291, n. 93 (CA11 2011), and now concede that the provisions here at issue do not offend the Due Process Clause.[8]

2

Underlying THE CHIEF JUSTICE's view that the Commerce Clause must be confined to the regulation of active participants in a commercial market is a fear that the commerce power would otherwise know no limits. See, *e.g., ante*, at 23 (Allowing Congress to compel an individual not engaged in commerce to purchase a product would "permi[t] Congress to reach beyond the natural extent of its authority, everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex." (internal quotation marks omitted)). The joint dissenters

---

[8] Some adherents to the joint dissent have questioned the existence of substantive due process rights. See *McDonald* v. *Chicago*, 561 U. S. \_\_\_, \_\_\_ (2010) (THOMAS, J., concurring) (slip op., at 7) (The notion that the Due Process Clause "could define the substance of th[e] righ[t to liberty] strains credulity."); *Albright* v. *Oliver*, 510 U. S. 266, 275 (1994) (SCALIA, J., concurring) ("I reject the proposition that the Due Process Clause guarantees certain (unspecified) liberties[.]"). Given these Justices' reluctance to interpret the Due Process Clause as guaranteeing liberty interests, their willingness to plant such protections in the Commerce Clause is striking.

express a similar apprehension. See *post,* at 8 (If the
minimum coverage provision is upheld under the com-
merce power then "the Commerce Clause becomes a font of
unlimited power, . . . the hideous monster whose devour-
ing jaws . . . spare neither sex nor age, nor high nor low,
nor sacred nor profane." (internal quotation marks omit-
ted)). This concern is unfounded.

First, THE CHIEF JUSTICE could certainly uphold the
individual mandate without giving Congress *carte blanche*
to enact any and all purchase mandates. As several times
noted, the unique attributes of the health-care market
render everyone active in that market and give rise to a
significant free-riding problem that does not occur in other
markets. See *supra,* at 3–7, 16–18, 21.

Nor would the commerce power be unbridled, absent
THE CHIEF JUSTICE's "activity" limitation. Congress would
remain unable to regulate noneconomic conduct that has
only an attenuated effect on interstate commerce and is
traditionally left to state law. See *Lopez*, 514 U. S., at
567; *Morrison*, 529 U. S., at 617–619. In *Lopez*, for
example, the Court held that the Federal Government
lacked power, under the Commerce Clause, to criminalize
the possession of a gun in a local school zone. Possessing
a gun near a school, the Court reasoned, "is in no sense
an economic activity that might, through repetition else-
where, substantially affect any sort of interstate com-
merce." 514 U. S., at 567; *ibid.* (noting that the Court
would have "to pile inference upon inference" to conclude
that gun possession has a substantial effect on commerce).
Relying on similar logic, the Court concluded in *Morrison*
that Congress could not regulate gender-motivated vio-
lence, which the Court deemed to have too "attenuated
[an] effect upon interstate commerce." 529 U. S., at 615.

An individual's decision to self-insure, I have explained,
is an economic act with the requisite connection to inter-
state commerce. See *supra,* at 16–17. Other choices

individuals make are unlikely to fit the same or similar description. As an example of the type of regulation he fears, THE CHIEF JUSTICE cites a Government mandate to purchase green vegetables. *Ante,* at 22–23. One could call this concern "the broccoli horrible." Congress, THE CHIEF JUSTICE posits, might adopt such a mandate, reasoning that an individual's failure to eat a healthy diet, like the failure to purchase health insurance, imposes costs on others. See *ibid.*

Consider the chain of inferences the Court would have to accept to conclude that a vegetable-purchase mandate was likely to have a substantial effect on the health-care costs borne by lithe Americans. The Court would have to believe that individuals forced to buy vegetables would then eat them (instead of throwing or giving them away), would prepare the vegetables in a healthy way (steamed or raw, not deep-fried), would cut back on unhealthy foods, and would not allow other factors (such as lack of exercise or little sleep) to trump the improved diet.[9] Such "pil[ing of] inference upon inference" is just what the Court refused to do in *Lopez* and *Morrison*.

Other provisions of the Constitution also check congressional overreaching. A mandate to purchase a particular product would be unconstitutional if, for example, the edict impermissibly abridged the freedom of speech, interfered with the free exercise of religion, or infringed on a liberty interest protected by the Due Process Clause.

---

[9] The failure to purchase vegetables in THE CHIEF JUSTICE's hypothetical, then, is *not* what leads to higher health-care costs for others; rather, it is the failure of individuals to maintain a healthy diet, and the resulting obesity, that creates the cost-shifting problem. See *ante,* at 22–23. Requiring individuals to purchase vegetables is thus several steps removed from solving the problem. The failure to obtain health insurance, by contrast, is the *immediate cause* of the cost-shifting Congress sought to address through the ACA. See *supra,* at 5–7. Requiring individuals to obtain insurance attacks the source of the problem directly, in a single step.

Supplementing these legal restraints is a formidable check on congressional power: the democratic process. See *Raich*, 545 U. S., at 33; *Wickard*, 317 U. S., at 120 (repeating Chief Justice Marshall's "warning that effective restraints on [the commerce power's] exercise must proceed from political rather than judicial processes" (citing *Gibbons* v. *Ogden*, 9 Wheat. 1, 197 (1824)). As the controversy surrounding the passage of the Affordable Care Act attests, purchase mandates are likely to engender political resistance. This prospect is borne out by the behavior of state legislators. Despite their possession of unquestioned authority to impose mandates, state governments have rarely done so. See Hall, Commerce Clause Challenges to Health Care Reform, 159 U. Pa. L. Rev. 1825, 1838 (2011).

When contemplated in its extreme, almost any power looks dangerous. The commerce power, hypothetically, would enable Congress to prohibit the purchase and home production of all meat, fish, and dairy goods, effectively compelling Americans to eat only vegetables. Cf. *Raich*, 545 U. S., at 9; *Wickard*, 317 U. S., at 127–129. Yet no one would offer the "hypothetical and unreal possibilit[y]," *Pullman Co.* v. *Knott*, 235 U. S. 23, 26 (1914), of a vegetarian state as a credible reason to deny Congress the authority ever to ban the possession and sale of goods. THE CHIEF JUSTICE accepts just such specious logic when he cites the broccoli horrible as a reason to deny Congress the power to pass the individual mandate. Cf. R. Bork, The Tempting of America 169 (1990) ("Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom."). But see, *e.g., post,* at 3 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.) (asserting, outlandishly, that if the minimum coverage provision is sustained, then Congress could make "breathing in and out the basis for federal prescription").

3

To bolster his argument that the minimum coverage provision is not valid Commerce Clause legislation, THE CHIEF JUSTICE emphasizes the provision's novelty. See *ante,* at 18 (asserting that "sometimes the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent for Congress's action" (internal quotation marks omitted)). While an insurance-purchase mandate may be novel, THE CHIEF JUSTICE's argument certainly is not. "[I]n almost every instance of the exercise of the [commerce] power differences are asserted from previous exercises of it and made a ground of attack." *Hoke* v. *United States*, 227 U. S. 308, 320 (1913). See, *e.g., Brief for Petitioner in *Perez* v. *United States*, O. T. 1970, No. 600, p. 5 ("unprecedented exercise of power"); Supplemental Brief for Appellees in *Katzenbach* v. *McClung*, O. T. 1964, No. 543, p. 40 ("novel assertion of federal power"); Brief for Appellee in *Wickard* v. *Filburn*, O. T. 1941, No. 59, p. 6 ("complete departure"). For decades, the Court has declined to override legislation because of its novelty, and for good reason. As our national economy grows and changes, we have recognized, Congress must adapt to the changing "economic and financial realities." See *supra,* at 14–15. Hindering Congress' ability to do so is shortsighted; if history is any guide, today's constriction of the Commerce Clause will not endure. See *supra,* at 25–26.

III

A

For the reasons explained above, the minimum coverage provision is valid Commerce Clause legislation. See *supra,* Part II. When viewed as a component of the entire ACA, the provision's constitutionality becomes even plainer.

The Necessary and Proper Clause "empowers Congress

to enact laws in effectuation of its [commerce] powe[r]
that are not within its authority to enact in isolation."
*Raich*, 545 U. S., at 39 (SCALIA, J., concurring in judgment).
Hence, "[a] complex regulatory program . . . can survive a
Commerce Clause challenge without a showing that every
single facet of the program is independently and directly
related to a valid congressional goal." *Indiana*, 452 U. S.,
at 329, n. 17. "It is enough that the challenged provisions
are an integral part of the regulatory program and that
the regulatory scheme when considered as a whole satis-
fies this test." *Ibid.* (collecting cases). See also *Raich*,
545 U. S., at 24–25 (A challenged statutory provision
fits within Congress' commerce authority if it is an "essen-
tial par[t] of a larger regulation of economic activity,"
such that, in the absence of the provision, "the regulatory
scheme could be undercut." (quoting *Lopez*, 514 U. S., at
561)); *Raich*, 545 U. S., at 37 (SCALIA, J., concurring in
judgment) ("Congress may regulate even noneconomic
local activity if that regulation is a necessary part of
a more general regulation of interstate commerce. The
relevant question is simply whether the means chosen are
'reasonably adapted' to the attainment of a legitimate end
under the commerce power." (citation omitted)).

Recall that one of Congress' goals in enacting the Af-
fordable Care Act was to eliminate the insurance indus-
try's practice of charging higher prices or denying coverage
to individuals with preexisting medical conditions. See
*supra,* at 9–10. The commerce power allows Congress to
ban this practice, a point no one disputes. See *United
States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533,
545, 552–553 (1944) (Congress may regulate "the methods
by which interstate insurance companies do business.").

Congress knew, however, that simply barring insurance
companies from relying on an applicant's medical history
would not work in practice. Without the individual man-
date, Congress learned, guaranteed-issue and community-

rating requirements would trigger an adverse-selection death-spiral in the health-insurance market: Insurance premiums would skyrocket, the number of uninsured would increase, and insurance companies would exit the market. See *supra,* at 10–11. When complemented by an insurance mandate, on the other hand, guaranteed issue and community rating would work as intended, increasing access to insurance and reducing uncompensated care. See *supra,* at 11–12. The minimum coverage provision is thus an "essential par[t] of a larger regulation of economic activity"; without the provision, "the regulatory scheme [w]ould be undercut." *Raich*, 545 U. S., at 24–25 (internal quotation marks omitted). Put differently, the minimum coverage provision, together with the guaranteed-issue and community-rating requirements, is "'reasonably adapted' to the attainment of a legitimate end under the commerce power": the elimination of pricing and sales practices that take an applicant's medical history into account. See *id.,* at 37 (SCALIA, J., concurring in judgment).

B

Asserting that the Necessary and Proper Clause does not authorize the minimum coverage provision, THE CHIEF JUSTICE focuses on the word "proper." A mandate to purchase health insurance is not "proper" legislation, THE CHIEF JUSTICE urges, because the command "undermine[s] the structure of government established by the Constitution." *Ante,* at 28. If long on rhetoric, THE CHIEF JUSTICE's argument is short on substance.

THE CHIEF JUSTICE cites only two cases in which this Court concluded that a federal statute impermissibly transgressed the Constitution's boundary between state and federal authority: *Printz* v. *United States*, 521 U. S. 898 (1997), and *New York* v. *United States*, 505 U. S. 144 (1992). See *ante,* at 29. The statutes at issue in

both cases, however, compelled *state officials* to act on the Federal Government's behalf. 521 U. S., at 925–933 (holding unconstitutional a statute obligating state law enforcement officers to implement a federal gun-control law); *New York*, 505 U. S., at 176–177 (striking down a statute requiring state legislators to pass regulations pursuant to Congress' instructions). "[Federal] laws conscripting state officers," the Court reasoned, "violate state sovereignty and are thus not in accord with the Constitution." *Printz,* 521 U. S., at 925, 935; *New York*, 505 U. S., at 176.

The minimum coverage provision, in contrast, acts "directly upon individuals, without employing the States as intermediaries." *New York*, 505 U. S., at 164. The provision is thus entirely consistent with the Constitution's design. See *Printz*, 521 U. S., at 920 ("[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." (internal quotation marks omitted)).

Lacking case law support for his holding, THE CHIEF JUSTICE nevertheless declares the minimum coverage provision not "proper" because it is less "narrow in scope" than other laws this Court has upheld under the Necessary and Proper Clause. *Ante,* at 29 (citing *United States* v. *Comstock*, 560 U. S. ___ (2010); *Sabri* v. *United States*, 541 U. S. 600 (2004); *Jinks* v. *Richland County*, 538 U. S. 456 (2003)). THE CHIEF JUSTICE's reliance on cases in which this Court has *affirmed* Congress' "broad authority to enact federal legislation" under the Necessary and Proper Clause, *Comstock*, 560 U. S., at ___ (slip op., at 5), is underwhelming.

Nor does THE CHIEF JUSTICE pause to explain *why* the power to direct either the purchase of health insurance or, alternatively, the payment of a penalty collectible as a tax is more far-reaching than other implied powers this Court has found meet under the Necessary and Proper Clause. These powers include the power to enact criminal laws,

see, *e.g., United States* v. *Fox*, 95 U. S. 670, 672 (1878); the power to imprison, including civil imprisonment, see, *e.g., Comstock*, 560 U. S., at \_\_\_ (slip op., at 1); and the power to create a national bank, see *McCulloch*, 4 Wheat., at 425. See also *Jinks*, 538 U. S., at 463 (affirming Congress' power to alter the way a state law is applied in state court, where the alteration "promotes fair and efficient operation of the federal courts").[10]

In failing to explain why the individual mandate threatens our constitutional order, THE CHIEF JUSTICE disserves future courts. How is a judge to decide, when ruling on the constitutionality of a federal statute, whether Congress employed an "independent power," *ante,* at 28, or merely a "derivative" one, *ante,* at 29. Whether the power used is "substantive," *ante,* at 30, or just "incidental," *ante,* at 29? The instruction THE CHIEF JUSTICE, in effect, provides lower courts: You will know it when you see it.

It is more than exaggeration to suggest that the minimum coverage provision improperly intrudes on "essential attributes of state sovereignty." *Ibid.* (internal quotation marks omitted). First, the Affordable Care Act does not operate "in [an] are[a] such as criminal law enforcement or education where States historically have been sovereign." *Lopez*, 514 U. S., at 564. As evidenced by Medicare, Medicaid, the Employee Retirement Income Security Act of 1974 (ERISA), and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Federal Govern-

---

[10] Indeed, Congress regularly and uncontroversially requires individuals who are "doing nothing," see *ante,* at 20, to take action. Examples include federal requirements to report for jury duty, 28 U. S. C. §1866(g) (2006 ed., Supp. IV); to register for selective service, 50 U. S. C. App. §453; to purchase firearms and gear in anticipation of service in the Militia, 1 Stat. 271 (Uniform Militia Act of 1792); to turn gold currency over to the Federal Government in exchange for paper currency, see *Nortz* v. *United States*, 294 U. S. 317, 328 (1935); and to file a tax return, 26 U. S. C. §6012 (2006 ed., Supp. IV).

ment plays a lead role in the health-care sector, both as a direct payer and as a regulator.

Second, and perhaps most important, the minimum coverage provision, along with other provisions of the ACA, addresses the very sort of interstate problem that made the commerce power essential in our federal system. See *supra,* at 12–14. The crisis created by the large number of U. S. residents who lack health insurance is one of national dimension that States are "separately incompetent" to handle. See *supra,* at 7–8, 13. See also Maryland Brief 15–26 (describing "the impediments to effective state policymaking that flow from the interconnectedness of each state's healthcare economy" and emphasizing that "state-level reforms cannot fully address the problems associated with uncompensated care"). Far from trampling on States' sovereignty, the ACA attempts a federal solution for the very reason that the States, acting separately, cannot meet the need. Notably, the ACA serves the general welfare of the people of the United States while retaining a prominent role for the States. See *id.,* at 31–36 (explaining and illustrating how the ACA affords States wide latitude in implementing key elements of the Act's reforms).[11]

---

[11] In a separate argument, the joint dissenters contend that the minimum coverage provision is not necessary and proper because it was not the "only . . . way" Congress could have made the guaranteed-issue and community-rating reforms work. *Post,* at 9–10. Congress could also have avoided an insurance-market death spiral, the dissenters maintain, by imposing a surcharge on those who did not previously purchase insurance when those individuals eventually enter the health-insurance system. *Post,* at 10. Or Congress could "den[y] a full income tax credit" to those who do not purchase insurance. *Ibid.*

Neither a surcharge on those who purchase insurance nor the denial of a tax credit to those who do not would solve the problem created by guaranteed-issue and community-rating requirements. Neither would prompt the purchase of insurance before sickness or injury occurred.

IV

In the early 20th century, this Court regularly struck down economic regulation enacted by the peoples' representatives in both the States and the Federal Government. See, *e.g., Carter Coal Co.*, 298 U. S., at 303–304, 309–310; *Dagenhart*, 247 U. S., at 276–277; *Lochner* v. *New York*, 198 U. S. 45, 64 (1905). THE CHIEF JUSTICE's Commerce Clause opinion, and even more so the joint dissenters' reasoning, see *post,* at 4–16, bear a disquieting resemblance to those long-overruled decisions.

Ultimately, the Court upholds the individual mandate as a proper exercise of Congress' power to tax and spend "for the . . . general Welfare of the United States." Art. I, §8, cl. 1; *ante,* at 43–44. I concur in that determination, which makes THE CHIEF JUSTICE's Commerce Clause essay all the more puzzling. Why should THE CHIEF JUSTICE strive so mightily to hem in Congress' capacity to meet the new problems arising constantly in our ever-developing modern economy? I find no satisfying response to that question in his opinion.[12]

———————

But even assuming there were "practicable" alternatives to the minimum coverage provision, "we long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be '*absolutely* necessary' to the exercise of an enumerated power." *Jinks* v. *Richland County*, 538 U. S. 456, 462 (2003) (quoting *McCulloch* v. *Maryland*, 4 Wheat. 316, 414–415 (1819)). Rather, the statutory provision at issue need only be "conducive" and "[reasonably] adapted" to the goal Congress seeks to achieve. *Jinks*, 538 U. S., at 462 (internal quotation marks omitted). The minimum coverage provision meets this requirement. See *supra,* at 31–33.

[12] THE CHIEF JUSTICE states that he must evaluate the constitutionality of the minimum coverage provision under the Commerce Clause because the provision "reads more naturally as a command to buy insurance than as a tax." *Ante,* at 44. THE CHIEF JUSTICE ultimately concludes, however, that interpreting the provision as a tax is a "fairly possible" construction. *Ante,* at 32 (internal quotation marks omitted). That being so, I see no reason to undertake a Commerce Clause analysis that is not outcome determinative.

V

Through Medicaid, Congress has offered the States an opportunity to furnish health care to the poor with the aid of federal financing. To receive federal Medicaid funds, States must provide health benefits to specified categories of needy persons, including pregnant women, children, parents, and adults with disabilities. Guaranteed eligibility varies by category: for some it is tied to the federal poverty level (incomes up to 100% or 133%); for others it depends on criteria such as eligibility for designated state or federal assistance programs. The ACA enlarges the population of needy people States must cover to include adults under age 65 with incomes up to 133% of the federal poverty level. The spending power conferred by the Constitution, the Court has never doubted, permits Congress to define the contours of programs financed with federal funds. See, *e.g., Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). And to expand coverage, Congress could have recalled the existing legislation, and replaced it with a new law making Medicaid as embracive of the poor as Congress chose.

The question posed by the 2010 Medicaid expansion, then, is essentially this: To cover a notably larger population, must Congress take the repeal/reenact route, or may it achieve the same result by amending existing law? The answer should be that Congress may expand by amendment the classes of needy persons entitled to Medicaid benefits. A ritualistic requirement that Congress repeal and reenact spending legislation in order to enlarge the population served by a federally funded program would advance no constitutional principle and would scarcely serve the interests of federalism. To the contrary, such a requirement would rigidify Congress' efforts to empower States by partnering with them in the implementation of federal programs.

Medicaid is a prototypical example of federal-state coop-

eration in serving the Nation's general welfare. Rather than authorizing a federal agency to administer a uniform national health-care system for the poor, Congress offered States the opportunity to tailor Medicaid grants to their particular needs, so long as they remain within bounds set by federal law. In shaping Medicaid, Congress did not endeavor to fix permanently the terms participating states must meet; instead, Congress reserved the "right to alter, amend, or repeal" any provision of the Medicaid Act. 42 U. S. C. §1304. States, for their part, agreed to amend their own Medicaid plans consistent with changes from time to time made in the federal law. See 42 CFR §430.12(c)(i) (2011). And from 1965 to the present, States have regularly conformed to Congress' alterations of the Medicaid Act.

THE CHIEF JUSTICE acknowledges that Congress may "condition the receipt of [federal] funds on the States' complying with restrictions on the use of those funds," *ante*, at 50, but nevertheless concludes that the 2010 expansion is unduly coercive. His conclusion rests on three premises, each of them essential to his theory. First, the Medicaid expansion is, in THE CHIEF JUSTICE's view, a new grant program, not an addition to the Medicaid program existing before the ACA's enactment. Congress, THE CHIEF JUSTICE maintains, has threatened States with the loss of funds from an old program in an effort to get them to adopt a new one. Second, the expansion was unforeseeable by the States when they first signed on to Medicaid. Third, the threatened loss of funding is so large that the States have no real choice but to participate in the Medicaid expansion. THE CHIEF JUSTICE therefore—*for the first time ever*—finds an exercise of Congress' spending power unconstitutionally coercive.

Medicaid, as amended by the ACA, however, is not two spending programs; it is a single program with a constant aim—to enable poor persons to receive basic health care

when they need it. Given past expansions, plus express statutory warning that Congress may change the requirements participating States must meet, there can be no tenable claim that the ACA fails for lack of notice. Moreover, States have no entitlement to receive any Medicaid funds; they enjoy only the opportunity to accept funds on Congress' terms. Future Congresses are not bound by their predecessors' dispositions; they have authority to spend federal revenue as they see fit. The Federal Government, therefore, is not, as THE CHIEF JUSTICE charges, threatening States with the loss of "existing" funds from one spending program in order to induce them to opt into another program. Congress is simply requiring States to do what States have long been required to do to receive Medicaid funding: comply with the conditions Congress prescribes for participation.

A majority of the Court, however, buys the argument that prospective withholding of funds formerly available exceeds Congress' spending power. Given that holding, I entirely agree with THE CHIEF JUSTICE as to the appropriate remedy. It is to bar the withholding found impermissible—not, as the joint dissenters would have it, to scrap the expansion altogether, see *post,* at 46–48. The dissenters' view that the ACA must fall in its entirety is a radical departure from the Court's normal course. When a constitutional infirmity mars a statute, the Court ordinarily removes the infirmity. It undertakes a salvage operation; it does not demolish the legislation. See, *e.g., Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 504 (1985) (Court's normal course is to declare a statute invalid "to the extent that it reaches too far, but otherwise [to leave the statute] intact"). That course is plainly in order where, as in this case, Congress has expressly instructed courts to leave untouched every provision not found invalid. See 42 U. S. C. §1303. Because THE CHIEF JUSTICE finds the withholding—not the granting—of federal funds incom-

patible with the Spending Clause, Congress' extension of Medicaid remains available to any State that affirms its willingness to participate.

## A

Expansion has been characteristic of the Medicaid program. Akin to the ACA in 2010, the Medicaid Act as passed in 1965 augmented existing federal grant programs jointly administered with the States.[13] States were not required to participate in Medicaid. But if they did, the Federal Government paid at least half the costs. To qualify for these grants, States had to offer a minimum level of health coverage to beneficiaries of four federally funded, state-administered welfare programs: Aid to Families with Dependent Children; Old Age Assistance; Aid to the Blind; and Aid to the Permanently and Totally Disabled. See Social Security Amendments of 1965, §121(a), 79 Stat. 343; *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 37 (1981). At their option, States could enroll additional "medically needy" individuals; these costs, too, were partially borne by the Federal Government at the same, at least 50%, rate. *Ibid.*

Since 1965, Congress has amended the Medicaid program on more than 50 occasions, sometimes quite sizably. Most relevant here, between 1988 and 1990, Congress

---

[13] Medicaid was "plainly an extension of the existing Kerr-Mills" grant program. Huberfeld, Federalizing Medicaid, 14 U. Pa. J. Const. L. 431, 444–445 (2011). Indeed, the "section of the Senate report dealing with Title XIX"—the title establishing Medicaid—"was entitled, 'Improvement and Extension of Kerr-Mills Medical Assistance Program.'" Stevens & Stevens, Welfare Medicine in America 51 (1974) (quoting S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 9 (1965)). Setting the pattern for Medicaid, Kerr-Mills reimbursed States for a portion of the cost of health care provided to welfare recipients if States met conditions specified in the federal law, *e.g.,* participating States were obliged to offer minimum coverage for hospitalization and physician services. See Huberfeld, *supra,* at 443–444.

required participating States to include among their bene-
ficiaries pregnant women with family incomes up to 133%
of the federal poverty level, children up to age 6 at the
same income levels, and children ages 6 to 18 with family
incomes up to 100% of the poverty level.  See 42 U. S. C.
§§1396a(a)(10)(A)(i), 1396a(*l*); Medicare Catastrophic Cov-
erage Act of 1988, §302, 102 Stat. 750; Omnibus Budget
Reconciliation Act of 1989, §6401, 103 Stat. 2258; Om-
nibus Budget Reconciliation Act of 1990, §4601, 104 Stat.
1388–166.    These amendments added millions to the
Medicaid-eligible population.  Dubay & Kenney, Lessons
from the Medicaid Expansions for Children and Pregnant
Women 5 (Apr. 1997).

Between 1966 and 1990, annual federal Medicaid spend-
ing grew from $631.6 million to $42.6 billion; state
spending rose to $31 billion over the same period.  See Dept.
of Health and Human Services, National Health Expendi-
tures by Type of Service and Source of Funds: Calendar
Years 1960 to 2010 (table).[14]  And between 1990 and 2010,
federal spending increased to $269.5 billion.  *Ibid.*  En-
largement of the population and services covered by Medi-
caid, in short, has been the trend.

Compared to past alterations, the ACA is notable for the
extent to which the Federal Government will pick up the
tab.    Medicaid's 2010 expansion is financed largely by
federal outlays.  In 2014, federal funds will cover 100%
of the costs for newly eligible beneficiaries; that rate will
gradually decrease before settling at 90% in 2020.    42
U. S. C. §1396d(y) (2006 ed., Supp. IV).  By comparison,
federal contributions toward the care of beneficiaries
eligible pre-ACA range from 50% to 83%, and averaged
57% between 2005 and 2008.  §1396d(b) (2006 ed., Supp.

―――――――
[14] Available online at http://www.cms.gov/Research-Statistics-Data-
and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/
NationalHealthAccountsHistorical.html.

IV); Dept. of Health and Human Services, Centers for Medicare and Medicaid Services, C. Truffer et al., 2010 Actuarial Report on the Financial Outlook for Medicaid, p. 20.

Nor will the expansion exorbitantly increase state Medicaid spending. The Congressional Budget Office (CBO) projects that States will spend 0.8% more than they would have, absent the ACA. See CBO, Spending & Enrollment Detail for CBO's March 2009 Baseline. But see *ante*, at 44–45 ("[T]he Act dramatically increases state obligations under Medicaid."); *post,* at 45 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.) ("[A]cceptance of the [ACA expansion] will impose very substantial costs on participating States."). Whatever the increase in state obligations after the ACA, it will pale in comparison to the increase in federal funding.[15]

Finally, any fair appraisal of Medicaid would require acknowledgment of the considerable autonomy States enjoy under the Act. Far from "conscript[ing] state agencies into the national bureaucratic army," *ante*, at 55 (citing *FERC* v. *Mississippi*, 456 U. S. 742, 775 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part) (brackets in original and internal quotation marks omitted)), Medicaid "is designed to advance cooperative federalism." *Wisconsin Dept. of Health and Family Servs.* v. *Blumer*, 534 U. S. 473, 495 (2002) (citing *Harris* v. *McRae*, 448 U. S. 297, 308 (1980)). Subject to its basic

---

[15] Even the study on which the plaintiffs rely, see Brief for Petitioners 10, concludes that "[w]hile most states will experience some increase in spending, this is quite small relative to the federal matching payments and low relative to the costs of uncompensated care that [the states] would bear if the[re] were no health reform." See Kaiser Commission on Medicaid & the Uninsured, Medicaid Coverage & Spending in Health Reform 16 (May 2010). Thus there can be no objection to the ACA's expansion of Medicaid as an "unfunded mandate." Quite the contrary, the program is impressively well funded.

requirements, the Medicaid Act empowers States to "select dramatically different levels of funding and coverage, alter and experiment with different financing and delivery modes, and opt to cover (or not to cover) a range of particular procedures and therapies. States have leveraged this policy discretion to generate a myriad of dramatically different Medicaid programs over the past several decades." Ruger, Of Icebergs and Glaciers, 75 Law & Contemp. Probs. 215, 233 (2012) (footnote omitted). The ACA does not jettison this approach. States, as first-line administrators, will continue to guide the distribution of substantial resources among their needy populations.

The alternative to conditional federal spending, it bears emphasis, is not state autonomy but state marginalization.[16] In 1965, Congress elected to nationalize health coverage for seniors through Medicare. It could similarly have established Medicaid as an exclusively federal program. Instead, Congress gave the States the opportunity to partner in the program's administration and development. Absent from the nationalized model, of course, is the state-level policy discretion and experimentation that is Medicaid's hallmark; undoubtedly the interests of federalism are better served when States retain a meaningful role in the implementation of a program of such importance. See Caminker, State Sovereignty and Subordinacy, 95 Colum. L. Rev. 1001, 1002–1003 (1995) (cooperative federalism can preserve "a significant role for state discretion in achieving specified federal goals, where the alternative is complete federal preemption of any state

---

[16] In 1972, for example, Congress ended the federal cash-assistance program for the aged, blind, and disabled. That program previously had been operated jointly by the Federal and State Governments, as is the case with Medicaid today. Congress replaced the cooperative federal program with the nationalized Supplemental Security Income (SSI) program. See *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 38 (1981).

regulatory role"); Rose-Ackerman, Cooperative Federalism and Co-optation, 92 Yale L. J. 1344, 1346 (1983) ("If the federal government begins to take full responsibility for social welfare spending and preempts the states, the result is likely to be weaker . . . state governments.").[17]

Although Congress "has no obligation to use its Spending Clause power to disburse funds to the States," *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 686 (1999), it has provided Medicaid grants notable for their generosity and flexibility. "[S]uch funds," we once observed, "are gifts," *id.,* at 686–687, and so they have remained through decades of expansion in their size and scope.

B

The Spending Clause authorizes Congress "to pay the Debts and provide for the . . . general Welfare of the United States." Art. I, §8, cl. 1. To ensure that federal funds granted to the States are spent "to 'provide for the . . . general Welfare' in the manner Congress intended," *ante*, at 46, Congress must of course have authority to impose limitations on the States' use of the federal dollars. This Court, time and again, has respected Congress' prescription of spending conditions, and has required States to abide by them. See, *e.g., Pennhurst*, 451 U. S., at 17 ("[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States."). In particular, we have recognized Congress' prerogative to condition a State's receipt of Medicaid

―――――――

[17] THE CHIEF JUSTICE and the joint dissenters perceive in cooperative federalism a "threa[t]" to "political accountability." *Ante*, at 48; see *post,* at 34–35. By that, they mean voter confusion: Citizens upset by unpopular government action, they posit, may ascribe to state officials blame more appropriately laid at Congress' door. But no such confusion is apparent in this case: Medicaid's status as a federally funded, state-administered program is hardly hidden from view.

funding on compliance with the terms Congress set for
participation in the program. See, *e.g., Harris*, 448 U. S.,
at 301 ("[O]nce a State elects to participate [in Medicaid],
it must comply with the requirements of [the Medicaid
Act]."); *Arkansas Dept. of Health and Human Servs.* v.
*Ahlborn*, 547 U. S. 268, 275 (2006); *Frew* v. *Hawkins*, 540
U. S. 431, 433 (2004); *Atkins* v. *Rivera*, 477 U. S. 154, 156–
157 (1986).

Congress' authority to condition the use of federal funds
is not confined to spending programs as first launched.
The legislature may, and often does, amend the law, im-
posing new conditions grant recipients henceforth must
meet in order to continue receiving funds. See *infra*, at 54
(describing *Bennett* v. *Kentucky Dept. of Ed.*, 470 U. S.
656, 659–660 (1985) (enforcing restriction added five years
after adoption of educational program)).

Yes, there are federalism-based limits on the use of
Congress' conditional spending power. In the leading
decision in this area, *South Dakota* v. *Dole*, 483 U. S. 203
(1987), the Court identified four criteria. The conditions
placed on federal grants to States must (a) promote the
"general welfare," (b) "unambiguously" inform States what
is demanded of them, (c) be germane "to the federal inter-
est in particular national projects or programs," and (d)
not "induce the States to engage in activities that would
themselves be unconstitutional." *Id.*, at 207–208, 210
(internal quotation marks omitted).[18]

The Court in *Dole* mentioned, but did not adopt, a fur-
ther limitation, one hypothetically raised a half-century
earlier: In "some circumstances," Congress might be pro-
hibited from offering a "financial inducement . . . so coer-

---

[18] Although the plaintiffs, in the proceedings below, did not contest
the ACA's satisfaction of these criteria, see 648 F. 3d 1235, 1263 (CA11
2011), THE CHIEF JUSTICE appears to rely heavily on the second crite-
rion. Compare *ante*, at 52, 54, with *infra*, at 52–54.

cive as to pass the point at which 'pressure turns into compulsion.'" *Id.,* at 211 (quoting *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 590 (1937)). Prior to today's decision, however, the Court has never ruled that the terms of any grant crossed the indistinct line between temptation and coercion.

*Dole* involved the National Minimum Drinking Age Act, 23 U. S. C. §158, enacted in 1984. That Act directed the Secretary of Transportation to withhold 5% of the federal highway funds otherwise payable to a State if the State permitted purchase of alcoholic beverages by persons less than 21 years old. Drinking age was not within the authority of Congress to regulate, South Dakota argued, because the Twenty-First Amendment gave the States exclusive power to control the manufacture, transportation, and consumption of alcoholic beverages. The small percentage of highway-construction funds South Dakota stood to lose by adhering to 19 as the age of eligibility to purchase 3.2% beer, however, was not enough to qualify as coercion, the Court concluded.

This case does not present the concerns that led the Court in *Dole* even to consider the prospect of coercion. In *Dole*, the condition—set 21 as the minimum drinking age—did not tell the States how to use funds Congress provided for highway construction. Further, in view of the Twenty-First Amendment, it was an open question whether Congress could directly impose a national minimum drinking age.

The ACA, in contrast, relates solely to the federally funded Medicaid program; if States choose not to comply, Congress has not threatened to withhold funds earmarked for any other program. Nor does the ACA use Medicaid funding to induce States to take action Congress itself could not undertake. The Federal Government undoubtedly could operate its own health-care program for poor persons, just as it operates Medicare for seniors' health

care.  See *supra,* at 44.

That is what makes this such a simple case, and the Court's decision so unsettling.  Congress, aiming to assist the needy, has appropriated federal money to subsidize state health-insurance programs that meet federal standards.  The principal standard the ACA sets is that the state program cover adults earning no more than 133% of the federal poverty line.  Enforcing that prescription ensures that federal funds will be spent on health care for the poor in furtherance of Congress' present perception of the general welfare.

C

THE CHIEF JUSTICE asserts that the Medicaid expansion creates a "new health care program."  *Ante,* at 54. Moreover, States could "hardly anticipate" that Congress would "transform [the program] so dramatically."  *Ante*, at 55.  Therefore, THE CHIEF JUSTICE maintains, Congress' threat to withhold "old" Medicaid funds based on a State's refusal to participate in the "new" program is a "threa[t] to terminate [an]other . . . independent gran[t]."  *Ante*, at 50, 52–53.  And because the threat to withhold a large amount of funds from one program "leaves the States with no real option but to acquiesce [in a newly created program]," THE CHIEF JUSTICE concludes, the Medicaid expansion is unconstitutionally coercive.  *Ante*, at 52.

1

The starting premise on which THE CHIEF JUSTICE's coercion analysis rests is that the ACA did not really "extend" Medicaid; instead, Congress created an entirely new program to co-exist with the old.  THE CHIEF JUSTICE calls the ACA new, but in truth, it simply reaches more of America's poor than Congress originally covered.

Medicaid was created to enable States to provide medical assistance to "needy persons."  See S. Rep. No. 404,

89th Cong., 1st Sess., pt. 1, p. 9 (1965). See also §121(a), 79 Stat. 343 (The purpose of Medicaid is to enable States "to furnish . . . medical assistance on behalf of [certain persons] whose income and resources are insufficient to meet the costs of necessary medical services."). By bringing health care within the reach of a larger population of Americans unable to afford it, the Medicaid expansion is an extension of that basic aim.

The Medicaid Act contains hundreds of provisions governing operation of the program, setting conditions ranging from "Limitation on payments to States for expenditures attributable to taxes," 42 U. S. C. §1396a(t) (2006 ed.), to "Medical assistance to aliens not lawfully admitted for permanent residence," §1396b(v) (2006 ed. and Supp. IV). The Medicaid expansion leaves unchanged the vast majority of these provisions; it adds beneficiaries to the existing program and specifies the rate at which States will be reimbursed for services provided to the added beneficiaries. See ACA §§2001(a)(1), (3), 124 Stat. 271–272. The ACA does not describe operational aspects of the program for these newly eligible persons; for that information, one must read the existing Medicaid Act. See 42 U. S. C. §§1396–1396v(b) (2006 ed. and Supp. IV).

Congress styled and clearly viewed the Medicaid expansion as an amendment to the Medicaid Act, not as a "new" health-care program. To the four categories of beneficiaries for whom coverage became mandatory in 1965, and the three mandatory classes added in the late 1980's, see *supra,* at 41–42, the ACA adds an eighth: individuals under 65 with incomes not exceeding 133% of the federal poverty level. The expansion is effectuated by §2001 of the ACA, aptly titled: "Medicaid Coverage for the Lowest Income Populations." 124 Stat. 271. That section amends Title 42, Chapter 7, Subchapter XIX: Grants to States for Medical Assistance Programs. Commonly known as the Medicaid Act, Subchapter XIX filled some 278 pages in

2006. Section 2001 of the ACA would add approximately three pages.[19]

Congress has broad authority to construct or adjust spending programs to meet its contemporary understanding of "the general Welfare." *Helvering* v. *Davis*, 301 U. S. 619, 640–641 (1937). Courts owe a large measure of respect to Congress' characterization of the grant programs it establishes. See *Steward Machine*, 301 U. S., at 594. Even if courts were inclined to second-guess Congress' conception of the character of its legislation, how would reviewing judges divine whether an Act of Congress, purporting to amend a law, is in reality not an amendment, but a new creation? At what point does an extension become so large that it "transforms" the basic law?

Endeavoring to show that Congress created a new program, THE CHIEF JUSTICE cites three aspects of the expansion. First, he asserts that, in covering those earning no more than 133% of the federal poverty line, the Medicaid expansion, unlike pre-ACA Medicaid, does not "care for the neediest among us." *Ante,* at 53. What makes that so? Single adults earning no more than $14,856 per year—133% of the current federal poverty level—surely rank among the Nation's poor.

Second, according to THE CHIEF JUSTICE, "Congress mandated that newly eligible persons receive a level of coverage that is less comprehensive than the traditional Medicaid benefit package." *Ibid.* That less comprehensive benefit package, however, is not an innovation introduced by the ACA; since 2006, States have been free to use it for many of their Medicaid beneficiaries.[20] The level of bene-

_____

[19] Compare Subchapter XIX, 42 U. S. C. §§1396–1396v(b) (2006 ed. and Supp. IV) with §§1396a(a) (10)(A)(i)(VIII) (2006 ed. and Supp. IV); 1396a(a) (10)(A)(ii)(XX), 1396a(a)(75), 1396a(k), 1396a(gg) to (hh), 1396d(y), 1396r–1(e), 1396u–7(b)(5) to (6).

[20] The Deficit Reduction Act of 2005 authorized States to provide "benchmark coverage" or "benchmark equivalent coverage" to certain

fits offered therefore does not set apart post-ACA Medicaid recipients from all those entitled to benefits pre-ACA.

Third, THE CHIEF JUSTICE correctly notes that the reimbursement rate for participating States is different regarding individuals who became Medicaid-eligible through the ACA. *Ibid.* But the rate differs only in its generosity to participating States. Under pre-ACA Medicaid, the Federal Government pays up to 83% of the costs of coverage for current enrollees, §1396d(b) (2006 ed. and Supp. IV); under the ACA, the federal contribution starts at 100% and will eventually settle at 90%, §1396d(y). Even if one agreed that a change of as little as 7 percentage points carries constitutional significance, is it not passing strange to suggest that the purported incursion on state sovereignty might have been averted, or at least mitigated, had Congress offered States *less* money to carry out the same obligations?

Consider also that Congress could have repealed Medicaid. See *supra,* at 38–39 (citing 42 U. S. C. §1304); Brief for Petitioners in No. 11–400, p. 41. Thereafter, Congress could have enacted Medicaid II, a new program combining the pre-2010 coverage with the expanded coverage required by the ACA. By what right does a court stop Congress from building up without first tearing down?

2

THE CHIEF JUSTICE finds the Medicaid expansion vulnerable because it took participating States by surprise. *Ante*, at 54. "A State could hardly anticipate that Congres[s]" would endeavor to "transform [the Medicaid program] so dramatically," he states. *Ante,* at 54–55. For the notion that States must be able to foresee, when they sign up, alterations Congress might make later on, THE CHIEF

Medicaid populations. See §6044, 120 Stat. 88, 42 U. S. C. §1396u–7 (2006 ed. and Supp. IV). States may offer the same level of coverage to persons newly eligible under the ACA. See §1396a(k).

JUSTICE cites only one case: *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1.

In *Pennhurst*, residents of a state-run, federally funded institution for the mentally disabled complained of abusive treatment and inhumane conditions in alleged violation of the Developmentally Disabled Assistance and Bill of Rights Act. 451 U. S., at 5–6. We held that the State was not answerable in damages for violating conditions it did not "voluntarily and knowingly accep[t]." *Id.,* at 17, 27. Inspecting the statutory language and legislative history, we found that the Act did not "unambiguously" impose the requirement on which the plaintiffs relied: that they receive appropriate treatment in the least restrictive environment. *Id.,* at 17–18. Satisfied that Congress had not clearly conditioned the States' receipt of federal funds on the States' provision of such treatment, we declined to read such a requirement into the Act. Congress' spending power, we concluded, "does not include surprising participating States with postacceptance or 'retroactive' conditions." *Id.,* at 24–25.

*Pennhurst* thus instructs that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Ante,* at 53 (quoting *Pennhurst*, 451 U. S., at 17). That requirement is met in this case. Section 2001 does not take effect until 2014. The ACA makes perfectly clear what will be required of States that accept Medicaid funding after that date: They must extend eligibility to adults with incomes no more than 133% of the federal poverty line. See 42 U. S. C. §1396a(a)(10)(A)(i)(VIII) (2006 ed. and Supp. IV).

THE CHIEF JUSTICE appears to find in *Pennhurst* a requirement that, when spending legislation is first passed, or when States first enlist in the federal program, Congress must provide clear notice of conditions it might later impose. If I understand his point correctly, it was incumbent on Congress, in 1965, to warn the States clearly

of the size and shape potential changes to Medicaid might take. And absent such notice, sizable changes could not be made mandatory. Our decisions do not support such a requirement.[21]

In *Bennett* v. *New Jersey*, 470 U. S. 632 (1985), the Secretary of Education sought to recoup Title I funds[22] based on the State's noncompliance, from 1970 to 1972, with a 1978 amendment to Title I. Relying on *Pennhurst*, we rejected the Secretary's attempt to recover funds based on the States' alleged violation of a rule that did not exist when the State accepted and spent the funds. See 470 U. S*.,* at 640 ("New Jersey[,] when it applied for and received Title I funds for the years 1970–1972[,] had no basis to believe that the propriety of the expenditures would be judged by any standards other than the ones in effect *at the time*." (citing *Pennhurst,* 451 U. S., at 17, 24–25; emphasis added)).

When amendment of an existing grant program has no such retroactive effect, however, we have upheld Congress' instruction. In *Bennett* v. *Kentucky Dept. of Ed.*, 470 U. S. 656 (1985), the Secretary sued to recapture Title I funds based on the Commonwealth's 1974 violation of a spending condition Congress added to Title I in 1970. Rejecting Kentucky's argument pinned to *Pennhurst*, we held that

_____

[21] THE CHIEF JUSTICE observes that "Spending Clause legislation [i]s much in the nature of a *contract*." *Ante*, at 46 (internal quotation marks omitted). See also *post,* at 33 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.) (same). But the Court previously has recognized that "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett* v. *Kentucky Dept. of Ed.*, 470 U. S. 656, 669 (1985).

[22] Title I of the Elementary and Secondary Education Act of 1965 provided federal grants to finance supplemental educational programs in school districts with high concentrations of children from low-income families. See *Bennett* v. *New Jersey*, 470 U. S. 632, 634–635 (1985) (citing Pub. L. No. 89–10, 79 Stat. 27).

the Commonwealth suffered no surprise after accepting the federal funds. Kentucky was therefore obliged to return the money. 470 U. S., at 665–666, 673–674. The conditions imposed were to be assessed as of 1974, in light of "the legal requirements in place when the grants were made," *id.,* at 670, not as of 1965, when Title I was originally enacted.

As these decisions show, *Pennhurst*'s rule demands that conditions on federal funds be unambiguously clear at the time a State receives and uses the money—not at the time, perhaps years earlier, when Congress passed the law establishing the program. See also *Dole*, 483 U. S., at 208 (finding *Pennhurst* satisfied based on the clarity of the Federal Aid Highway Act as amended in 1984, without looking back to 1956, the year of the Act's adoption).

In any event, from the start, the Medicaid Act put States on notice that the program could be changed: "The right to alter, amend, or repeal any provision of [Medicaid]," the statute has read since 1965, "is hereby reserved to the Congress." 42 U. S. C. §1304. The "effect of these few simple words" has long been settled. See *National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.*, 470 U. S. 451, 467–468, n. 22 (1985) (citing *Sinking Fund Cases*, 99 U. S. 700, 720 (1879)). By reserving the right to "alter, amend, [or] repeal" a spending program, Congress "has given special notice of its intention to retain . . . full and complete power to make such alterations and amendments . . . as come within the just scope of legislative power." *Id.,* at 720.

Our decision in *Bowen* v. *Public Agencies Opposed to Social Security Entrapment*, 477 U. S. 41, 51–52 (1986), is guiding here. As enacted in 1935, the Social Security Act did not cover state employees. *Id.,* at 44. In response to pressure from States that wanted coverage for their employees, Congress, in 1950, amended the Act to allow States to opt into the program. *Id.,* at 45. The statutory

provision giving States this option expressly permitted them to withdraw from the program. *Ibid.*

Beginning in the late 1970's, States increasingly exercised the option to withdraw. *Id.,* at 46. Concerned that withdrawals were threatening the integrity of Social Security, Congress repealed the termination provision. Congress thereby changed Social Security from a program voluntary for the States to one from which they could not escape. *Id.,* at 48. California objected, arguing that the change impermissibly deprived it of a right to withdraw from Social Security. *Id.,* at 49–50. We unanimously rejected California's argument. *Id.,* at 51–53. By including in the Act "a clause expressly reserving to it '[t]he right to alter, amend, or repeal any provision' of the Act," we held, Congress put States on notice that the Act "created no contractual rights." *Id.,* at 51–52. The States therefore had no law-based ground on which to complain about the amendment, despite the significant character of the change.

THE CHIEF JUSTICE nevertheless would rewrite §1304 to countenance only the "right to alter *somewhat*," or "amend, *but not too much*." Congress, however, did not so qualify §1304. Indeed, Congress retained discretion to "repeal" Medicaid, wiping it out entirely. Cf. *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 368 (1981) (Rehnquist, J., dissenting) (invoking "the common-sense maxim that the greater includes the lesser"). As *Bowen* indicates, no State could reasonably have read §1304 as reserving to Congress authority to make adjustments only if modestly sized.

In fact, no State proceeded on that understanding. In compliance with Medicaid regulations, each State expressly undertook to abide by future Medicaid changes. See 42 CFR §430.12(c)(1) (2011) ("The [state Medicaid] plan must provide that it will be amended whenever necessary to reflect . . . [c]hanges in Federal law, regulations, policy

interpretations, or court decisions."). Whenever a State notifies the Federal Government of a change in its own Medicaid program, the State certifies both that it knows the federally set terms of participation may change, and that it will abide by those changes as a condition of continued participation. See, *e.g.,* Florida Agency for Health Care Admin., State Plan Under Title XIX of the Social Security Act Medical Assistance Program §7.1, p. 86 (Oct. 6, 1992).

THE CHIEF JUSTICE insists that the most recent expansion, in contrast to its predecessors, "accomplishes a shift in kind, not merely degree." *Ante*, at 53. But why was Medicaid altered only in degree, not in kind, when Congress required States to cover millions of children and pregnant women? See *supra,* at 41–42. Congress did not "merely alte[r] and expan[d] the boundaries of" the Aid to Families with Dependent Children program. But see *ante*, at 53–55. Rather, Congress required participating States to provide coverage tied to the federal poverty level (as it later did in the ACA), rather than to the AFDC program. See Brief for National Health Law Program et al. as *Amici Curiae* 16–18. In short, given §1304, this Court's construction of §1304's language in *Bowen*, and the enlargement of Medicaid in the years since 1965,[23] a State would be hard put to complain that it lacked fair notice when, in 2010, Congress altered Medicaid to embrace a larger portion of the Nation's poor.

3

THE CHIEF JUSTICE ultimately asks whether "the finan-

---

[23] Note, in this regard, the extension of Social Security, which began in 1935 as an old-age pension program, then expanded to include survivor benefits in 1939 and disability benefits in 1956. See Social Security Act, ch. 531, 49 Stat. 622–625; Social Security Act Amendments of 1939, 53 Stat. 1364–1365; Social Security Amendments of 1956, ch. 836, §103, 70 Stat. 815–816.

cial inducement offered by Congress . . . pass[ed] the point at which pressure turns into compulsion." *Ante*, at 50 (internal quotation marks omitted). The financial inducement Congress employed here, he concludes, crosses that threshold: The threatened withholding of "existing Medicaid funds" is "a gun to the head" that forces States to acquiesce. *Ante,* at 50–51 (citing 42 U. S. C. §1396c).[24]

THE CHIEF JUSTICE sees no need to "fix the outermost line," *Steward Machine*, 301 U. S., at 591, "where persuasion gives way to coercion," *ante*, at 55. Neither do the joint dissenters. See *post,* at 36, 38.[25] Notably, the deci-

_____

[24] The joint dissenters, for their part, would make this the entire inquiry. "[I]f States really have no choice other than to accept the package," they assert, "the offer is coercive." *Post,* at 35. THE CHIEF JUSTICE recognizes Congress' authority to construct a single federal program and "condition the receipt of funds on the States' complying with restrictions on the use of those funds." *Ante*, at 50. For the joint dissenters, however, all that matters, it appears, is whether States can resist the temptation of a given federal grant. *Post,* at 35. On this logic, any federal spending program, sufficiently large and well-funded, would be unconstitutional. The joint dissenters point to smaller programs States might have the will to refuse. See *post,* at 40–41 (elementary and secondary education). But how is a court to judge whether "only 6.6% of all state expenditures," *post,* at 41, is an amount States could or would do without?

Speculations of this genre are characteristic of the joint dissent. See, *e.g., post*, at 35 ("it *may* be state officials who will bear the brunt of public disapproval" for joint federal-state endeavors); *ibid.*, ("federal officials . . . *may* remain insulated from the electoral ramifications of their decision"); *post,* at 37 ("a heavy federal tax . . . levied to support a federal program that offers large grants to the States . . . *may*, as a practical matter, [leave States] unable to refuse to participate"); *ibid.* (withdrawal from a federal program "would *likely* force the State to impose a huge tax increase"); *post,* at 46 (state share of ACA expansion costs "*may* increase in the future") (all emphasis added; some internal quotation marks omitted). The joint dissenters are long on conjecture and short on real-world examples.

[25] The joint dissenters also rely heavily on Congress' perceived intent to coerce the States. *Post,* at 42–46; see, *e.g., post,* at 42 ("In crafting the ACA, Congress clearly expressed its informed view that no State could

sion on which they rely, *Steward Machine*, found the
statute at issue inside the line, "wherever the line may
be." 301 U. S., at 591.

When future Spending Clause challenges arrive, as they
likely will in the wake of today's decision, how will liti-
gants and judges assess whether "a State has a legitimate
choice whether to accept the federal conditions in ex-
change for federal funds"? *Ante*, at 48. Are courts to
measure the number of dollars the Federal Government
might withhold for noncompliance? The portion of the
State's budget at stake? And which State's—or States'—
budget is determinative: the lead plaintiff, all challenging
States (26 in this case, many with quite different fiscal
situations), or some national median? Does it matter that
Florida, unlike most States, imposes no state income tax,
and therefore might be able to replace foregone federal
funds with new state revenue?[26] Or that the coercion state

———————

possibly refuse the offer that the ACA extends."). We should not lightly
ascribe to Congress an intent to violate the Constitution (at least as my
colleagues read it). This is particularly true when the ACA could just
as well be comprehended as demonstrating Congress' mere expectation,
in light of the uniformity of past participation and the generosity of the
federal contribution, that States would not withdraw. Cf. *South Dakota*
v. *Dole*, 483 U. S. 203, 211 (1987) ("We cannot conclude . . . that a con-
ditional grant of federal money . . . is unconstitutional simply by
reason of its success in achieving the congressional objective.").

[26] Federal taxation of a State's citizens, according to the joint dissent-
ers, may diminish a State's ability to raise new revenue. This, in turn,
could limit a State's capacity to replace a federal program with an
"equivalent" state-funded analog. *Post,* at 40. But it cannot be true
that "the amount of the federal taxes extracted from the taxpayers of a
State to pay for the program in question is relevant in determining
whether there is impermissible coercion." *Post,* at 37. When the
United States Government taxes United States citizens, it taxes them
"in their individual capacities" as "the people of America"—not as
residents of a particular State. See *U. S. Term Limits, Inc.* v. *Thornton*,
514 U. S. 779, 839 (1995) (KENNEDY, J., concurring). That is because
the "Framers split the atom of sovereignty[,] . . . establishing two orders
of government"—"one state and one federal"—"each with its own direct

officials in fact fear is punishment at the ballot box for turning down a politically popular federal grant?

The coercion inquiry, therefore, appears to involve political judgments that defy judicial calculation. See *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). Even commentators sympathetic to robust enforcement of *Dole*'s limitations, see *supra,* at 46, have concluded that conceptions of "impermissible coercion" premised on States' perceived inability to decline federal funds "are just too amorphous to be judicially administrable." Baker & Berman, Getting off the *Dole*, 78 Ind. L. J. 459, 521, 522, n. 307 (2003) (citing, *e.g.,* Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989)).

At bottom, my colleagues' position is that the States' reliance on federal funds limits Congress' authority to alter its spending programs. This gets things backwards: Congress, not the States, is tasked with spending federal money in service of the general welfare. And each successive Congress is empowered to appropriate funds as it sees fit. When the 110th Congress reached a conclusion about Medicaid funds that differed from its predecessors' view, it abridged no State's right to "existing," or "pre-existing," funds. But see *ante*, at 51–52; *post,* at 47–48 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.). For, in

_____

relationship" to the people. *Id.,* at 838.

A State therefore has no claim on the money its residents pay in federal taxes, and federal "spending programs need not help people in all states in the same measure." See Brief for David Satcher et al. as *Amici Curiae* 19. In 2004, for example, New Jersey received 55 cents in federal spending for every dollar its residents paid to the Federal Government in taxes, while Mississippi received $1.77 per tax dollar paid. C. Dubay, Tax Foundation, Federal Tax Burdens and Expenditures by State: Which States Gain Most from Federal Fiscal Operations? 2 (Mar. 2006). Thus no constitutional problem was created when Arizona declined for 16 years to participate in Medicaid, even though its residents' tax dollars financed Medicaid programs in every other State.

fact, there are no such funds. There is only money States *anticipate* receiving from future Congresses.

D

Congress has delegated to the Secretary of Health and Human Services the authority to withhold, in whole or in part, federal Medicaid funds from States that fail to comply with the Medicaid Act as originally composed and as subsequently amended. 42 U. S. C. §1396c.[27] THE CHIEF JUSTICE, however, holds that the Constitution precludes the Secretary from withholding "existing" Medicaid funds based on States' refusal to comply with the expanded Medicaid program. *Ante*, at 55. For the foregoing reasons, I disagree that any such withholding would violate the Spending Clause. Accordingly, I would affirm the decision of the Court of Appeals for the Eleventh Circuit in this regard.

But in view of THE CHIEF JUSTICE's disposition, I agree with him that the Medicaid Act's severability clause determines the appropriate remedy. That clause provides that "[i]f any provision of [the Medicaid Act], or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby." 42 U. S. C. §1303.

The Court does not strike down any provision of the

_____

[27] As THE CHIEF JUSTICE observes, the Secretary is authorized to withhold all of a State's Medicaid funding. See *ante*, at 51. But total withdrawal is what the Secretary *may*, not must, do. She has discretion to withhold only a portion of the Medicaid funds otherwise due a noncompliant State. See §1396c; cf. 45 CFR §80.10(f) (2011) (Secretary may enforce Title VI's nondiscrimination requirement through "refusal to grant or continue Federal financial assistance, *in whole or in part*." (emphasis added)). The Secretary, it is worth noting, may herself experience political pressures, which would make her all the more reluctant to cut off funds Congress has appropriated for a State's needy citizens.

ACA. It prohibits only the "application" of the Secretary's authority to withhold Medicaid funds from States that decline to conform their Medicaid plans to the ACA's requirements. Thus the ACA's authorization of funds to finance the expansion remains intact, and the Secretary's authority to withhold funds for reasons other than noncompliance with the expansion remains unaffected.

Even absent §1303's command, we would have no warrant to invalidate the Medicaid expansion, contra *post,* at 46–48 (joint opinion of SCALIA, KENNEDY, THOMAS, and ALITO, JJ.), not to mention the entire ACA, *post,* at 49–64 (same). For when a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislature's dominant objective. See, *e.g., Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 328–330 (2006). In this case, that objective was to increase access to health care for the poor by increasing the States' access to federal funds. THE CHIEF JUSTICE is undoubtedly right to conclude that Congress may offer States funds "to expand the availability of health care, and requir[e] that States accepting such funds comply with the conditions on their use." *Ante*, at 55. I therefore concur in the judgment with respect to Part IV–B of THE CHIEF JUSTICE's opinion.

*       *       *

For the reasons stated, I agree with THE CHIEF JUSTICE that, as to the validity of the minimum coverage provision, the judgment of the Court of Appeals for the Eleventh Circuit should be reversed. In my view, the provision encounters no constitutional obstruction. Further, I would uphold the Eleventh Circuit's decision that the Medicaid expansion is within Congress' spending power.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 11–393, 11–398 and 11–400

————

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, ET AL., PETITIONERS
11–393                  *v.*
KATHLEEN SEBELIUS, SECRETARY OF HEALTH
AND HUMAN SERVICES, ET AL.


DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL., PETITIONERS
11–398                  *v.*
FLORIDA ET AL.


FLORIDA, ET AL., PETITIONERS
11–400                  *v.*
DEPARTMENT OF HEALTH AND
HUMAN SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 28, 2012]

JUSTICE SCALIA, JUSTICE KENNEDY, JUSTICE THOMAS,
and JUSTICE ALITO, dissenting.

Congress has set out to remedy the problem that the
best health care is beyond the reach of many Americans
who cannot afford it. It can assuredly do that, by exercis-
ing the powers accorded to it under the Constitution. The
question in this case, however, is whether the complex
structures and provisions of the Patient Protection and
Affordable Care Act (Affordable Care Act or ACA) go be-
yond those powers. We conclude that they do.

This case is in one respect difficult: it presents two

questions of first impression.  The first of those is whether
failure to engage in economic activity (the purchase of
health insurance) is subject to regulation under the Com-
merce Clause.  Failure to act does result in an effect
on commerce, and hence might be said to come under
this Court's "affecting commerce" criterion of Commerce
Clause jurisprudence.  But in none of its decisions has this
Court extended the Clause that far.  The second question
is whether the congressional power to tax and spend,
U. S. Const., Art. I, §8, cl. 1, permits the conditioning of
a State's continued receipt of all funds under a massive
state-administered federal welfare program upon its ac-
ceptance of an expansion to that program.  Several of our
opinions have suggested that the power to tax and spend
cannot be used to coerce state administration of a federal
program, but we have never found a law enacted under
the spending power to be coercive.  Those questions are
difficult.

The case is easy and straightforward, however, in an-
other respect.  What is absolutely clear, affirmed by the
text of the 1789 Constitution, by the Tenth Amendment
ratified in 1791, and by innumerable cases of ours in the
220 years since, is that there are structural limits upon
federal power—upon what it can prescribe with respect to
private conduct, and upon what it can impose upon the
sovereign States.  Whatever may be the conceptual limits
upon the Commerce Clause and upon the power to tax
and spend, they cannot be such as will enable the Federal
Government to regulate all private conduct and to com-
pel the States to function as administrators of federal
programs.

That clear principle carries the day here.  The striking
case of *Wickard* v. *Filburn*, 317 U. S. 111 (1942), which
held that the economic activity of growing wheat, even
for one's own consumption, affected commerce sufficiently
that it could be regulated, always has been regarded as

the *ne plus ultra* of expansive Commerce Clause jurisprudence. To go beyond that, and to say the *failure* to grow wheat (which is *not* an economic activity, or any activity at all) nonetheless affects commerce and therefore can be federally regulated, is to make mere breathing in and out the basis for federal prescription and to extend federal power to virtually all human activity.

As for the constitutional power to tax and spend for the general welfare: The Court has long since expanded that beyond (what Madison thought it meant) taxing and spending for those aspects of the general welfare that were within the Federal Government's enumerated powers, see *United States* v. *Butler*, 297 U. S. 1, 65–66 (1936). Thus, we now have sizable federal Departments devoted to subjects not mentioned among Congress' enumerated powers, and only marginally related to commerce: the Department of Education, the Department of Health and Human Services, the Department of Housing and Urban Development. The principal practical obstacle that prevents Congress from using the tax-and-spend power to assume all the general-welfare responsibilities traditionally exercised by the States is the sheer impossibility of managing a Federal Government large enough to administer such a system. That obstacle can be overcome by granting funds to the States, allowing them to administer the program. That is fair and constitutional enough when the States freely agree to have their powers employed and their employees enlisted in the federal scheme. But it is a blatant violation of the constitutional structure when the States have no choice.

The Act before us here exceeds federal power both in mandating the purchase of health insurance and in denying nonconsenting States all Medicaid funding. These parts of the Act are central to its design and operation, and all the Act's other provisions would not have been enacted without them. In our view it must follow that the

entire statute is inoperative.

## I

## **The Individual Mandate**

Article I, §8, of the Constitution gives Congress the power to "regulate Commerce . . . among the several States." The Individual Mandate in the Act commands that every "applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage." 26 U. S. C. §5000A(a) (2006 ed., Supp. IV). If this provision "regulates" anything, it is the *failure* to maintain minimum essential coverage. One might argue that it regulates that failure by requiring it to be accompanied by payment of a penalty. But that failure—that abstention from commerce—is not "Commerce." To be sure, *purchasing* insurance *is* "Commerce"; but one does not regulate commerce that does not exist by compelling its existence.

In *Gibbons* v. *Ogden*, 9 Wheat. 1, 196 (1824), Chief Justice Marshall wrote that the power to regulate commerce is the power "to prescribe the rule by which commerce is to be governed." That understanding is consistent with the original meaning of "regulate" at the time of the Constitution's ratification, when "to regulate" meant "[t]o adjust by rule, method or established mode," 2 N. Webster, An American Dictionary of the English Language (1828); "[t]o adjust by rule or method," 2 S. Johnson, A Dictionary of the English Language (7th ed. 1785); "[t]o adjust, to direct according to rule," 2 J. Ash, New and Complete Dictionary of the English Language (1775); "to put in order, set to rights, govern or keep in order," T. Dyche & W. Pardon, A New General English Dictionary

(16th ed. 1777).[1]  It can mean to direct the manner of something but not to direct that something come into being.  There is no instance in which this Court or Congress (or anyone else, to our knowledge) has used "regulate" in that peculiar fashion.  If the word bore that meaning, Congress' authority "[t]o make Rules for the Government and Regulation of the land and naval Forces," U. S. Const., Art. I, §8, cl. 14, would have made superfluous the later provision for authority "[t]o raise and support Armies," *id.*, §8, cl. 12, and "[t]o provide and maintain a Navy," *id.*, §8, cl. 13.

We do not doubt that the buying and selling of health insurance contracts is commerce generally subject to federal regulation.  But when Congress provides that (nearly) all citizens must buy an insurance contract, it goes beyond "adjust[ing] by rule or method," Johnson, *supra,* or "direct[ing] according to rule," Ash, *supra;* it directs the creation of commerce.

In response, the Government offers two theories as to why the Individual Mandate is nevertheless constitutional.  Neither theory suffices to sustain its validity.

### A

First, the Government submits that §5000A is "integral to the Affordable Care Act's insurance reforms" and "necessary to make effective the Act's core reforms."  Brief for Petitioners in No. 11–398 (Minimum Coverage Provision) 24 (hereinafter Petitioners' Minimum Coverage Brief).  Congress included a "finding" to similar effect in the Act

---

[1] The most authoritative legal dictionaries of the founding era lack any definition for "regulate" or "regulation," suggesting that the term bears its ordinary meaning (rather than some specialized legal meaning) in the constitutional text.  See R. Burn, A New Law Dictionary 281 (1792); G. Jacob, A New Law Dictionary (10th ed. 1782); 2 T. Cunningham, A New and Complete Law Dictionary (2d ed. 1771).

itself. See 42 U. S. C. §18091(2)(H).

As discussed in more detail in Part V, *infra*, the Act contains numerous health insurance reforms, but most notable for present purposes are the "guaranteed issue" and "community rating" provisions, §§300gg to 300gg–4. The former provides that, with a few exceptions, "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage." §300gg–1(a). That is, an insurer may not deny coverage on the basis of, among other things, any pre-existing medical condition that the applicant may have, and the resulting insurance must cover that condition. See §300gg–3.

Under ordinary circumstances, of course, insurers would respond by charging high premiums to individuals with pre-existing conditions. The Act seeks to prevent this through the community-rating provision. Simply put, the community-rating provision requires insurers to calculate an individual's insurance premium based on only four factors: (i) whether the individual's plan covers just the individual or his family also, (ii) the "rating area" in which the individual lives, (iii) the individual's age, and (iv) whether the individual uses tobacco. §300gg(a)(1)(A). Aside from the rough proxies of age and tobacco use (and possibly rating area), the Act does not allow an insurer to factor the individual's health characteristics into the price of his insurance premium. This creates a new incentive for young and healthy individuals without pre-existing conditions. The insurance premiums for those in this group will not reflect their own low actuarial risks but will subsidize insurance for others in the pool. Many of them may decide that purchasing health insurance is not an economically sound decision—especially since the guaranteed-issue provision will enable them to purchase it at the same cost in later years and even if they have developed a

pre-existing condition. But without the contribution of above-risk premiums from the young and healthy, the community-rating provision will not enable insurers to take on high-risk individuals without a massive increase in premiums.

The Government presents the Individual Mandate as a unique feature of a complicated regulatory scheme governing many parties with countervailing incentives that must be carefully balanced. Congress has imposed an extensive set of regulations on the health insurance industry, and compliance with those regulations will likely cost the industry a great deal. If the industry does not respond by increasing premiums, it is not likely to survive. And if the industry does increase premiums, then there is a serious risk that its products—insurance plans—will become economically undesirable for many and prohibitively expensive for the rest.

This is not a dilemma unique to regulation of the health-insurance industry. Government regulation typically imposes costs on the regulated industry—especially regulation that prohibits economic behavior in which most market participants are already engaging, such as "piecing out" the market by selling the product to different classes of people at different prices (in the present context, providing much lower insurance rates to young and healthy buyers). And many industries so regulated face the reality that, without an artificial increase in demand, they cannot continue on. When Congress is regulating these industries directly, it enjoys the broad power to enact "'all appropriate legislation'" to "'protec[t]'" and "'advanc[e]'" commerce, *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 36–37 (1937) (quoting *The Daniel Ball*, 10 Wall. 557, 564 (1871)). Thus, Congress might protect the imperiled industry by prohibiting low-cost competition, or by according it preferential tax treatment, or even by granting it a direct subsidy.

Here, however, Congress has impressed into service
third parties, healthy individuals who could be but are not
customers of the relevant industry, to offset the undesir-
able consequences of the regulation. Congress' desire to
force these individuals to purchase insurance is motivated
by the fact that they are further removed from the market
than unhealthy individuals with pre-existing conditions,
because they are less likely to need extensive care in
the near future. If Congress can reach out and command
even those furthest removed from an interstate market to
participate in the market, then the Commerce Clause
becomes a font of unlimited power, or in Hamilton's words,
"the hideous monster whose devouring jaws . . . spare
neither sex nor age, nor high nor low, nor sacred nor pro-
fane." The Federalist No. 33, p. 202 (C. Rossiter ed. 1961).

At the outer edge of the commerce power, this Court has
insisted on careful scrutiny of regulations that do not
act directly on an interstate market or its participants. In
*New York* v. *United States*, 505 U. S. 144 (1992), we held
that Congress could not, in an effort to regulate the dis-
posal of radioactive waste produced in several different
industries, order the States to take title to that waste.
*Id.,* at 174–177. In *Printz* v. *United States*, 521 U. S.
898 (1997), we held that Congress could not, in an effort to
regulate the distribution of firearms in the interstate mar-
ket, compel state law-enforcement officials to perform
background checks. *Id.,* at 933–935. In *United States* v.
*Lopez*, 514 U. S. 549 (1995), we held that Congress could
not, as a means of fostering an educated interstate labor
market through the protection of schools, ban the posses-
sion of a firearm within a school zone. *Id.,* at 559–563.
And in *United States* v. *Morrison*, 529 U. S. 598 (2000), we
held that Congress could not, in an effort to ensure the full
participation of women in the interstate economy, subject
private individuals and companies to suit for gender-
motivated violent torts. *Id.,* at 609–619. The lesson of

these cases is that the Commerce Clause, even when supplemented by the Necessary and Proper Clause, is not *carte blanche* for doing whatever will help achieve the ends Congress seeks by the regulation of commerce. And the last two of these cases show that the scope of the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of the States but also when it violates the background principle of enumerated (and hence limited) federal power.

The case upon which the Government principally relies to sustain the Individual Mandate under the Necessary and Proper Clause is *Gonzales* v. *Raich*, 545 U. S. 1 (2005). That case held that Congress could, in an effort to restrain the interstate market in marijuana, ban the local cultivation and possession of that drug. *Id.,* at 15–22. *Raich* is no precedent for what Congress has done here. That case's prohibition of growing (cf. *Wickard*, 317 U. S. 111), and of possession (cf. innumerable federal statutes) did not represent the expansion of the federal power to direct into a broad new field. The mandating of economic activity does, and since it is a field so limitless that it converts the Commerce Clause into a general authority to direct the economy, that mandating is not "consist[ent] with the letter and spirit of the constitution." *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819).

Moreover, *Raich* is far different from the Individual Mandate in another respect. The Court's opinion in *Raich* pointed out that the growing and possession prohibitions were the only practicable way of enabling the prohibition of interstate traffic in marijuana to be effectively enforced. 545 U. S., at 22. See also *Shreveport Rate Cases*, 234 U. S. 342 (1914) (Necessary and Proper Clause allows regulations of intrastate transactions if necessary to the regulation of an interstate market). Intrastate marijuana could no more be distinguished from interstate marijuana than, for example, endangered-species trophies obtained before

the species was federally protected can be distinguished
from trophies obtained afterwards—which made it neces-
sary and proper to prohibit the sale of all such trophies,
see *Andrus* v. *Allard*, 444 U. S. 51 (1979).

With the present statute, by contrast, there are many
ways other than this unprecedented Individual Mandate
by which the regulatory scheme's goals of reducing insur-
ance premiums and ensuring the profitability of insurers
could be achieved. For instance, those who did not pur-
chase insurance could be subjected to a surcharge when
they do enter the health insurance system. Or they could
be denied a full income tax credit given to those who do
purchase the insurance.

The Government was invited, at oral argument, to
suggest what federal controls over private conduct (other
than those explicitly prohibited by the Bill of Rights or
other constitutional controls) could *not* be justified as
necessary and proper for the carrying out of a general
regulatory scheme. See Tr. of Oral Arg. 27–30, 43–45
(Mar. 27, 2012). It was unable to name any. As we said at
the outset, whereas the precise scope of the Commerce
Clause and the Necessary and Proper Clause is uncertain,
the proposition that the Federal Government cannot do
everything is a fundamental precept. See *Lopez*, 514 U. S.,
at 564 ("[I]f we were to accept the Government's argu-
ments, we are hard pressed to posit any activity by an in-
dividual that Congress is without power to regulate").
Section 5000A is defeated by that proposition.

B

The Government's second theory in support of the In-
dividual Mandate is that §5000A is valid because it is
actually a "regulat[ion of] activities having a substantial
relation to interstate commerce, . . . *i.e.,* . . . activities that
substantially affect interstate commerce." *Id.,* at 558–559.
See also *Shreveport Rate Cases*, *supra.* This argument

takes a few different forms, but the basic idea is that §5000A regulates "the way in which individuals finance their participation in the health-*care* market." Petitioners' Minimum Coverage Brief 33 (emphasis added). That is, the provision directs the manner in which individuals purchase health care services and related goods (directing that they be purchased through insurance) and is therefore a straightforward exercise of the commerce power.

The primary problem with this argument is that §5000A does not apply only to persons who purchase all, or most, or even any, of the health care services or goods that the mandated insurance covers. Indeed, the main objection many have to the Mandate is that they have no intention of purchasing most or even any of such goods or services and thus no need to buy insurance for those purchases. The Government responds that the health-care market involves "essentially universal participation," *id.,* at 35. The principal difficulty with this response is that it is, in the only relevant sense, not true. It is true enough that everyone consumes "health care," if the term is taken to include the purchase of a bottle of aspirin. But the health care "market" that is the object of the Individual Mandate not only includes but principally consists of goods and services that the young people primarily affected by the Mandate *do not purchase*. They are quite simply not participants in that market, and cannot be made so (and thereby subjected to regulation) by the simple device of defining participants to include all those who will, later in their lifetime, probably purchase the goods or services covered by the mandated insurance.[2] Such a definition of

_____

[2] JUSTICE GINSBURG is therefore right to note that Congress is "not mandating the purchase of a discrete, unwanted product." *Ante,* at 22 (opinion concurring in part, concurring in judgment in part, and dis-

market participants is unprecedented, and were it to be a premise for the exercise of national power, it would have no principled limits.

In a variation on this attempted exercise of federal power, the Government points out that Congress in this Act has purported to regulate "economic and financial decision[s] to forego *[sic]* health insurance coverage and [to] attempt to self-insure," 42 U. S. C. §18091(2)(A), since those decisions have "a substantial and deleterious effect on interstate commerce," Petitioners' Minimum Coverage Brief 34. But as the discussion above makes clear, the decision to forgo participation in an interstate market is not itself commercial activity (or indeed any activity at all) within Congress' power to regulate. It is true that, at the end of the day, it is inevitable that each American will affect commerce and become a part of it, even if not by choice. But if every person comes within the Commerce Clause power of Congress to regulate by the simple reason that he will one day engage in commerce, the idea of a limited Government power is at an end.

*Wickard* v. *Filburn* has been regarded as the most expansive assertion of the commerce power in our history. A close second is *Perez* v. *United States*, 402 U. S. 146 (1971), which upheld a statute criminalizing the eminently local activity of loan-sharking. Both of those cases, however,

––––––––––

senting in part). Instead, it is mandating the purchase of an unwanted suite of products—*e.g.,* physician office visits, emergency room visits, hospital room and board, physical therapy, durable medical equipment, mental health care, and substance abuse detoxification. See Selected Medical Benefits: A Report from the Dept. of Labor to the Dept. of Health & Human Services (April 15, 2011) (reporting that over two-thirds of private industry health plans cover these goods and services), online at http://www.bls.gov/ncs/ebs/sp/selmedbensreport.pdf (all Internet materials as visited June 26, 2012, and available in Clerk of Court's case file).

involved commercial *activity*.  To go beyond that, and to say that the failure to grow wheat or the refusal to make loans affects commerce, so that growing and lending can be federally compelled, is to extend federal power to virtually everything.  All of us consume food, and when we do so the Federal Government can prescribe what its quality must be and even how much we must pay.  But the mere fact that we all consume food and are thus, sooner or later, participants in the "market" for food, does not empower the Government to say when and what we will buy.  That is essentially what this Act seeks to do with respect to the purchase of health care.  It exceeds federal power.

## C

A few respectful responses to JUSTICE GINSBURG's dissent on the issue of the Mandate are in order.  That dissent duly recites the test of Commerce Clause power that our opinions have applied, but disregards the premise the test contains.  It is true enough that Congress needs only a "'rational basis' for concluding that the *regulated activity* substantially affects interstate commerce," *ante*, at 15 (emphasis added).  But it must be *activity* affecting commerce that is regulated, and not merely the failure to engage in commerce.  And one is not now purchasing the health care covered by the insurance mandate simply because one is likely to be purchasing it in the future.  Our test's premise of regulated activity is not invented out of whole cloth, but rests upon the Constitution's requirement that it be commerce which is regulated.  If all inactivity affecting commerce is commerce, commerce is everything.  Ultimately the dissent is driven to saying that there is really no difference between action and inaction, *ante*, at 26, a proposition that has never recommended itself, neither to the law nor to common sense.  To say, for example, that the inaction here consists of activity in "the self-insurance market," *ibid.*, seems to us wordplay.  By parity

of reasoning the failure to buy a car can be called participation in the non-private-car-transportation market. Commerce becomes everything.

The dissent claims that we "fai[l] to explain why the individual mandate threatens our constitutional order." *Ante*, at 35. But we have done so. It threatens that order because it gives such an expansive meaning to the Commerce Clause that *all* private conduct (including failure to act) becomes subject to federal control, effectively destroying the Constitution's division of governmental powers. Thus the dissent, on the theories proposed for the validity of the Mandate, would alter the accepted constitutional relation between the individual and the National Government. The dissent protests that the Necessary and Proper Clause has been held to include "the power to enact criminal laws, . . . the power to imprison, . . . and the power to create a national bank," *ante*, at 34–35. Is not the power to compel purchase of health insurance much lesser? No, not if (unlike those other dispositions) its application rests upon a theory that everything is within federal control simply because it exists.

The dissent's exposition of the wonderful things the Federal Government has achieved through exercise of its assigned powers, such as "the provision of old-age and survivors' benefits" in the Social Security Act, *ante*, at 2, is quite beside the point. The issue here is whether the federal government can impose the Individual Mandate through the Commerce Clause. And the relevant history is not that Congress has achieved wide and wonderful results through the proper exercise of its assigned powers in the past, but that it has never before used the Commerce Clause to compel entry into commerce.[3] The dissent

---

[3] In its effort to show the contrary, JUSTICE GINSBURG'S dissent comes

treats the Constitution as though it is an enumeration of those problems that the Federal Government can address—among which, it finds, is "the Nation's course in the economic and social welfare realm," *ibid.*, and more specifically "the problem of the uninsured," *ante,* at 7. The Constitution is not that. It enumerates not federally soluble *problems*, but federally available *powers*. The Federal Government can address whatever problems it wants but can bring to their solution only those powers that the Constitution confers, among which is the power to regulate commerce. None of our cases say anything else. Article I contains no whatever-it-takes-to-solve-a-national-problem power.

The dissent dismisses the conclusion that the power to compel entry into the health-insurance market would include the power to compel entry into the new-car or broccoli markets. The latter purchasers, it says, "will be obliged to pay at the counter before receiving the vehicle

------

up with nothing more than two condemnation cases, which it says demonstrate "Congress' authority under the commerce power to compel an 'inactive' landholder to submit to an unwanted sale." *Ante,* at 24. Wrong on both scores. As its name suggests, the condemnation power does not "compel" anyone to do anything. It acts *in rem*, against the property that is condemned, and is effective with or without a transfer of title from the former owner. More important, the power to condemn for public use is a separate sovereign power, explicitly acknowledged in the Fifth Amendment, which provides that "private property [shall not] be taken for public use, without just compensation."

Thus, the power to condemn tends to refute rather than support the power to compel purchase of unwanted goods at a prescribed price: The latter is rather like the power to condemn cash for public use. If it existed, why would it not (like the condemnation power) be accompanied by a requirement of fair compensation for the portion of the exacted price that exceeds the goods' fair market value (here, the difference between what the free market would charge for a health-insurance policy on a young, healthy person with no pre-existing conditions, and the government-exacted community-rated premium)?

or nourishment," whereas those refusing to purchase health-insurance will ultimately get treated anyway, at others' expense. *Ante*, at 21. "[T]he unique attributes of the health-care market . . . give rise to a significant free-riding problem that does not occur in other markets." *Ante,* at 28. And "a vegetable-purchase mandate" (or a car-purchase mandate) is not "likely to have a substantial effect on the health-care costs" borne by other Americans. *Ante,* at 29. Those differences make a very good argument by the dissent's own lights, since they show that the failure to purchase health insurance, unlike the failure to purchase cars or broccoli, creates a national, social-welfare problem that is (in the dissent's view) included among the unenumerated "problems" that the Constitution authorizes the Federal Government to solve. But those differences do not show that the failure to enter the health-insurance market, unlike the failure to buy cars and broccoli, is an *activity* that Congress can "regulate." (Of course one day the failure of some of the public to purchase American cars may endanger the existence of domestic automobile manufacturers; or the failure of some to eat broccoli may be found to deprive them of a newly discovered cancer-fighting chemical which only that food contains, producing health-care costs that are a burden on the rest of us—in which case, under the theory of JUSTICE GINSBURG's dissent, moving against those inactivities will also come within the Federal Government's unenumerated problem-solving powers.)

## II
## The Taxing Power

As far as §5000A is concerned, we would stop there. Congress has attempted to regulate beyond the scope of its

Commerce Clause authority,[4] and §5000A is therefore invalid. The Government contends, however, as expressed in the caption to Part II of its brief, that "THE MINIMUM COVERAGE PROVISION IS INDEPENDENTLY AUTHORIZED BY CONGRESS'S TAXING POWER." Petitioners' Minimum Coverage Brief 52. The phrase "independently authorized" suggests the existence of a creature never hitherto seen in the United States Reports: A penalty for constitutional purposes that is *also* a tax for constitutional purposes. In all our cases the two are mutually exclusive. The provision challenged under the Constitution is either a penalty or else a tax. Of course in many cases what was a regulatory mandate enforced by a penalty *could have been* imposed as a tax upon permissible action; or what was imposed as a tax upon permissible action *could have been* a regulatory mandate enforced by a penalty. But we know of no case, and the Government cites none, in which the imposition was, for constitutional purposes, both.[5] The two are mutually exclusive. Thus, what the Government's caption should have read was "ALTERNATIVELY, THE MINIMUM COVERAGE PROVISION IS NOT A MANDATE-WITH-PENALTY BUT A TAX." It is important to bear this in mind in evaluating the tax argument of the Government and of those who support it: The issue is not whether Congress

------

[4] No one seriously contends that any of Congress' other enumerated powers gives it the authority to enact §5000A *as a regulation*.

[5] Of course it can be both for statutory purposes, since Congress can define "tax" and "penalty" in its enactments any way it wishes. That is why *United States* v. *Sotelo*, 436 U. S. 268 (1978), does not disprove our statement. That case held that a "penalty" for willful failure to pay one's taxes was included among the "taxes" made non-dischargeable under the Bankruptcy Code. 436 U. S., at 273–275. Whether the "penalty" was a "tax" within the meaning of the Bankruptcy Code had absolutely no bearing on whether it escaped the constitutional limitations on penalties.

had the *power* to frame the minimum-coverage provision as a tax, but whether it *did* so.

In answering that question we must, if "fairly possible," *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932), construe the provision to be a tax rather than a mandate-with-penalty, since that would render it constitutional rather than un-constitutional *(ut res magis valeat quam pereat).* But we cannot rewrite the statute to be what it is not. "'"[A]l-though this Court will often strain to construe legis-lation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . ." or judicially rewriting it.'" *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 841 (1986) (quoting *Aptheker* v. *Secretary of State*, 378 U. S. 500, 515 (1964), in turn quoting *Scales* v. *United States*, 367 U. S. 203, 211 (1961)). In this case, there is simply no way, "without doing violence to the fair meaning of the words used," *Grenada County Supervisors* v. *Brog-den*, 112 U. S. 261, 269 (1884), to escape what Congress enacted: a mandate that individuals maintain minimum essential coverage, enforced by a penalty.

Our cases establish a clear line between a tax and a penalty: "'[A] tax is an enforced contribution to provide for the support of government; a penalty . . . is an exaction imposed by statute as punishment for an unlawful act.'" *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U. S. 213, 224 (1996) (quoting *United States* v. *La Franca*, 282 U. S. 568, 572 (1931)). In a few cases, this Court has held that a "tax" imposed upon private conduct was so onerous as to be in effect a penalty. But we have never held—*never*—that a penalty imposed for violation of the law was so trivial as to be in effect a tax. We have never held that *any* exaction imposed for violation of the law is an exercise of Congress' taxing power—even when the statute *calls* it a tax, much less when (as here) the statute repeatedly calls it a penalty. When an act

"adopt[s] the criteria of wrongdoing" and then imposes a monetary penalty as the "principal consequence on those who transgress its standard," it creates a regulatory penalty, not a tax. *Child Labor Tax Case*, 259 U. S. 20, 38 (1922).

So the question is, quite simply, whether the exaction here is imposed for violation of the law. It unquestionably is. The minimum-coverage provision is found in 26 U. S. C. §5000A, entitled "*Requirement* to maintain minimum essential coverage." (Emphasis added.) It commands that every "applicable individual *shall* . . . ensure that the individual . . . is covered under minimum essential coverage." *Ibid.* (emphasis added). And the immediately following provision states that, "[i]f . . . an applicable individual . . . fails to meet the *requirement* of subsection (a) . . . there is hereby imposed . . . a *penalty*." §5000A(b) (emphasis added). And several of Congress' legislative "findings" with regard to §5000A confirm that it sets forth a legal requirement and constitutes the assertion of regulatory power, not mere taxing power. See 42 U. S. C. §18091(2)(A) ("The requirement regulates activity . . ."); §18091(2)(C) ("The requirement . . . will add millions of new consumers to the health insurance market . . ."); §18091(2)(D) ("The requirement achieves near-universal coverage"); §18091(2)(H) ("The requirement is an essential part of this larger regulation of economic activity, and the absence of the requirement would undercut Federal regulation of the health insurance market"); §18091(3) ("[T]he Supreme Court of the United States ruled that insurance is interstate commerce subject to Federal regulation").

The Government and those who support its view on the tax point rely on *New York* v. *United States*, 505 U. S. 144, to justify reading "shall" to mean "may." The "shall" in that case was contained in an introductory provision—a recital that provided for no legal consequences—which said that "[e]ach State shall be responsible for providing

. . . for the disposal of . . . low-level radioactive waste." 42 U. S. C. §2021c(a)(1)(A). The Court did not hold that "shall" could be construed to mean "may," but rather that this preliminary provision could not impose upon the operative provisions of the Act a mandate that they did not contain: "We . . . decline petitioners' invitation to construe §2021c(a)(1)(A), alone and in isolation, as a command to the States independent of the remainder of the Act." *New York*, 505 U. S., at 170. Our opinion then proceeded to "consider each [of the three operative provisions] in turn." *Ibid.* Here the mandate—the "shall"—is contained not in an inoperative preliminary recital, but in the dispositive operative provision itself. *New York* provides no support for reading it to be permissive.

Quite separately, the fact that Congress (in its own words) "imposed . . . a penalty," 26 U. S. C. §5000A(b)(1), for failure to buy insurance is alone sufficient to render that failure unlawful. It is one of the canons of interpretation that a statute that penalizes an act makes it unlawful: "[W]here the statute inflicts a penalty for doing an act, although the act itself is not expressly prohibited, yet to do the act is unlawful, because it cannot be supposed that the Legislature intended that a penalty should be inflicted for a lawful act." *Powhatan Steamboat Co.* v. *Appomattox R. Co.*, 24 How. 247, 252 (1861). Or in the words of Chancellor Kent: "If a statute inflicts a penalty for doing an act, the penalty implies a prohibition, and the thing is unlawful, though there be no prohibitory words in the statute." 1 J. Kent, Commentaries on American Law 436 (1826).

We never have classified as a tax an exaction imposed for violation of the law, and so too, we never have classified as a tax an exaction described in the legislation itself as a penalty. To be sure, we have sometimes treated as a tax a statutory exaction (imposed for something other than a violation of law) which bore an agnostic label that does not entail the significant constitutional consequences

of a penalty—such as "license" (*License Tax Cases*, 5 Wall. 462 (1867)) or "surcharge" (*New York* v. *United States*, *supra.*). But we have never—*never*—treated as a tax an exaction which faces up to the critical difference between a tax and a penalty, and explicitly denominates the exaction a "penalty." Eighteen times in §5000A itself and elsewhere throughout the Act, Congress called the exaction in §5000A(b) a "penalty."

That §5000A imposes not a simple tax but a mandate to which a penalty is attached is demonstrated by the fact that some are exempt from the tax who are not exempt from the mandate—a distinction that would make no sense if the mandate were not a mandate. Section 5000A(d) exempts three classes of people from the definition of "applicable individual" subject to the minimum coverage requirement: Those with religious objections or who participate in a "health care sharing ministry," §5000A(d)(2); those who are "not lawfully present" in the United States, §5000A(d)(3); and those who are incarcerated, §5000A(d)(4). Section 5000A(e) then creates a separate set of exemptions, excusing from liability for the penalty certain individuals who are subject to the minimum coverage requirement: Those who cannot afford coverage, §5000A(e)(1); who earn too little income to require filing a tax return, §5000A(e)(2); who are members of an Indian tribe, §5000A(e)(3); who experience only short gaps in coverage, §5000A(e)(4); and who, in the judgment of the Secretary of Health and Human Services, "have suffered a hardship with respect to the capability to obtain coverage," §5000A(e)(5). If §5000A were a tax, these two classes of exemption would make no sense; there being no requirement, *all* the exemptions would attach to the penalty (renamed tax) alone.

In the face of all these indications of a regulatory requirement accompanied by a penalty, the Solicitor General assures us that "neither the Treasury Department nor the

Department of Health and Human Services interprets Section 5000A as imposing a legal obligation," Petitioners' Minimum Coverage Brief 61, and that "[i]f [those subject to the Act] pay the tax penalty, they're in compliance with the law," Tr. of Oral Arg. 50 (Mar. 26, 2012). These self-serving litigating positions are entitled to no weight. What counts is what the statute says, and that is entirely clear. It is worth noting, moreover, that these assurances contradict the Government's position in related litigation. Shortly before the Affordable Care Act was passed, the Commonwealth of Virginia enacted Va. Code Ann. §38.2–3430.1:1 (Lexis Supp. 2011), which states, "No resident of [the] Commonwealth . . . shall be required to obtain or maintain a policy of individual insurance coverage except as required by a court or the Department of Social Services . . . ." In opposing Virginia's assertion of standing to challenge §5000A based on this statute, the Government said that "if the minimum coverage provision is unconstitutional, the [Virginia] statute is unnecessary, and if the minimum coverage provision is upheld, the state statute is void under the Supremacy Clause." Brief for Appellant in No. 11–1057 etc. (CA4), p. 29. But it would be void under the Supremacy Clause only if it was contradicted by a federal "require[ment] to obtain or maintain a policy of individual insurance coverage."

Against the mountain of evidence that the minimum coverage requirement is what the statute calls it—a requirement—and that the penalty for its violation is what the statute calls it—a penalty—the Government brings forward the flimsiest of indications to the contrary. It notes that "[t]he minimum coverage provision amends the Internal Revenue Code to provide that a non-exempted individual . . . will owe a monetary penalty, in addition to the income tax itself," and that "[t]he [Internal Revenue Service (IRS)] will assess and collect the penalty in the same manner as assessable penalties under the Internal

Revenue Code." Petitioners' Minimum Coverage Brief 53. The manner of collection could perhaps suggest a tax if IRS penalty-collection were unheard-of or rare. It is not. See, *e.g.,* 26 U. S. C. §527(j) (2006 ed.) (IRS-collectible penalty for failure to make campaign-finance disclosures); §5761(c) (IRS-collectible penalty for domestic sales of tobacco products labeled for export); §9707 (IRS-collectible penalty for failure to make required health-insurance premium payments on behalf of mining employees). In *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U. S. 213, we held that an exaction not only *enforced* by the Commissioner of Internal Revenue but even *called* a "tax" was in fact a penalty. "[I]f the concept of penalty means anything," we said, "it means punishment for an unlawful act or omission." *Id.,* at 224. See also *Lipke* v. *Lederer*, 259 U. S. 557 (1922) (same). Moreover, while the penalty is assessed and collected by the IRS, §5000A is administered both by that agency and by the Department of Health and Human Services (and also the Secretary of Veteran Affairs), see §5000A(e)(1)(D), (e)(5), (f)(1)(A)(v), (f)(1)(E) (2006 ed., Supp. IV), which is responsible for defining its substantive scope—a feature that would be quite extraordinary for taxes.

The Government points out that "[t]he amount of the penalty will be calculated as a percentage of household income for federal income tax purposes, subject to a floor and [a] ca[p]," and that individuals who earn so little money that they "are not required to file income tax returns for the taxable year are not subject to the penalty" (though they are, as we discussed earlier, subject to the mandate). Petitioners' Minimum Coverage Brief 12, 53. But varying a penalty according to ability to pay is an utterly familiar practice. See, *e.g.,* 33 U. S. C. §1319(d) (2006 ed., Supp. IV) ("In determining the amount of a civil penalty the court shall consider . . . the economic impact of the penalty on the violator"); see also 6 U. S. C. §488e(c); 7

U. S. C. §§7734(b)(2), 8313(b)(2); 12 U. S. C. §§1701q–1(d)(3), 1723i(c)(3), 1735f–14(c)(3), 1735f–15(d)(3), 4585(c)(2); 15 U. S. C. §§45(m)(1)(C), 77h–1(g)(3), 78u–2(d), 80a–9(d)(4), 80b–3(i)(4), 1681s(a)(2)(B), 1717a(b)(3), 1825(b)(1), 2615(a) (2)(B), 5408(b)(2); 33 U. S. C. §2716a(a).

The last of the feeble arguments in favor of petitioners that we will address is the contention that what this statute repeatedly calls a penalty is in fact a tax because it contains no scienter requirement. The *presence* of such a requirement suggests a penalty—though one can imagine a tax imposed only on willful action; but the *absence* of such a requirement does not suggest a tax. Penalties for absolute-liability offenses are commonplace. And where a statute is silent as to scienter, we traditionally presume a *mens rea* requirement if the statute imposes a "severe penalty." *Staples* v. *United States*, 511 U. S. 600, 618 (1994). Since we have an entire jurisprudence addressing when it is that a scienter requirement should be inferred from a penalty, it is quite illogical to suggest that a penalty is not a penalty for want of an express scienter requirement.

And the nail in the coffin is that the mandate and penalty are located in Title I of the Act, its operative core, rather than where a tax would be found—in Title IX, containing the Act's "Revenue Provisions." In sum, "the terms of [the] act rende[r] it unavoidable," *Parsons* v. *Bedford*, 3 Pet. 433, 448 (1830), that Congress imposed a regulatory penalty, not a tax.

For all these reasons, to say that the Individual Mandate merely imposes a tax is not to interpret the statute but to rewrite it. Judicial tax-writing is particularly troubling. Taxes have never been popular, see, *e.g.,* Stamp Act of 1765, and in part for that reason, the Constitution requires tax increases to originate in the House of Representatives. See Art. I, §7, cl. 1. That is to say, they must originate in the legislative body most accountable to the

people, where legislators must weigh the need for the tax against the terrible price they might pay at their next election, which is never more than two years off. The Federalist No. 58 "defend[ed] the decision to give the origination power to the House on the ground that the Chamber that is more accountable to the people should have the primary role in raising revenue." *United States* v. *Munoz-Flores*, 495 U. S. 385, 395 (1990). We have no doubt that Congress knew precisely what it was doing when it rejected an earlier version of this legislation that imposed a tax instead of a requirement-with-penalty. See Affordable Health Care for America Act, H. R. 3962, 111th Cong., 1st Sess., §501 (2009); America's Healthy Future Act of 2009, S. 1796, 111th Cong., 1st Sess., §1301. Imposing a tax through judicial legislation inverts the constitutional scheme, and places the power to tax in the branch of government least accountable to the citizenry.

Finally, we must observe that rewriting §5000A as a tax in order to sustain its constitutionality would force us to confront a difficult constitutional question: whether this is a direct tax that must be apportioned among the States according to their population. Art. I, §9, cl. 4. Perhaps it is not (we have no need to address the point); but the meaning of the Direct Tax Clause is famously unclear, and its application here is a question of first impression that deserves more thoughtful consideration than the lick-and-a-promise accorded by the Government and its supporters. The Government's opening brief did not even address the question—perhaps because, until today, no federal court has accepted the implausible argument that §5000A is an exercise of the tax power. And once respondents raised the issue, the Government devoted a mere 21 lines of its reply brief to the issue. Petitioners' Minimum Coverage Reply Brief 25. At oral argument, the most prolonged statement about the issue was just over 50 words. Tr. of Oral Arg. 79 (Mar. 27, 2012). One would expect this Court

to demand more than fly-by-night briefing and argument before deciding a difficult constitutional question of first impression.

### III
### The Anti-Injunction Act

There is another point related to the Individual Mandate that we must discuss—a point that logically should have been discussed first: Whether jurisdiction over the challenges to the minimum-coverage provision is precluded by the Anti-Injunction Act, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person," 26 U. S. C. §7421(a) (2006 ed.).

We have left the question to this point because it seemed to us that the dispositive question whether the minimum-coverage provision is a tax is more appropriately addressed in the significant constitutional context of whether it is an exercise of Congress' taxing power. Having found that it is not, we have no difficulty in deciding that these suits do not have "the purpose of restraining the assessment or collection of any tax."[6]

—————

[6]The *amicus* appointed to defend the proposition that the Anti-Injunction Act deprives us of jurisdiction stresses that the penalty for failing to comply with the mandate "shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68," 26 U. S. C. §5000A(g)(1) (2006 ed., Supp. IV), and that such penalties "shall be assessed and collected in the same manner as taxes," §6671(a) (2006 ed.). But that point seems to us to confirm the *inapplicability* of the Anti-Injunction Act. That the penalty is to be "assessed and collected *in the same manner as* taxes" refutes the proposition that it *is* a tax for all statutory purposes, including with respect to the Anti-Injunction Act. Moreover, elsewhere in the Internal Revenue Code, Congress has provided *both* that a particular payment shall be "assessed and collected" in the same manner as a tax *and* that no suit shall be maintained to restrain the assessment or collection of the payment. See, *e.g.,* §§7421(b)(1), §6901(a); §6305(a), (b). The

The Government and those who support its position on this point make the remarkable argument that §5000A is not a tax for purposes of the Anti-Injunction Act, see Brief for Petitioners in No. 11–398 (Anti-Injunction Act), but is a tax for constitutional purposes, see Petitioners' Minimum Coverage Brief 52–62. The rhetorical device that tries to cloak this argument in superficial plausibility is the same device employed in arguing that for constitutional purposes the minimum-coverage provision is a tax: confusing the question of what Congress *did* with the question of what Congress *could have done.* What qualifies as a tax for purposes of the Anti-Injunction Act, unlike what qualifies as a tax for purposes of the Constitution, is entirely within the control of Congress. Compare *Bailey* v. *George*, 259 U. S. 16, 20 (1922) (Anti-Injunction Act barred suit to restrain collections under the Child Labor Tax Law), with *Child Labor Tax Case*, 259 U. S., at 36–41 (holding the same law unconstitutional as exceeding Congress' taxing power). Congress could have defined "tax" for purposes of that statute in such fashion as to exclude some exactions that in fact are "taxes*."* It might have prescribed, for example, that a particular exercise of the taxing power "shall not be regarded as a tax for purposes of the Anti-Injunction Act." But there is no such prescription here. What the Government would have us believe in

---

latter directive would be superfluous if the former invoked the Anti-Injunction Act.

*Amicus* also suggests that the penalty should be treated as a tax because it is an assessable penalty, and the Code's assessment provision authorizes the Secretary of the Treasury to assess "all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title." §6201(a) (2006 ed., Supp. IV). But the fact that such items are included as "taxes" for purposes of assessment does not establish that they are included as "taxes" for purposes of other sections of the Code, such as the Anti-Injunction Act, that do not contain similar "including" language.

these cases is that the very same textual indications that show this is *not* a tax under the Anti-Injunction Act show that it *is* a tax under the Constitution. That carries verbal wizardry too far, deep into the forbidden land of the sophists.

## IV
## The Medicaid Expansion

We now consider respondents' second challenge to the constitutionality of the ACA, namely, that the Act's dramatic expansion of the Medicaid program exceeds Congress' power to attach conditions to federal grants to the States.

The ACA does not legally compel the States to participate in the expanded Medicaid program, but the Act authorizes a severe sanction for any State that refuses to go along: termination of all the State's Medicaid funding. For the average State, the annual federal Medicaid subsidy is equal to more than one-fifth of the State's expenditures.[7] A State forced out of the program would not only lose this huge sum but would almost certainly find it necessary to increase its own health-care expenditures substantially, requiring either a drastic reduction in funding for other programs or a large increase in state taxes. And these new taxes would come on top of the federal taxes already paid by the State's citizens to fund the Medicaid program in other States.

The States challenging the constitutionality of the ACA's Medicaid Expansion contend that, for these practical reasons, the Act really does not give them any choice at all. As proof of this, they point to the goal and the struc-

--------

[7] "State expenditures" is used here to mean annual expenditures from the States' own funding sources, and it excludes federal grants unless otherwise noted.

ture of the ACA. The goal of the Act is to provide near-universal medical coverage, 42 U. S. C. §18091(2)(D), and without 100% State participation in the Medicaid program, attainment of this goal would be thwarted. Even if States could elect to remain in the old Medicaid program, while declining to participate in the Expansion, there would be a gaping hole in coverage. And if a substantial number of States were entirely expelled from the program, the number of persons without coverage would be even higher.

In light of the ACA's goal of near-universal coverage, petitioners argue, if Congress had thought that anything less than 100% state participation was a realistic possibility, Congress would have provided a backup scheme. But no such scheme is to be found anywhere in the more than 900 pages of the Act. This shows, they maintain, that Congress was certain that the ACA's Medicaid offer was one that no State could refuse.

In response to this argument, the Government contends that any congressional assumption about uniform state participation was based on the simple fact that the offer of federal funds associated with the expanded coverage is such a generous gift that no State would want to turn it down.

To evaluate these arguments, we consider the extent of the Federal Government's power to spend money and to attach conditions to money granted to the States.

### A

No one has ever doubted that the Constitution authorizes the Federal Government to spend money, but for many years the scope of this power was unsettled. The Constitution grants Congress the power to collect taxes "to . . . provide for the . . . general Welfare of the United States," Art. I, §8, cl. 1, and from "the foundation of the Nation sharp differences of opinion have persisted as to

the true interpretation of the phrase" "the general wel-
fare." *Butler*, 297 U. S., at 65. Madison, it has been said,
thought that the phrase "amounted to no more than a
reference to the other powers enumerated in the subse-
quent clauses of the same section," while Hamilton "main-
tained the clause confers a power separate and distinct
from those later enumerated [and] is not restricted in
meaning by the grant of them." *Ibid.*

The Court resolved this dispute in *Butler*. Writing for
the Court, Justice Roberts opined that the Madisonian
view would make Article I's grant of the spending power a
"mere tautology." *Ibid.* To avoid that, he adopted Hamil-
ton's approach and found that "the power of Congress to
authorize expenditure of public moneys for public pur-
poses is not limited by the direct grants of legislative
power found in the Constitution." *Id.,* at 66. Instead, he
wrote, the spending power's "confines are set in the clause
which confers it, and not in those of section 8 which be-
stow and define the legislative powers of the Congress."
*Ibid.*; see also *Steward Machine Co.* v. *Davis*, 301 U. S.
548, 586–587 (1937); *Helvering* v. *Davis*, 301 U. S. 619,
640 (1937).

The power to make any expenditure that furthers "the
general welfare" is obviously very broad, and shortly after
*Butler* was decided the Court gave Congress wide leeway
to decide whether an expenditure qualifies. See *Helvering*,
301 U. S., at 640–641. "The discretion belongs to Con-
gress," the Court wrote, "unless the choice is clearly
wrong, a display of arbitrary power, not an exercise of
judgment." *Id.*, at 640. Since that time, the Court has
never held that a federal expenditure was not for "the
general welfare."

### B

One way in which Congress may spend to promote the
general welfare is by making grants to the States. Mone-

tary grants, so-called grants-in-aid, became more frequent during the 1930's, G. Stephens & N. Wikstrom, American Intergovernmental Relations—A Fragmented Federal Polity 83 (2007), and by 1950 they had reached $20 billion[8] or 11.6% of state and local government expenditures from their own sources.[9] By 1970 this number had grown to $123.7 billion[10] or 29.1% of state and local government expenditures from their own sources.[11] As of 2010, federal outlays to state and local governments came to over $608 billion or 37.5% of state and local government expenditures.[12]

When Congress makes grants to the States, it customarily attaches conditions, and this Court has long held that the Constitution generally permits Congress to do this. See *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981); *South Dakota* v. *Dole*, 483 U. S. 203, 206 (1987); *Fullilove* v. *Klutznick*, 448 U. S. 448, 474 (1980) (opinion of Burger, C. J.); *Steward Machine, supra,* at 593.

## C

This practice of attaching conditions to federal funds

---

[8] This number is expressed in billions of Fiscal Year 2005 dollars.

[9] See Office of Management and Budget, Historical Tables, Budget of the U. S. Government, Fiscal Year 2013, Table 12.1—Summary Comparison of Total Outlays for Grants to State and Local Governments: 1940–2017 (hereinafter Table 12.1), http://www.whitehouse.gov/omb/ budget/Historicals; *id.*, Table 15.2—Total Government Expenditures: 1948–2011 (hereinafter Table 15.2).

[10] This number is expressed in billions of Fiscal Year 2005 dollars.

[11] See Table 12.1; Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2001, p. 262 (Table 419, Federal Grants-in-Aid Summary: 1970 to 2001).

[12] See Statistical Abstract of the United States: 2012, p. 268 (Table 431, Federal Grants-in-Aid to State and Local Governments: 1990 to 2011).

greatly increases federal power.  "[O]bjectives not thought
to be within Article I's enumerated legislative fields, may
nevertheless be attained through the use of the spending
power and the conditional grant of federal funds."  *Dole*,
*supra*, at 207 (internal quotation marks and citation omit-
ted); see also *College Savings Bank* v. *Florida Prepaid
Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 686 (1999)
(by attaching conditions to federal funds, Congress may
induce the States to "tak[e] certain actions that Congress
could not require them to take").

   This formidable power, if not checked in any way, would
present a grave threat to the system of federalism created
by our Constitution.  If Congress' "Spending Clause power
to pursue objectives outside of Article I's enumerated
legislative fields," *Davis* v. *Monroe County Bd. of Ed.*, 526
U. S. 629, 654 (1999) (KENNEDY, J., dissenting) (internal
quotation marks omitted), is "limited only by Congress'
notion of the general welfare, the reality, given the vast
financial resources of the Federal Government, is that
the Spending Clause gives 'power to the Congress to tear
down the barriers, to invade the states' jurisdiction, and to
become a parliament of the whole people, subject to no
restrictions save such as are self-imposed,'" *Dole*, *supra*, at
217 (O'Connor, J., dissenting) (quoting *Butler*, 297 U. S.,
at 78).  "[T]he Spending Clause power, if wielded without
concern for the federal balance, has the potential to oblite-
rate distinctions between national and local spheres of
interest and power by permitting the Federal Government
to set policy in the most sensitive areas of traditional
state concern, areas which otherwise would lie outside
its reach."   *Davis*, *supra,* at 654–655 (KENNEDY, J.,
dissenting).

   Recognizing this potential for abuse, our cases have long
held that the power to attach conditions to grants to the
States has limits.  See, *e.g., Dole*, *supra*, at 207–208; *id*.,
at 207 (spending power is "subject to several general re-

strictions articulated in our cases"). For one thing, any such conditions must be unambiguous so that a State at least knows what it is getting into. See *Pennhurst, supra,* at 17. Conditions must also be related "to the federal interest in particular national projects or programs," *Massachusetts* v. *United States*, 435 U. S. 444, 461 (1978), and the conditional grant of federal funds may not "induce the States to engage in activities that would themselves be unconstitutional," *Dole, supra,* at 210; see *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1*, 469 U. S. 256, 269–270 (1985). Finally, while Congress may seek to induce States to accept conditional grants, Congress may not cross the "point at which pressure turns into compulsion, and ceases to be inducement." *Steward Machine*, 301 U. S., at 590. Accord, *College Savings Bank, supra,* at 687; *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 285 (1991) (White, J., dissenting); *Dole, supra*, at 211.

When federal legislation gives the States a real choice whether to accept or decline a federal aid package, the federal-state relationship is in the nature of a contractual relationship. See *Barnes* v. *Gorman*, 536 U. S. 181, 186 (2002); *Pennhurst*, 451 U. S., at 17. And just as a contract is voidable if coerced, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State *voluntarily* and knowingly accepts the terms of the 'contract.'" *Ibid.* (emphasis added). If a federal spending program coerces participation the States have not "exercise[d] their choice"—let alone made an "informed choice." *Id.*, at 17, 25.

Coercing States to accept conditions risks the destruction of the "unique role of the States in our system." *Davis*, *supra*, at 685 (KENNEDY, J., dissenting). "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U. S., at

162. Congress may not "simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.*, at 161 (internal quotation marks and brackets omitted). Congress effectively engages in this impermissible compulsion when state participation in a federal spending program is coerced, so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory.

Where all Congress has done is to "encourag[e] state regulation rather than compe[l] it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people. [But] where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished." *New York*, *supra,* at 168.

*Amici* who support the Government argue that forcing state employees to implement a federal program is more respectful of federalism than using federal workers to implement that program. See, *e.g.*, Brief for Service Employees International Union et al. as *Amici Curiae* in No. 11–398, pp. 25–26. They note that Congress, instead of expanding Medicaid, could have established an entirely federal program to provide coverage for the same group of people. By choosing to structure Medicaid as a cooperative federal-state program, they contend, Congress allows for more state control. *Ibid.*

This argument reflects a view of federalism that our cases have rejected—and with good reason. When Congress compels the States to do its bidding, it blurs the lines of political accountability. If the Federal Government makes a controversial decision while acting on its own, "it is the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular." *New York*, 505 U. S., at

168. But when the Federal Government compels the States to take unpopular actions, "it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *Id.*, at 169; see *Printz*, *supra,* at 930. For this reason, federal officeholders may view this "departur[e] from the federal structure to be in their personal interests . . . as a means of shifting responsibility for the eventual decision." *New York*, 505 U. S., at 182–183. And even state officials may favor such a "departure from the constitutional plan," since uncertainty concerning responsibility may also permit them to escape accountability. *Id.*, at 182. If a program is popular, state officials may claim credit; if it is unpopular, they may protest that they were merely responding to a federal directive.

Once it is recognized that spending-power legislation cannot coerce state participation, two questions remain: (1) What is the meaning of coercion in this context? (2) Is the ACA's expanded Medicaid coverage coercive? We now turn to those questions.

D

1

The answer to the first of these questions—the meaning of coercion in the present context—is straightforward. As we have explained, the legitimacy of attaching conditions to federal grants to the States depends on the voluntariness of the States' choice to accept or decline the offered package. Therefore, if States really have no choice other than to accept the package, the offer is coercive, and the conditions cannot be sustained under the spending power. And as our decision in *South Dakota* v. *Dole* makes clear, theoretical voluntariness is not enough.

In *South Dakota* v. *Dole*, we considered whether the spending power permitted Congress to condition 5% of the

State's federal highway funds on the State's adoption of
a minimum drinking age of 21 years. South Dakota ar-
gued that the program was impermissibly coercive, but we
disagreed, reasoning that "Congress ha[d] directed only
that a State desiring to establish a minimum drinking age
lower than 21 lose a relatively small percentage of certain
federal highway funds." 483 U. S., at 211. Because "all
South Dakota would lose if she adhere[d] to her chosen
course as to a suitable minimum drinking age [was] 5%
of the funds otherwise obtainable under specified high-
way grant programs," we found that "Congress ha[d] of-
fered relatively mild encouragement to the States to enact
higher minimum drinking ages than they would otherwise
choose." *Ibid.* Thus, the decision whether to comply with
the federal condition "remain[ed] the prerogative of the
States *not merely in theory but in fact*," and so the pro-
gram at issue did not exceed Congress' power. *Id.*, at 211–
212 (emphasis added).

The question whether a law enacted under the spending
power is coercive in fact will sometimes be difficult, but
where Congress has plainly "crossed the line distinguish-
ing encouragement from coercion," *New York, supra,* at
175, a federal program that coopts the States' political
processes must be declared unconstitutional. "[T]he fed-
eral balance is too essential a part of our constitutional
structure and plays too vital a role in securing freedom for
us to admit inability to intervene." *Lopez*, 514 U. S., at
578 (KENNEDY, J., concurring).

2

The Federal Government's argument in this case at best
pays lip service to the anticoercion principle. The Federal
Government suggests that it is sufficient if States are
"free, *as a matter of law*, to turn down" federal funds.
Brief for Respondents in No. 11–400, p. 17 (emphasis
added); see also *id.*, at 25. According to the Federal Gov-

ernment, neither the amount of the offered federal funds nor the amount of the federal taxes extracted from the taxpayers of a State to pay for the program in question is relevant in determining whether there is impermissible coercion. *Id.*, at 41–46.

This argument ignores reality. When a heavy federal tax is levied to support a federal program that offers large grants to the States, States may, as a practical matter, be unable to refuse to participate in the federal program and to substitute a state alternative. Even if a State believes that the federal program is ineffective and inefficient, withdrawal would likely force the State to impose a huge tax increase on its residents, and this new state tax would come on top of the federal taxes already paid by residents to support subsidies to participating States.[13]

Acceptance of the Federal Government's interpretation of the anticoercion rule would permit Congress to dictate policy in areas traditionally governed primarily at the state or local level. Suppose, for example, that Congress enacted legislation offering each State a grant equal to the State's entire annual expenditures for primary and secondary education. Suppose also that this funding came with conditions governing such things as school curriculum, the hiring and tenure of teachers, the drawing of school districts, the length and hours of the school day, the

---

[13] JUSTICE GINSBURG argues that "[a] State . . . has no claim on the money its residents pay in federal taxes." *Ante,* at 59, n. 26. This is true as a formal matter. "When the United States Government taxes United States citizens, it taxes them 'in their individual capacities' as 'the people of America'—not as residents of a particular State." *Ante,* at 58, n. 26 (quoting *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 839 (1995) (KENNEDY, J., concurring)). But unless JUSTICE GINSBURG thinks that there is no limit to the amount of money that can be squeezed out of taxpayers, heavy federal taxation diminishes the practical ability of States to collect their own taxes.

school calendar, a dress code for students, and rules for student discipline. *As a matter of law*, a State could turn down that offer, but if it did so, its residents would not only be required to pay the federal taxes needed to support this expensive new program, but they would also be forced to pay an equivalent amount in state taxes. And if the State gave in to the federal law, the State and its subdivisions would surrender their traditional authority in the field of education. Asked at oral argument whether such a law would be allowed under the spending power, the Solicitor General responded that it would. Tr. of Oral Arg. 44–45 (Mar. 28, 2012).

E

Whether federal spending legislation crosses the line from enticement to coercion is often difficult to determine, and courts should not conclude that legislation is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear. In this case, however, there can be no doubt. In structuring the ACA, Congress unambiguously signaled its belief that every State would have no real choice but to go along with the Medicaid Expansion. If the anticoercion rule does not apply in this case, then there is no such rule.

1

The dimensions of the Medicaid program lend strong support to the petitioner States' argument that refusing to accede to the conditions set out in the ACA is not a realistic option. Before the ACA's enactment, Medicaid funded medical care for pregnant women, families with dependents, children, the blind, the elderly, and the disabled. See 42 U. S. C. §1396a(a)(10) (2006 ed., Supp. IV). The ACA greatly expands the program's reach, making new funds available to States that agree to extend coverage to all individuals who are under age 65 and have incomes below

133% of the federal poverty line. See §1396a(a)(10)(A)(i)(VIII). Any State that refuses to expand its Medicaid programs in this way is threatened with a severe sanction: the loss of all its federal Medicaid funds. See §1396c (2006 ed.).

Medicaid has long been the largest federal program of grants to the States. See Brief for Respondents in No. 11–400, at 37. In 2010, the Federal Government directed more than $552 billion in federal funds to the States. See Nat. Assn. of State Budget Officers, 2010 State Expenditure Report: Examining Fiscal 2009–2011 State Spending, p. 7 (2011) (NASBO Report). Of this, more than $233 billion went to pre-expansion Medicaid. See *id.*, at 47.[14] *This amount equals nearly 22% of all state expenditures combined.* See *id.*, at 7.

The States devote a larger percentage of their budgets to Medicaid than to any other item. *Id.,* at 5. Federal funds account for anywhere from 50% to 83% of each State's total Medicaid expenditures, see §1396d(b) (2006 ed., Supp. IV); most States receive more than $1 billion in federal Medicaid funding; and a quarter receive more than

———————

[14] The Federal Government has a higher number for federal spending on Medicaid. According to the Office of Management and Budget, federal grants to the States for Medicaid amounted to nearly $273 billion in Fiscal Year 2010. See Office of Management and Budget, Historical Tables, Budget of the U. S. Government, Fiscal Year 2013, Table 12.3—Total Outlays for Grants to State and Local Governments by Function, Agency, and Program: 1940–2013, http://www.whitehouse.gov/omb/budget/Historicals. In that Fiscal Year, total federal outlays for grants to state and local governments amounted to over $608 billion, see Table 12.1, and state and local government expenditures from their own sources amounted to $1.6 trillion, see Table 15.2. Using these numbers, 44.8% of all federal outlays to both state and local governments was allocated to Medicaid, amounting to 16.8% of all state and local expenditures from their own sources.

$5 billion, NASBO Report 47. These federal dollars total nearly two thirds—64.6%—of all Medicaid expenditures nationwide.[15] *Id.,* at 46.

The Court of Appeals concluded that the States failed to establish coercion in this case in part because the "states have the power to tax and raise revenue, and therefore can create and fund programs of their own if they do not like Congress's terms." 648 F. 3d 1235, 1268 (CA11 2011); see Brief for Sen. Harry Reid et al. as *Amici Curiae* in No. 11–400, p. 21 ("States may always choose to decrease expenditures on other programs or to raise revenues"). But the sheer size of this federal spending program in relation to state expenditures means that a State would be very hard pressed to compensate for the loss of federal funds by cutting other spending or raising additional revenue. Arizona, for example, commits 12% of its state expenditures to Medicaid, and relies on the Federal Government to provide the rest: $5.6 billion, equaling roughly one-third of Arizona's annual state expenditures of $17 billion. See NASBO Report 7, 47. Therefore, if Arizona lost federal Medicaid funding, the State would have to commit an additional 33% of all its state expenditures to fund an equivalent state program along the lines of pre-expansion Medicaid. This means that the State would have to allocate 45% of its annual expenditures for that one purpose. See *ibid.*

The States are far less reliant on federal funding for any other program. After Medicaid, the next biggest federal

---

[15] The Federal Government reports a higher percentage. According to Medicaid.gov, in Fiscal Year 2010, the Federal Government made Medicaid payments in the amount of nearly $260 billion, representing 67.79% of total Medicaid payments of $383 billion. See www.medicaid.gov/Medicaid-CHIP-Program-Information/By-State/By-State.html.

funding item is aid to support elementary and secondary education, which amounts to 12.8% of total federal outlays to the States, see *id.*, at 7, 16, and equals only 6.6% of all state expenditures combined. See *ibid.* In Arizona, for example, although federal Medicaid expenditures are equal to 33% of all state expenditures, federal education funds amount to only 9.8% of all state expenditures. See *ibid.* And even in States with less than average federal Medicaid funding, that funding is at least twice the size of federal education funding as a percentage of state expenditures. *Id.*, at 7, 16, 47.

A State forced out of the Medicaid program would face burdens in addition to the loss of federal Medicaid funding. For example, a nonparticipating State might be found to be ineligible for other major federal funding sources, such as Temporary Assistance for Needy Families (TANF), which is premised on the expectation that States will participate in Medicaid. See 42 U. S. C. §602(a)(3) (2006 ed.) (requiring that certain beneficiaries of TANF funds be "eligible for medical assistance under the State['s Medicaid] plan"). And withdrawal or expulsion from the Medicaid program would not relieve a State's hospitals of their obligation under federal law to provide care for patients who are unable to pay for medical services. The Emergency Medical Treatment and Active Labor Act, §1395dd, requires hospitals that receive any federal funding to provide stabilization care for indigent patients but does not offer federal funding to assist facilities in carrying out its mandate. Many of these patients are now covered by Medicaid. If providers could not look to the Medicaid program to pay for this care, they would find it exceedingly difficult to comply with federal law unless they were given substantial state support. See, *e.g.*, Brief for Economists as *Amici Curiae* in No 11–400, p. 11.

For these reasons, the offer that the ACA makes to the States—go along with a dramatic expansion of Medicaid or

potentially lose all federal Medicaid funding—is quite unlike anything that we have seen in a prior spending-power case. In *South Dakota* v. *Dole*, the total amount that the States would have lost if every single State had refused to comply with the 21-year-old drinking age was approximately $614.7 million—or about 0.19% of all state expenditures combined. See Nat. Assn. of State Budget Officers, 1989 (Fiscal Years 1987–1989 Data) State Expenditure Report 10, 84 (1989), http://www.nasbo.org/publications-data/state-expenditure-report/archives. South Dakota stood to lose, at most, funding that amounted to less than 1% of its annual state expenditures. See *ibid.* Under the ACA, by contrast, the Federal Government has threatened to withhold 42.3% of all federal outlays to the states, or approximately $233 billion. See NASBO Report 7, 10, 47. South Dakota stands to lose federal funding equaling 28.9% of its annual state expenditures. See *id.*, at 7, 47. Withholding $614.7 million, equaling only 0.19% of all state expenditures combined, is aptly characterized as "relatively mild encouragement," but threatening to withhold $233 billion, equaling 21.86% of all state expenditures combined, is a different matter.

2

What the statistics suggest is confirmed by the goal and structure of the ACA. In crafting the ACA, Congress clearly expressed its informed view that no State could possibly refuse the offer that the ACA extends.

The stated goal of the ACA is near-universal health care coverage. To achieve this goal, the ACA mandates that every person obtain a minimum level of coverage. It attempts to reach this goal in several different ways. The guaranteed issue and community-rating provisions are designed to make qualifying insurance available and affordable for persons with medical conditions that may

require expensive care. Other ACA provisions seek to make such policies more affordable for people of modest means. Finally, for low-income individuals who are simply not able to obtain insurance, Congress expanded Medicaid, transforming it from a program covering only members of a limited list of vulnerable groups into a program that provides at least the requisite minimum level of coverage for the poor. See 42 U. S. C. §§1396a(a) (10)(A)(i)(VIII) (2006 ed., Supp. IV), 1396u–7(a), (b)(5), 18022(a). This design was intended to provide at least a specified minimum level of coverage for all Americans, but the achievement of that goal obviously depends on participation by every single State. If any State—not to mention all of the 26 States that brought this suit— chose to decline the federal offer, there would be a gaping hole in the ACA's coverage.

It is true that some persons who are eligible for Medicaid coverage under the ACA may be able to secure private insurance, either through their employers or by obtaining subsidized insurance through an exchange. See 26 U. S. C. §36B(a) (2006 ed., Supp. IV); Brief for Respondents in No. 11–400, at 12. But the new federal subsidies are not available to those whose income is below the federal poverty level, and the ACA provides no means, other than Medicaid, for these individuals to obtain coverage and comply with the Mandate. The Government counters that these people will not have to pay the penalty, see, *e.g.*, Tr. of Oral Arg. 68 (Mar. 28, 2012); Brief for Respondents in No. 11–400, at 49–50, but that argument misses the point: Without Medicaid, these individuals will not have coverage and the ACA's goal of near-universal coverage will be severely frustrated.

If Congress had thought that States might actually refuse to go along with the expansion of Medicaid, Congress would surely have devised a backup scheme so that the most vulnerable groups in our society, those previously

eligible for Medicaid, would not be left out in the cold.  But
nowhere in the over 900-page Act is such a scheme to be
found.  By contrast, because Congress thought that some
States might decline federal funding for the operation of
a "health benefit exchange," Congress provided a backup
scheme; if a State declines to participate in the operation
of an exchange, the Federal Government will step in
and operate an exchange in that State.  See 42 U. S. C.
§18041(c)(1).  Likewise, knowing that States would not
necessarily provide affordable health insurance for aliens
lawfully present in the United States—because Medicaid
does not require States to provide such coverage—Con-
gress extended the availability of the new federal insur-
ance subsidies to all aliens.  See 26 U. S. C. §36B(c)
(1)(B)(ii) (excepting from the income limit individuals
who are "not eligible for the medicaid program . . . by
reason of [their] alien status").  Congress did not make
these subsidies available for citizens with incomes below
the poverty level because Congress obviously assumed
that they would be covered by Medicaid.  If Congress had
contemplated that some of these citizens would be left
without Medicaid coverage as a result of a State's with-
drawal or expulsion from the program, Congress surely
would have made them eligible for the tax subsidies pro-
vided for low-income aliens.

These features of the ACA convey an unmistakable
message: Congress never dreamed that any State would
refuse to go along with the expansion of Medicaid.  Con-
gress well understood that refusal was not a practical
option.

The Federal Government does not dispute the inference
that Congress anticipated 100% state participation, but it
argues that this assumption was based on the fact that
ACA's offer was an "exceedingly generous" gift.  Brief for
Respondents in No. 11–400, at 50.  As the Federal Gov-
ernment sees things, Congress is like the generous bene-

factor who offers $1 million with few strings attached to 50 randomly selected individuals. Just as this benefactor might assume that all of these 50 individuals would snap up his offer, so Congress assumed that every State would gratefully accept the federal funds (and conditions) to go with the expansion of Medicaid.

This characterization of the ACA's offer raises obvious questions. If that offer is "exceedingly generous," as the Federal Government maintains, why have more than half the States brought this lawsuit, contending that the offer is coercive? And why did Congress find it necessary to threaten that any State refusing to accept this "exceedingly generous" gift would risk losing all Medicaid funds? Congress could have made just the *new* funding provided under the ACA contingent on acceptance of the terms of the Medicaid Expansion. Congress took such an approach in some earlier amendments to Medicaid, separating new coverage requirements and funding from the rest of the program so that only new funding was conditioned on new eligibility extensions. See, *e.g.*, Social Security Amendments of 1972, 86 Stat. 1465.

Congress' decision to do otherwise here reflects its understanding that the ACA offer is not an "exceedingly generous" gift that no State in its right mind would decline. Instead, acceptance of the offer will impose very substantial costs on participating States. It is true that the Federal Government will bear most of the initial costs associated with the Medicaid Expansion, first paying 100% of the costs of covering newly eligible individuals between 2014 and 2016. 42 U. S. C. §1396d(y). But that is just part of the picture. Participating States will be forced to shoulder substantial costs as well, because after 2019 the Federal Government will cover only 90% of the costs associated with the Expansion, see *ibid.*, with state spending projected to increase by at least $20 billion by 2020 as a consequence. Statement of Douglas W. Elmen-

dorf, CBO's Analysis of the Major Health Care Legislation
Enacted in March 2010, p. 24 (Mar. 30, 2011); see also R.
Bovbjerg, B. Ormond, & V. Chen, Kaiser Commission on
Medicaid and the Uninsured, State Budgets under Federal
Health Reform: The Extent and Causes of Variations in
Estimated Impacts 4, n. 27 (Feb. 2011) (estimating new
state spending at $43.2 billion through 2019). After 2019,
state spending is expected to increase at a faster rate; the
CBO estimates new state spending at $60 billion through
2021. Statement of Douglas W. Elmendorf, *supra,* at 24.
And these costs may increase in the future because of
the very real possibility that the Federal Government will
change funding terms and reduce the percentage of funds
it will cover. This would leave the States to bear an in-
creasingly large percentage of the bill. See Tr. of Oral
Arg. 74–76 (Mar. 28, 2012). Finally, after 2015, the States
will have to pick up the tab for 50% of all administrative
costs associated with implementing the new program, see
§§1396b(a)(2)–(5), (7) (2006 ed., Supp. IV), costs that could
approach $12 billion between fiscal years 2014 and 2020,
see Dept. of Health and Human Services, Center for Medi-
caid and Medicare Services, 2010 Actuarial Report on the
Financial Outlook for Medicaid 30.

In sum, it is perfectly clear from the goal and structure
of the ACA that the offer of the Medicaid Expansion was
one that Congress understood no State could refuse. The
Medicaid Expansion therefore exceeds Congress' spending
power and cannot be implemented.

F

Seven Members of the Court agree that the Medicaid
Expansion, as enacted by Congress, is unconstitutional.
See Part IV–A to IV–E, *supra*; Part IV–A, *ante,* at 45–55
(opinion of ROBERTS, C. J., joined by BREYER and KAGAN,
JJ.). Because the Medicaid Expansion is unconstitutional,
the question of remedy arises. The most natural remedy

would be to invalidate the Medicaid Expansion. However, the Government proposes—in two cursory sentences at the very end of its brief—preserving the Expansion. Under its proposal, States would receive the additional Medicaid funds if they expand eligibility, but States would keep their pre-existing Medicaid funds if they do not expand eligibility. We cannot accept the Government's suggestion.

The reality that States were given no real choice but to expand Medicaid was not an accident. Congress assumed States would have no choice, and the ACA depends on States' having no choice, because its Mandate requires low-income individuals to obtain insurance many of them can afford only through the Medicaid Expansion. Furthermore, a State's withdrawal might subject everyone in the State to much higher insurance premiums. That is because the Medicaid Expansion will no longer offset the cost to the insurance industry imposed by the ACA's insurance regulations and taxes, a point that is explained in more detail in the severability section below. To make the Medicaid Expansion optional despite the ACA's structure and design "'would be to make a new law, not to enforce an old one. This is no part of our duty.'" *Trade-Mark Cases*, 100 U. S. 82, 99 (1879).

Worse, the Government's proposed remedy introduces a new dynamic: States must choose between expanding Medicaid or paying huge tax sums to the federal fisc for the sole benefit of expanding Medicaid in other States. If this divisive dynamic between and among States can be introduced at all, it should be by conscious congressional choice, not by Court-invented interpretation. We do not doubt that States are capable of making decisions when put in a tight spot. We do doubt the authority of this Court to put them there.

The Government cites a severability clause codified with Medicaid in Chapter 7 of the United States Code stating

that if "any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby." 42 U. S. C. §1303 (2006 ed.). But that clause tells us only that other provisions in Chapter 7 should not be invalidated if §1396c, the authorization for the cut-off of all Medicaid funds, is unconstitutional. It does not tell us that §1396c can be judicially revised, to say what it does not say. Such a judicial power would not be called the doctrine of severability but perhaps the doctrine of amendatory invalidation—similar to the amendatory veto that permits the Governors of some States to reduce the amounts appropriated in legislation. The proof that such a power does not exist is the fact that it would not preserve other congressional dispositions, but would leave it up to the Court what the "validated" legislation will contain. The Court today opts for permitting the cut-off of only incremental Medicaid funding, but it might just as well have permitted, say, the cut-off of funds that represent no more than *x* percent of the State's budget. The Court severs nothing, but simply revises §1396c to read as the Court would desire.

We should not accept the Government's invitation to attempt to solve a constitutional problem by rewriting the Medicaid Expansion so as to allow States that reject it to retain their pre-existing Medicaid funds. Worse, the Government's remedy, now adopted by the Court, takes the ACA and this Nation in a new direction and charts a course for federalism that the Court, not the Congress, has chosen; but under the Constitution, that power and authority do not rest with this Court.

## V
## Severability

The Affordable Care Act seeks to achieve "near-

universal" health insurance coverage. §18091(2)(D) (2006 ed., Supp. IV). The two pillars of the Act are the Individual Mandate and the expansion of coverage under Medicaid. In our view, both these central provisions of the Act—the Individual Mandate and Medicaid Expansion—are invalid. It follows, as some of the parties urge, that all other provisions of the Act must fall as well. The following section explains the severability principles that require this conclusion. This analysis also shows how closely interrelated the Act is, and this is all the more reason why it is judicial usurpation to impose an entirely new mechanism for withdrawal of Medicaid funding, see Part IV–F, *supra*, which is one of many examples of how rewriting the Act alters its dynamics.

## A

When an unconstitutional provision is but a part of a more comprehensive statute, the question arises as to the validity of the remaining provisions. The Court's authority to declare a statute partially unconstitutional has been well established since *Marbury* v. *Madison*, 1 Cranch 137 (1803), when the Court severed an unconstitutional provision from the Judiciary Act of 1789. And while the Court has sometimes applied "at least a modest presumption in favor of . . . severability," C. Nelson, Statutory Interpretation 144 (2010), it has not always done so, see, *e.g., Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 190–195 (1999).

An automatic or too cursory severance of statutory provisions risks "rewrit[ing] a statute and giv[ing] it an effect altogether different from that sought by the measure viewed as a whole." *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 362 (1935). The Judiciary, if it orders uncritical severance, then assumes the legislative function; for it imposes on the Nation, by the Court's decree, its own new statutory regime, consisting of poli-

cies, risks, and duties that Congress did not enact. That
can be a more extreme exercise of the judicial power than
striking the whole statute and allowing Congress to ad-
dress the conditions that pertained when the statute was
considered at the outset.

The Court has applied a two-part guide as the frame-
work for severability analysis. The test has been deemed
"well established." *Alaska Airlines, Inc.* v. *Brock*, 480
U. S. 678, 684 (1987). First, if the Court holds a statutory
provision unconstitutional, it then determines whether
the now truncated statute will operate in the manner Con-
gress intended. If not, the remaining provisions must be
invalidated. See *id.,* at 685. In *Alaska Airlines*, the Court
clarified that this first inquiry requires more than ask-
ing whether "the balance of the legislation is incapable of
functioning independently." *Id.,* at 684. Even if the re-
maining provisions will operate in some coherent way,
that alone does not save the statute. The question is
whether the provisions will work as Congress intended.
The "relevant inquiry in evaluating severability is whether
the statute will function in a *manner* consistent with
the intent of Congress." *Id.,* at 685 (emphasis in original).
See also *Free Enterprise Fund* v. *Public Company Account-
ing Oversight Bd.*, 561 U. S. ___, ___ (2010) (slip op., at
28) (the Act "remains fully operative as a law with these
tenure restrictions excised") (internal quotation marks
omitted); *United States* v. *Booker*, 543 U. S. 220, 227
(2005) ("[T]wo provisions . . . must be invalidated in order
to allow the statute to operate in a manner consistent
with congressional intent"); *Mille Lacs*, *supra*, at 194 ("[E]m-
bodying as it did one coherent policy, [the entire order]
is inseverable").

Second, even if the remaining provisions can operate as
Congress designed them to operate, the Court must de-
termine if Congress would have enacted them standing
alone and without the unconstitutional portion. If Con-

gress would not, those provisions, too, must be invalidated. See *Alaska Airlines*, *supra,* at 685 ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted"); see also *Free Enterprise Fund*, *supra,* at \_\_\_ (slip op., at 29) ("[N]othing in the statute's text or historical context makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will"); *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 330 (2006) ("Would the legislature have preferred what is left of its statute to no statute at all"); *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 767 (1996) (plurality opinion) ("Would Congress still have passed §10(a) had it known that the remaining provisions were invalid" (internal quotation marks and brackets omitted)).

The two inquiries—whether the remaining provisions will operate as Congress designed them, and whether Congress would have enacted the remaining provisions standing alone—often are interrelated. In the ordinary course, if the remaining provisions cannot operate according to the congressional design (the first inquiry), it almost necessarily follows that Congress would not have enacted them (the second inquiry). This close interaction may explain why the Court has not always been precise in distinguishing between the two. There are, however, occasions in which the severability standard's first inquiry (statutory functionality) is not a proxy for the second inquiry (whether the Legislature intended the remaining provisions to stand alone).

## B

The Act was passed to enable affordable, "near-universal" health insurance coverage. 42 U. S. C. §18091(2)(D). The resulting, complex statute consists of mandates and

other requirements; comprehensive regulation and penalties; some undoubted taxes; and increases in some governmental expenditures, decreases in others. Under the severability test set out above, it must be determined if those provisions function in a coherent way and as Congress would have intended, even when the major provisions establishing the Individual Mandate and Medicaid Expansion are themselves invalid.

Congress did not intend to establish the goal of near-universal coverage without regard to fiscal consequences. See, *e.g.,* ACA §1563, 124 Stat. 270 ("[T]his Act will reduce the Federal deficit between 2010 and 2019"). And it did not intend to impose the inevitable costs on any one industry or group of individuals. The whole design of the Act is to balance the costs and benefits affecting each set of regulated parties. Thus, individuals are required to obtain health insurance. See 26 U. S. C. §5000A(a). Insurance companies are required to sell them insurance regardless of patients' pre-existing conditions and to comply with a host of other regulations. And the companies must pay new taxes. See §4980I (high-cost insurance plans); 42 U. S. C. §§300gg(a)(1), 300gg–4(b) (community rating); §§300gg–1, 300gg–3, 300gg–4(a) (guaranteed issue); §300gg–11 (elimination of coverage limits); §300gg–14(a) (dependent children up to age 26); ACA §§9010, 10905, 124 Stat. 865, 1017 (excise tax); Health Care and Education Reconciliation Act of 2010 (HCERA) §1401, 124 Stat. 1059 (excise tax). States are expected to expand Medicaid eligibility and to create regulated marketplaces called exchanges where individuals can purchase insurance. See 42 U. S. C. §§1396a(a)(10)(A)(i)(VIII) (2006 ed., Supp. IV) (Medicaid Expansion), 18031 (exchanges). Some persons who cannot afford insurance are provided it through the Medicaid Expansion, and others are aided in their purchase of insurance through federal subsidies available on health-insurance exchanges. See 26 U. S. C. §36B (2006

ed., Supp. IV), 42 U. S. C. §18071 (2006 ed., Supp. IV) (federal subsidies). The Federal Government's increased spending is offset by new taxes and cuts in other federal expenditures, including reductions in Medicare and in federal payments to hospitals. See, *e.g.,* §1395ww(r) (Medicare cuts); ACA Title IX, Subtitle A, 124 Stat. 847 ("Revenue Offset Provisions"). Employers with at least 50 employees must either provide employees with adequate health benefits or pay a financial exaction if an employee who qualifies for federal subsidies purchases insurance through an exchange. See 26 U. S. C. §4980H (2006 ed., Supp. IV).

In short, the Act attempts to achieve near-universal health insurance coverage by spreading its costs to individuals, insurers, governments, hospitals, and employers— while, at the same time, offsetting significant portions of those costs with new benefits to each group. For example, the Federal Government bears the burden of paying billions for the new entitlements mandated by the Medicaid Expansion and federal subsidies for insurance purchases on the exchanges; but it benefits from reductions in the reimbursements it pays to hospitals. Hospitals lose those reimbursements; but they benefit from the decrease in uncompensated care, for under the insurance regulations it is easier for individuals with pre-existing conditions to purchase coverage that increases payments to hospitals. Insurance companies bear new costs imposed by a collection of insurance regulations and taxes, including "guaranteed issue" and "community rating" requirements to give coverage regardless of the insured's pre-existing conditions; but the insurers benefit from the new, healthy purchasers who are forced by the Individual Mandate to buy the insurers' product and from the new low-income Medicaid recipients who will enroll in insurance companies' Medicaid-funded managed care programs. In summary, the Individual Mandate and Medicaid Expan-

sion offset insurance regulations and taxes, which offset reduced reimbursements to hospitals, which offset increases in federal spending. So, the Act's major provisions are interdependent.

The Act then refers to these interdependencies as "shared responsibility." See ACA Subtitle F, Title I, 124 Stat. 242 ("Shared Responsibility"); ACA §1501, *ibid.* (same); ACA §1513, *id.,* at 253 (same); ACA §4980H, *ibid.* (same). In at least six places, the Act describes the Individual Mandate as working "together with the other provisions of this Act." 42 U. S. C. §18091(2)(C) (2006 ed., Supp. IV) (working "together" to "add millions of new consumers to the health insurance market"); §18091(2)(E) (working "together" to "significantly reduce" the economic cost of the poorer health and shorter lifespan of the uninsured); §18091(2)(F) (working "together" to "lower health insurance premiums"); §18091(2)(G) (working "together" to "improve financial security for families"); §18091(2)(I) (working "together" to minimize "adverse selection and broaden the health insurance risk pool to include healthy individuals"); §18091(2)(J) (working "together" to "significantly reduce administrative costs and lower health insurance premiums"). The Act calls the Individual Mandate "an essential part" of federal regulation of health insurance and warns that "the absence of the requirement would undercut Federal regulation of the health insurance market." §18091(2)(H).

C

One preliminary point should be noted before applying severability principles to the Act. To be sure, an argument can be made that those portions of the Act that none of the parties has standing to challenge cannot be held nonseverable. The response to this argument is that our cases do not support it. See, *e.g., Williams* v. *Standard Oil Co. of La.*, 278 U. S. 235, 242–244 (1929) (holding nonsever-

able statutory provisions that did not burden the parties). It would be particularly destructive of sound government to apply such a rule with regard to a multifaceted piece of legislation like the ACA. It would take years, perhaps decades, for each of its provisions to be adjudicated separately—and for some of them (those simply expending federal funds) no one may have separate standing. The Federal Government, the States, and private parties ought to know at once whether the entire legislation fails.

The opinion now explains in Part V–C–1, *infra*, why the Act's major provisions are not severable from the Mandate and Medicaid Expansion. It proceeds from the insurance regulations and taxes (C–1–a), to the reductions in reimbursements to hospitals and other Medicare reductions (C–1–b), the exchanges and their federal subsidies (C–1–c), and the employer responsibility assessment (C–1–d). Part V–C–2, *infra*, explains why the Act's minor provisions also are not severable.

## 1
## The Act's Major Provisions

Major provisions of the Affordable Care Act—*i.e.*, the insurance regulations and taxes, the reductions in federal reimbursements to hospitals and other Medicare spending reductions, the exchanges and their federal subsidies, and the employer responsibility assessment—cannot remain once the Individual Mandate and Medicaid Expansion are invalid. That result follows from the undoubted inability of the other major provisions to operate as Congress intended without the Individual Mandate and Medicaid Expansion. Absent the invalid portions, the other major provisions could impose enormous risks of unexpected burdens on patients, the health-care community, and the federal budget. That consequence would be in absolute conflict with the ACA's design of "shared responsibility," and would pose a threat to the Nation that Congress did

not intend.

### a
### *Insurance Regulations and Taxes*

Without the Individual Mandate and Medicaid Expansion, the Affordable Care Act's insurance regulations and insurance taxes impose risks on insurance companies and their customers that this Court cannot measure. Those risks would undermine Congress' scheme of "shared responsibility." See 26 U. S. C. §4980I (2006 ed., Supp. IV) (high-cost insurance plans); 42 U. S. C. §§300gg(a)(1) (2006 ed., Supp. IV), 300gg–4(b) (community rating); §§300gg–1, 300gg–3, 300gg–4(a) (guaranteed issue); §300gg–11 (elimination of coverage limits); §300gg–14(a) (dependent children up to age 26); ACA §§9010, 10905, 124 Stat. 865, 1017 (excise tax); HCERA §1401, 124 Stat. 1059 (excise tax).

The Court has been informed by distinguished economists that the Act's Individual Mandate and Medicaid Expansion would each increase revenues to the insurance industry by about $350 billion over 10 years; that this combined figure of $700 billion is necessary to offset the approximately $700 billion in new costs to the insurance industry imposed by the Act's insurance regulations and taxes; and that the new $700-billion burden would otherwise dwarf the industry's current profit margin. See Brief for Economists as *Amici Curiae* in No. 11–393 etc. (Severability), pp. 9–16, 10a.

If that analysis is correct, the regulations and taxes will mean higher costs for insurance companies. Higher costs may mean higher premiums for consumers, despite the Act's goal of "lower[ing] health insurance premiums." 42 U. S. C. §18091(2)(F) (2006 ed., Supp. IV). Higher costs also could threaten the survival of health-insurance companies, despite the Act's goal of "effective health insurance markets." §18091(2)(J).

The actual cost of the regulations and taxes may be more or less than predicted. What is known, however, is that severing other provisions from the Individual Mandate and Medicaid Expansion necessarily would impose significant risks and real uncertainties on insurance companies, their customers, all other major actors in the system, and the government treasury. And what also is known is this: Unnecessary risks and avoidable uncertainties are hostile to economic progress and fiscal stability and thus to the safety and welfare of the Nation and the Nation's freedom. If those risks and uncertainties are to be imposed, it must not be by the Judiciary.

b

### *Reductions in Reimbursements to Hospitals and Other Reductions in Medicare Expenditures*

The Affordable Care Act reduces payments by the Federal Government to hospitals by more than $200 billion over 10 years. See 42 U. S. C. §1395ww(b)(3)(B)(xi)–(xii) (2006 ed., Supp. IV); §1395ww(q); §1395ww(r); §1396r–4(f)(7).

The concept is straightforward: Near-universal coverage will reduce uncompensated care, which will increase hospitals' revenues, which will offset the government's reductions in Medicare and Medicaid reimbursements to hospitals. Responsibility will be shared, as burdens and benefits balance each other. This is typical of the whole dynamic of the Act.

Invalidating the key mechanisms for expanding insurance coverage, such as community rating and the Medicaid Expansion, without invalidating the reductions in Medicare and Medicaid, distorts the ACA's design of "shared responsibility." Some hospitals may be forced to raise the cost of care in order to offset the reductions in reimbursements, which could raise the cost of insurance premiums, in contravention of the Act's goal of "lower[ing]

health insurance premiums." 42 U. S. C. §18091(2)(F) (2006 ed., Supp. IV). See also §18091(2)(I) (goal of "lower[ing] health insurance premiums"); §18091(2)(J) (same). Other hospitals, particularly safety-net hospitals that serve a large number of uninsured patients, may be forced to shut down. Cf. National Assn. of Public Hospitals, 2009 Annual Survey: Safety Net Hospitals and Health Systems Fulfill Mission in Uncertain Times 5–6 (Feb. 2011). Like the effect of preserving the insurance regulations and taxes, the precise degree of risk to hospitals is unknowable. It is not the proper role of the Court, by severing part of a statute and allowing the rest to stand, to impose unknowable risks that Congress could neither measure nor predict. And Congress could not have intended that result in any event.

There is a second, independent reason why the reductions in reimbursements to hospitals and the ACA's other Medicare cuts must be invalidated. The ACA's $455 billion in Medicare and Medicaid savings offset the $434-billion cost of the Medicaid Expansion. See CBO Estimate, Table 2 (Mar. 20, 2010). The reductions allowed Congress to find that the ACA "will reduce the Federal deficit between 2010 and 2019" and "will continue to reduce budget deficits after 2019." ACA §§1563(a)(1), (2), 124 Stat. 270.

That finding was critical to the ACA. The Act's "shared responsibility" concept extends to the federal budget. Congress chose to offset new federal expenditures with budget cuts and tax increases. That is why the United States has explained in the course of this litigation that "[w]hen Congress passed the ACA, it was careful to ensure that any increased spending, including on Medicaid, was offset by other revenue-raising and cost-saving provisions." Memorandum in Support of Government's Motion for Summary Judgment in No. 3–10–cv–91, p. 41.

If the Medicare and Medicaid reductions would no longer

be needed to offset the costs of the Medicaid Expansion, the reductions would no longer operate in the manner Congress intended. They would lose their justification and foundation. In addition, to preserve them would be "to eliminate a significant *quid pro quo* of the legislative compromise" and create a statute Congress did not enact. *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 561 (2001) (SCALIA, J., dissenting). It is no secret that cutting Medicare is unpopular; and it is most improbable Congress would have done so without at least the assurance that it would render the ACA deficit-neutral. See ACA §§1563(a)(1), (2), 124 Stat. 270.

c
### *Health Insurance Exchanges and Their Federal Subsidies*

The ACA requires each State to establish a health-insurance "exchange." Each exchange is a one-stop marketplace for individuals and small businesses to compare community-rated health insurance and purchase the policy of their choice. The exchanges cannot operate in the manner Congress intended if the Individual Mandate, Medicaid Expansion, and insurance regulations cannot remain in force.

The Act's design is to allocate billions of federal dollars to subsidize individuals' purchases on the exchanges. Individuals with incomes between 100 and 400 percent of the poverty level receive tax credits to offset the cost of insurance to the individual purchaser. 26 U. S. C. §36B (2006 ed., Supp. IV); 42 U. S. C. §18071 (2006 ed., Supp. IV). By 2019, 20 million of the 24 million people who will obtain insurance through an exchange are expected to receive an average federal subsidy of $6,460 per person. See CBO, Analysis of the Major Health Care Legislation Enacted in March 2010, pp. 18–19 (Mar. 30, 2011). Without the community-rating insurance regulation, however,

the average federal subsidy could be much higher; for community rating greatly lowers the enormous premiums unhealthy individuals would otherwise pay. Federal subsidies would make up much of the difference.

The result would be an unintended boon to insurance companies, an unintended harm to the federal fisc, and a corresponding breakdown of the "shared responsibility" between the industry and the federal budget that Congress intended. Thus, the federal subsidies must be invalidated.

In the absence of federal subsidies to purchasers, insurance companies will have little incentive to sell insurance on the exchanges. Under the ACA's scheme, few, if any, individuals would want to buy individual insurance policies outside of an exchange, because federal subsidies would be unavailable outside of an exchange. Difficulty in attracting individuals outside of the exchange would in turn motivate insurers to enter exchanges, despite the exchanges' onerous regulations. See 42 U. S. C. §18031. That system of incentives collapses if the federal subsidies are invalidated. Without the federal subsidies, individuals would lose the main incentive to purchase insurance inside the exchanges, and some insurers may be unwilling to offer insurance inside of exchanges. With fewer buyers and even fewer sellers, the exchanges would not operate as Congress intended and may not operate at all.

There is a second reason why, if community rating is invalidated by the Mandate and Medicaid Expansion's invalidity, exchanges cannot be implemented in a manner consistent with the Act's design. A key purpose of an exchange is to provide a marketplace of insurance options where prices are standardized regardless of the buyer's pre-existing conditions. See *ibid.* An individual who shops for insurance through an exchange will evaluate different insurance products. The products will offer different benefits and prices. Congress designed the ex-

changes so the shopper can compare benefits and prices. But the comparison cannot be made in the way Congress designed if the prices depend on the shopper's pre-existing health conditions. The prices would vary from person to person. So without community rating—which prohibits insurers from basing the price of insurance on pre-existing conditions—the exchanges cannot operate in the manner Congress intended.

#### d

### *Employer-Responsibility Assessment*

The employer responsibility assessment provides an incentive for employers with at least 50 employees to provide their employees with health insurance options that meet minimum criteria. See 26 U. S. C. §4980H (2006 ed., Supp. IV). Unlike the Individual Mandate, the employer-responsibility assessment does not require employers to provide an insurance option. Instead, it requires them to make a payment to the Federal Government if they do not offer insurance to employees and if insurance is bought on an exchange by an employee who qualifies for the exchange's federal subsidies. See *ibid*.

For two reasons, the employer-responsibility assessment must be invalidated. First, the ACA makes a direct link between the employer-responsibility assessment and the exchanges. The financial assessment against employers occurs only under certain conditions. One of them is the purchase of insurance by an employee on an exchange. With no exchanges, there are no purchases on the exchanges; and with no purchases on the exchanges, there is nothing to trigger the employer-responsibility assessment.

Second, after the invalidation of burdens on individuals (the Individual Mandate), insurers (the insurance regulations and taxes), States (the Medicaid Expansion), the Federal Government (the federal subsidies for exchanges and for the Medicaid Expansion), and hospitals (the reduc-

tions in reimbursements), the preservation of the employer-responsibility assessment would upset the ACA's design of "shared responsibility." It would leave employers as the only parties bearing any significant responsibility. That was not the congressional intent.

### 2
### The Act's Minor Provisions

The next question is whether the invalidation of the ACA's major provisions requires the Court to invalidate the ACA's other provisions. It does.

The ACA is over 900 pages long. Its regulations include requirements ranging from a break time and secluded place at work for nursing mothers, see 29 U. S. C. §207(r)(1) (2006 ed., Supp. IV), to displays of nutritional content at chain restaurants, see 21 U. S. C. §343(q)(5)(H). The Act raises billions of dollars in taxes and fees, including exactions imposed on high-income taxpayers, see ACA §§9015, 10906; HCERA §1402, medical devices, see 26 U. S. C. §4191 (2006 ed., Supp. IV), and tanning booths, see §5000B. It spends government money on, among other things, the study of how to spend less government money. 42 U. S. C. §1315a. And it includes a number of provisions that provide benefits to the State of a particular legislator. For example, §10323, 124 Stat. 954, extends Medicare coverage to individuals exposed to asbestos from a mine in Libby, Montana. Another provision, §2006, *id.,* at 284, increases Medicaid payments only in Louisiana.

Such provisions validate the Senate Majority Leader's statement, "'I don't know if there is a senator that doesn't have something in this bill that was important to them. . . . [And] if they don't have something in it important to them, then it doesn't speak well of them. That's what this legislation is all about: It's the art of compromise.'" Pear, In Health Bill for Everyone, Provisions for a Few, N. Y. Times, Jan. 4, 2010, p. A10 (quoting Sen. Reid). Often, a

minor provision will be the price paid for support of a major provision. So, if the major provision were unconstitutional, Congress would not have passed the minor one.

Without the ACA's major provisions, many of these minor provisions will not operate in the manner Congress intended. For example, the tax increases are "Revenue Offset Provisions" designed to help offset the cost to the Federal Government of programs like the Medicaid Expansion and the exchanges' federal subsidies. See Title IX, Subtitle A—Revenue Offset Provisions, 124 Stat. 847. With the Medicaid Expansion and the exchanges invalidated, the tax increases no longer operate to offset costs, and they no longer serve the purpose in the Act's scheme of "shared responsibility" that Congress intended.

Some provisions, such as requiring chain restaurants to display nutritional content, appear likely to operate as Congress intended, but they fail the second test for severability. There is no reason to believe that Congress would have enacted them independently. The Court has not previously had occasion to consider severability in the context of an omnibus enactment like the ACA, which includes not only many provisions that are ancillary to its central provisions but also many that are entirely unrelated—hitched on because it was a quick way to get them passed despite opposition, or because their proponents could exact their enactment as the *quid pro quo* for their needed support. When we are confronted with such a so-called "Christmas tree," a law to which many nongermane ornaments have been attached, we think the proper rule must be that when the tree no longer exists the ornaments are superfluous. We have no reliable basis for knowing which pieces of the Act would have passed on their own. It is certain that many of them would not have, and it is not a proper function of this Court to guess which. To sever the statute in that manner "'would be to make a new law, not to enforce an old one. This is not part of our duty.'"

*Trade-Mark Cases*, 100 U. S., at 99.

This Court must not impose risks unintended by Congress or produce legislation Congress may have lacked the support to enact. For those reasons, the unconstitutionality of both the Individual Mandate and the Medicaid Expansion requires the invalidation of the Affordable Care Act's other provisions.

\* \* \*

The Court today decides to save a statute Congress did not write. It rules that what the statute declares to be a requirement with a penalty is instead an option subject to a tax. And it changes the intentionally coercive sanction of a total cut-off of Medicaid funds to a supposedly noncoercive cut-off of only the incremental funds that the Act makes available.

The Court regards its strained statutory interpretation as judicial modesty. It is not. It amounts instead to a vast judicial overreaching. It creates a debilitated, inoperable version of health-care regulation that Congress did not enact and the public does not expect. It makes enactment of sensible health-care regulation more difficult, since Congress cannot start afresh but must take as its point of departure a jumble of now senseless provisions, provisions that certain interests favored under the Court's new design will struggle to retain. And it leaves the public and the States to expend vast sums of money on requirements that may or may not survive the necessary congressional revision.

The Court's disposition, invented and atextual as it is, does not even have the merit of avoiding constitutional difficulties. It creates them. The holding that the Individual Mandate is a tax raises a difficult constitutional question (what is a direct tax?) that the Court resolves with inadequate deliberation. And the judgment on the Medicaid Expansion issue ushers in new federalism con-

cerns and places an unaccustomed strain upon the Union. Those States that decline the Medicaid Expansion must subsidize, by the federal tax dollars taken from their citizens, vast grants to the States that accept the Medicaid Expansion. If that destabilizing political dynamic, so antagonistic to a harmonious Union, is to be introduced at all, it should be by Congress, not by the Judiciary.

The values that should have determined our course today are caution, minimalism, and the understanding that the Federal Government is one of limited powers. But the Court's ruling undermines those values at every turn. In the name of restraint, it overreaches. In the name of constitutional avoidance, it creates new constitutional questions. In the name of cooperative federalism, it undermines state sovereignty.

The Constitution, though it dates from the founding of the Republic, has powerful meaning and vital relevance to our own times. The constitutional protections that this case involves are protections of structure. Structural protections—notably, the restraints imposed by federalism and separation of powers—are less romantic and have less obvious a connection to personal freedom than the provisions of the Bill of Rights or the Civil War Amendments. Hence they tend to be undervalued or even forgotten by our citizens. It should be the responsibility of the Court to teach otherwise, to remind our people that the Framers considered structural protections of freedom the most important ones, for which reason they alone were embodied in the original Constitution and not left to later amendment. The fragmentation of power produced by the structure of our Government is central to liberty, and when we destroy it, we place liberty at peril. Today's decision should have vindicated, should have taught, this truth; instead, our judgment today has disregarded it.

For the reasons here stated, we would find the Act invalid in its entirety. We respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 11–393, 11–398 and 11–400

_____

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, ET AL., PETITIONERS
11–393                    *v.*
KATHLEEN SEBELIUS, SECRETARY OF HEALTH
AND HUMAN SERVICES, ET AL.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL., PETITIONERS
11–398                    *v.*
FLORIDA ET AL.

FLORIDA, ET AL., PETITIONERS
11–400                    *v.*
DEPARTMENT OF HEALTH AND
HUMAN SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 28, 2012]

JUSTICE THOMAS, dissenting.

I dissent for the reasons stated in our joint opinion, but I write separately to say a word about the Commerce Clause. The joint dissent and THE CHIEF JUSTICE correctly apply our precedents to conclude that the Individual Mandate is beyond the power granted to Congress under the Commerce Clause and the Necessary and Proper Clause. Under those precedents, Congress may regulate "economic activity [that] substantially affects interstate commerce." *United States* v. *Lopez,* 514 U. S. 549, 560 (1995). I adhere to my view that "the very notion of a

'substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases." *United States* v. *Morrison,* 529 U. S. 598, 627 (2000) (THOMAS, J., concurring); see also *Lopez, supra,* at 584–602 (THOMAS, J., concurring); *Gonzales* v. *Raich,* 545 U. S. 1, 67–69 (2005) (THOMAS, J., dissenting). As I have explained, the Court's continued use of that test "has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits." *Morrison, supra,* at 627. The Government's unprecedented claim in this suit that it may regulate not only economic activity but also *inactivity* that substantially affects interstate commerce is a case in point.